IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Indian River County, Indian River County      )
Emergency Services District, Old Vero Ice      )
Age Sites Committee, Inc.,                      )
                                                )
                  Plaintiffs,                   )
                                                )
            vs.                                 )
                                                )
Peter M. Rogoff, in his official capacity as the )   Civil Action No. 15-460
Under Secretary of Transportation for Policy    )
of the United States Department of              )
Transportation; and the United States          )
Department of Transportation,                   )
                                                )
                  Defendants.                   )
                                                )
                                                )
_____   )

## COMPLAINT

Plaintiffs Indian River County, Indian River County Emergency Services District and Old Vero Ice Age Sites Committee, Inc. (collectively, the "Plaintiffs"), for their Complaint for declaratory and injunctive relief against Peter M. Rogoff, in his official capacity as the Under Secretary of Transportation for Policy of the United States Department of Transportation (the "Under Secretary"), and the United States Department of Transportation ("DOT"), allege as follows:

### NATURE OF THE PROCEEDING

1.  This Complaint is brought under the Administrative Procedure Act (the "APA") to challenge as arbitrary, capricious, an abuse of discretion and unlawful the determination made by the Under Secretary on December 22, 2014 to approve the allocation of $1,750,000,000 in private activity bonds to finance the All Aboard Florida Project (the "Project"

or "All Aboard Florida") under section 142(m)(2)(C) of the Internal Revenue Code (the "Project Approval," annexed hereto as Exhibit A).  The Project Approval was final agency action subject to review by this Court under the APA, 5 U.S.C. §§ 701-706.

2.     The Project, if constructed and operated as proposed, would be a for-profit intercity passenger rail service between Orlando and Miami, sharing tracks with freight trains.

3.     According to the application for private activity bond financing for the Project (annexed hereto as Exhibit B), the estimated construction cost of the Project is approximately $1,700,000,000.  Exh. B at 10.

4.     The $1,750,000,000 of private activity bonds approved by the Under Secretary and DOT (collectively, the "Defendants") are the "linchpin" for financing the Project, and thus critical to its construction.  *See* Exh. B (cover letter, page 1).  Thus, the injuries to Plaintiffs resulting from the construction and operation of the Project are fairly traceable to the Project Approval, and the annulment of the Project Approval, as requested herein, would redress those injuries.

5.     Section 142(m)(2)(C) directs the Secretary of Transportation (who has delegated his decision-making authority thereunder to the Under Secretary, *see* 49 C.F.R. § 1.25(l)) to allocate the nation-wide cap of $15,000,000,000 in tax exempt private activity bonds among qualified projects "in such manner as the Secretary determines appropriate."  26 U.S.C. § 142(m)(2)(C).

6.     But nothing in Section 142(m) exempts the Secretary of Transportation, or his delegee, the Under Secretary, from compliance with the nation's environmental and historic preservation laws.  The Project Approval was plainly unlawful because as of the date of the Project Approval, neither the Defendants nor any other federal agency had completed the process

of evaluating the environmental and historic resource impacts of the Project, and considering reasonable alternatives to the Project and/or mitigation to avoid or minimize such impacts, as required by the National Environmental Policy Act ("NEPA"), Section 106 of the National Historic Preservation Act ("Section 106"), and Section 4(f) of the Department of Transportation Act ("Section 4(f)").

7.     The Project Approval occurred after publication of the Draft Environmental Impact Statement ("DEIS") for the Project on September 19, 2014, but as of the Project Approval date, no Final Environmental Impact Statement ("FEIS") or Record of Decision ("ROD") had been issued for the Project under NEPA.  Similarly, as of the Project Approval date, the required consultation had not occurred and the necessary findings had not been made under Section 106 or Section 4(f).

8.     Moreover, on information and belief, even as of the date of the filing of this Complaint, neither the Defendants nor any other federal agency has issued an FEIS or ROD for the Project under NEPA or undertaken the consultation and made the findings required for the Project under Section 106 or Section 4(f).

9.     Accordingly, the Project Approval should be declared not in accordance with law, arbitrary, capricious, and an abuse of discretion, and should be vacated and annulled as being in violation of NEPA, Section 106 and Section 4(f).  Defendants should be enjoined from issuing any approval for private activity bonds for the Project unless and until all of the requirements of these statutes are satisfied.

## JURISDICTION AND VENUE

10.     Although styled as a "provisional" approval, the Project Approval is a final determination to approve the allocation of $1,750,000,000 in private activity bonds to the Project under section 142(m)(2)(C) of the Internal Revenue Code, subject to compliance with certain specified provisions (conditions) set forth in the Project Approval letter.

11.     If these specified conditions are satisfied, the Project Approval does not require any further action by the Defendants or any other federal agency prior to the issuance of the bonds.

12.     On information and belief, the issuance of the bonds is imminent, to occur in April, May or June of 2015.

13.     There is no adequate remedy at law that would otherwise redress the injuries to the Plaintiffs that would result from the Project Approval.

14.     Accordingly, this action seeks to vacate and nullify the final action of an officer or agency of the United States and arises under the APA, which provides for judicial review of federal agency determinations such as those at issue here.  The APA requires a reviewing court to hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court is authorized to issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against both an officer of the United States who performs his official duties in this judicial district, and an agency of the United States located in this judicial district.  Additionally, venue is proper because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## THE PLAINTIFFS

17.     Indian River County (the "County") is a duly organized political subdivision in the State of Florida.  The County has approximately 142,000 permanent residents.  The Project's construction would disrupt normal business and individual activities in the County, by requiring substantial construction to build new railroad tracks and bridges.  Once in operation, the Project would cause at least 32 passenger trains, pulled by diesel locomotives, to pass through the County daily at speeds of over 100 miles per hour, resulting in traffic tie-ups near railroad crossings, safety concerns, noise, harm to County conservation areas, and damage to neighborhoods and historic resources in the County.

18.     The Indian River County Emergency Services District (the "Emergency Services District" or "District") is a dependent special district, formed by the County pursuant to the authority granted in § 125.01(5)(a), Florida Statutes, as documented in County Ordinance No. 90-25.  The governing body of the Emergency Services District is the Board of County Commissioners of Indian River County, sitting as the Board of Commissioners of the Emergency Services District.  The Emergency Services District has the power to sue and be sued.  The boundaries of the Emergency Services District extend through the entirety of the County, excluding the Town of Indian River Shores (which is on a barrier island east of the mainland).  The Emergency Services District provides fire, rescue, emergency medical services, and other emergency services to property and persons within the district boundaries noted above.  The

Project, as proposed, would cause at least 32 passenger trains, pulled by diesel locomotives, to pass through the Emergency Services District daily at speeds of over 100 miles per hour, interfering with the District's operations and burdening the District with responding to accidents and potentially catastrophic releases of hazardous chemicals.

19. The Old Vero Ice Age Sites Committee, Inc. (the "OVIASC") is a Florida non-profit corporation and a registered section 501(c)(3) organization formed to identify, conserve, and appropriately excavate the notable ice age sites in Indian River County, Florida. Its office address is 935 Seagrape Lane, Vero Beach, FL 32963. The OVIASC is currently excavating the "Vero Man" site located along the Main Relief Canal (Van Valkenburg Creek), Vero Beach, Indian River County. The Vero Man site is included as #8IR09 in the Florida Master Site File ("FMSF"), Florida's official inventory of historical and cultural resources and has been determined to be eligible for the National Register of Historic Places by the Florida State Historic Preservation Office. The OVIASC likewise has plans to excavate the "Gifford Bones" site, located at the North Relief Canal (Houston Creek), and recorded as FMSF #8IR07 and #8IR08. The Vero Man site and the Gifford Bones site each lie in or adjacent to the railroad right-of-way, and Project work is planned to occur at and adversely affect each of these sites, significantly hampering and even preventing the work of the OVIASC.

## THE DEFENDANTS

20. Peter M. Rogoff is DOT's Under Secretary of Transportation for Policy. He is being sued in his official capacity as Under Secretary. The Secretary of Transportation has delegated to the Under Secretary responsibility for approving private activity bonds under Section 142(m) of the Internal Revenue Code.

21. DOT is a Cabinet Department of the United States Government.

## PLAINTIFFS' STANDING TO BRING THIS ACTION

22.     By granting the Project Approval, the Defendants have provided substantial assistance to the Project, which will cause injury to Plaintiffs, as is acknowledged, though understated, in the DEIS, as discussed below.  This injury can only be redressed by granting the relief the Plaintiffs request herein.  As a result, Plaintiffs have standing to challenge the Project Approval.

### *Description of the Project*

23.     The Project would run in a 121 mile North-South corridor (the "North-South Corridor") through the heart of Indian River County and its Emergency Services District, adjoining populated areas, conservation areas and sites of historical and archeological significance.  The Project, as proposed, would degrade the quality of life in the County, harm the tourism that is vital to its economy and tax revenues, adversely affect socioeconomic conditions along the railroad tracks within the County, degrade the experience and ecological conditions at County-owned conservation areas, and result in many other environmental harms to the Plaintiffs discussed below.

24.     The construction of the Project will include the addition of a second track throughout the entire 21-mile length of the railroad right-of-way in Indian River County.  The construction will require the reconstruction, replacement or rehabilitation of four railroad bridges in the County.  After construction, the Project would operate with 30 at-grade road crossings in the County.

25.     The DEIS only hints at the massive scope of construction, noting that it will result in "impacts to freight rail transportation, regional highways and local vehicular traffic" and involve 1,695 construction-related jobs.  Construction of the Project is anticipated to result in temporary road closures.  The diesel-powered construction equipment will pollute the

air during the construction period, which is likely to take at least two years.  Construction activity will also have noise and vibration impacts on the surrounding land uses.

### *Traffic Conditions at and near Grade Crossings*

26.     The DEIS estimates that, in the year it is completed, the Project would entail 16 round trips per day, resulting in 32 crossings per day at each of the 30 at-grade road crossings in the County, in order to carry 1 million projected annual passengers.  The DEIS also estimates that within three years of operation, ridership is predicted to grow from 1 million annual passengers to at least 3.5 million annual passengers and as many as 5.1 million annual passengers.  Accordingly, the 32 daily passenger train trips planned for the first year of operation may increase substantially over time, to accommodate additional passengers.

27.     Each train will cause traffic delays at each at-grade crossing when the gate is closed on the road to allow the train to cross over the road.  These delays will be significant at many crossings.

28.     For example, at the railroad crossing at Oslo Road in Indian River County, an appendix to the DEIS includes a table indicating that in the first year of the Project's operation there would be a westbound queue of 1,299 feet every time a passenger train passes by during the evening peak hour.  Since there are only approximately 350 feet on Oslo Road between the crossing and US Route 1 (the north-south highway that runs from Maine to Key West), the majority of vehicles will be backed up in queues onto or beyond US Route 1.

29.     The same table appended to the DEIS indicates that by 2036, the eastbound queues predicted to form at the intersection of Oslo Road and US Route 1 each time a passenger train passes during the evening peak will extend more than 7,000 feet – well over a mile.  By 2036, eastbound delays at the Oslo Road and US Route 1 intersection in Indian River

County are projected to exceed 656 seconds (*i.e.*, almost 11 minutes) with every train crossing during the evening rush hour.  DEIS App. 3.3-C at 3-22.

30.     The morning peak hour traffic backups may be worse, given that school and commuter traffic both occupy the roadways at that time.

31.     These extraordinary queues and delays at the at-grade crossings in the County will not only degrade traffic flow on the streets that cross the tracks, but at numerous other roadways intersecting these streets in the vicinity of the crossings.

32.     The delays at the 30 at-grade crossings in the County will cause traffic backups, threaten traffic safety, impede the ability of police, fire and emergency medical vehicles to respond to emergencies, harm economic conditions in affected business districts, adversely affect the neighborhoods near the grade-crossings, degrade socioeconomic conditions in these areas by blighting the affected areas, and cause negative localized impacts to air quality as numerous vehicles idle for extended periods of time, all of which would adversely affect the County and its Emergency Services District.

33.     The adverse traffic conditions at grade crossings will directly interfere with the operations of the County.  Indian River County owns and insures numerous vehicles used for County purposes.  These include, for example, vehicles used by the County employees of the Indian River County Sherriff's Office, Environmental Planning and Code Enforcement Division, Traffic Engineering Division, and Parks Division.

34.     Although the Sheriff of Indian River County is a separate constitutional officer under Article III, Section 1(d) of the Florida Constitution, the Board of County Commissioners of Indian River County is responsible for approving the budget and appropriating County funds to the Indian River County Sheriff's Office ("Sheriff's Office") pursuant to

Section 30.49, Florida Statutes.  The Sheriff's Office has nearly 300 vehicles used for law enforcement, criminal investigation, and prisoner transport purposes.  To carry out these responsibilities, the vehicles operated by the Sheriff's Office must regularly cross the railroad tracks and their operation would be impeded by the frequent queues at these crossings.

35.     The increased traffic caused by the numerous daily train crossings will interfere with efficient law enforcement activity by the Sheriff's Office and may increase response times to calls for police assistance.  Further, Sheriff's Office vehicles will spend additional time idling in traffic, thereby increasing fuel costs borne by the County.

36.     The Indian River County Environmental Planning and Code Enforcement Division is charged with implementing the County's environmental policies and enforcing County codes and ordinances.  As part of its duties, the employees of the Code Enforcement division travel around the County, including crossing the railroad tracks, using County-owned vehicles to inspect and issue code violation citations and to perform site inspections.  The Traffic Engineering Division is responsible for traffic safety and operational efficiency of County roads. In carrying out these duties, Traffic Engineering Division employees drive County vehicles throughout Indian River County, including across the railroad tracks, to perform traffic counts and maintain and repair traffic signals, signs, and pavement markings.  The Parks Division likewise has County-wide responsibility to maintain existing parks, buildings, and equipment. To perform these responsibilities, Parks Department employees regularly travel around the County in County vehicles to the various parks, necessarily crossing the railroad tracks.  These are just three departments of many in Indian River County that use County-owned vehicles to traverse the County in the performance of their duties.

37.     The smooth and effective operation of Indian River County depends on the ability of its employees, like those of the Code Enforcement, Traffic Engineering, and Parks Department, to move safely and efficiently throughout Indian River County.  Lengthy traffic queues caused by Project construction and operation will inhibit Indian River County's ability to deliver necessary County services proficiently and economically.  Further, the County will experience increased fuel costs as its vehicles spend additional time idling in traffic created by the Project.

38.     The traffic queues and extraordinary delays caused by the 30 at-grade railroad crossings in Indian River County will also affect the operations of the Emergency Services District.  The District provides fire rescue response, medical/trauma emergency response, and hazardous materials response, among other tasks, within its service area, which, as noted above, encompasses almost all of Indian River County.

39.     The District has twelve fire/rescue stations from which its fire trucks and ambulances depart in response to emergency calls.  Eight of these stations are located west of the railroad tracks; four are located east of the railroad tracks.

40.     The District is the only first tier Advanced Life Support (ALS) service provider in its service area and, therefore, is the only provider who can respond to 911 calls for emergency medical services in Indian River County.  ALS vehicles, like those of the District, are staffed with paramedics to provide emergency medical care.

41.     It is critical for the District's ambulances to reach patients as rapidly as possible, and to transport them as quickly as possible to a hospital, where they can receive medical care from a physician.

42.     The only two hospitals in the District's service area are located to the east of the railroad tracks: Sebastian River Medical Center, located on US Route 1 in Sebastian and Indian River Medical Center on 36th Street in Vero Beach.  These two hospitals are the only locations to which the District may transport patients in distress in Indian River County.  (If the emergency situation rises to the need for a certified trauma center, the District would transport a patient to the Holmes Regional Medical center in Melbourne, Florida, or Lawnwood Medical Center in Ft. Pierce, Florida.)

43.     The majority of Indian River County's population resides to the west of the railroad tracks, and the majority of the emergency medical assistance calls received by the District are from locations to the west of the railroad tracks.  Service to these locations requires the District's ambulances to cross the railroad tracks to transport patients to the two hospitals east of the tracks.

44.     The Project, during both the construction and operation phases, will increase traffic congestion and delays at grade crossings throughout the District service area and will prevent all traffic flow when the crossings are closed to permit the train to pass by.  As a result of the Project, it can be expected that the District would experience increased response times for emergency service calls and increased delivery times transporting patients to a hospital.  Thus, the Project's adverse impacts on the traffic environment will harm the District's ability to deliver emergency care to County residents, workers and visitors.

### *Increased Risks of Catastrophic Accidents*

45.     NEPA encompasses risks to "public health or safety," including catastrophic risks whose "probability of occurrence is low."  40 C.F.R. §§ 1508.27, 1502.22(b)(4).  The County and its Emergency Services District are concerned that once the

Project is operational, passenger and freight trains will share the same railway corridor, resulting in potentially catastrophic risks.

46.     The private sponsor of the Project has acknowledged, in a Preliminary Offering Memorandum dated June 4, 2014 (the "Offering Memorandum"), that co-locating passenger and freight trains on the same tracks may result in "casualty and property risks as a result of shared use of the corridor with freight railroad operations."  Offering Memorandum at 25.  This increased risk is of particular concern, because in the same document, the private sponsor states that "[t]he operation of any railroad carries with it an inherent risk of catastrophe, mechanical failure, collision and property loss" and that "[c]ollisions, derailments, leaks, explosions, environmental mishaps, or other accidents can cause serious bodily injury, death and extensive property damage, particularly when such accidents occur in heavily populated areas." *Id.* at 24.

47.     The use of shared railroad tracks between passenger and freight trains also poses the potential for collisions between passenger and freight trains to result in catastrophic releases of hazardous and toxic chemicals.

48.     The Florida East Coast Railway ("FEC"), which operates a freight line and owns the railroad tracks that would be utilized by the Project for passenger trains, services numerous customers who handle hazardous materials.[1]  The FEC has published a general tariff that sets forth its procedures for shipping "Poison Inhalation Hazardous" and "Toxic Inhalation Hazardous" chemicals.[2]  Dozens of such chemicals are listed on the FEC tariff, including anhydrous ammonia, sulfuric acid and chlorine gas.  The DEIS confirms that freight traffic

---

[1] *See* FEC web site (https://www.fecrwy.com/customers/what-can-i-ship, visited on March 27, 2015).

[2] *See* FEC web site (http://www.fecrwy.com/sites/default/files/fec_1000_section_5_tih_pih.pdf, visited on March 27, 2015).

travelling on the rail lines in this corridor transport hazardous materials, including ammonium nitrate, bleach, sulfur dioxide, liquid propane gas, and explosives.  DEIS at 5-6 (Table 5.2.4-1).

49.     The Project will increase the potentially catastrophic risks of shipping these chemicals through Indian River County.

50.     An accident causing the release of a tanker car of such chemicals could cause a toxic plume posing a severe safety hazard in an area more than a mile from the accident site, threatening public safety.  The testimony of Robert L. Sumwalt, Vice Chairman of the National Transportation Safety Board, before the U.S. House of Representatives Committee on Transportation and Infrastructure, Subcommittee on Railroads, Pipelines and Hazardous Materials, on January 30, 2007, illustrates these risks.  In his testimony, Mr. Sumwalt discussed a catastrophic railroad accident that occurred in South Carolina on January 6, 2005, resulting in a chlorine vapor plume that killed nine people through chlorine gas inhalation.  Approximately 554 people were taken to local hospitals as a result of respiratory difficulties, of which 75 were admitted for treatment.  An estimated 5,400 residents within a 1-mile radius of the accident site were evacuated for several days.[3]

51.     Such an accident could cause serious harm to the County and its Emergency Services District by burdening them with the requirement to provide emergency response services to hundreds of residents, directly harming their employees and causing devastating harm to a local community, requiring the County to provide medical, social and other services.

---

[3] *See* http://app.ntsb.gov/news/speeches/sumwalt/rls070130.html (visited March 27, 2015).

*Harm to County Conservation Areas*

52.     Indian River County owns and manages three dedicated nature conservation areas that abut the existing railroad right-of-way that would be utilized by the Project.  They are: (i) the North Sebastian Conservation Area, an approximately 407-acre conservation area located in the northern part of the County and directly adjacent to the railroad right-of-way for about 0.85 miles, (ii) the Hallstrom Farmstead Conservation Area, a 93-acre property located in southern Indian River County, including a wetlands area, that is adjacent to the railroad right-of-way for about 0.45 miles, and (iii) the Harmony Oaks Conservation Area, a 90.7 acre conservation area also located in the southern portion of the County and which abuts the railroad right-of-way for about 0.045 miles.  The North Sebastian, Hallstrom Farmstead and Harmony Oaks Conservation Areas are all open to the public for recreational purposes including, but not limited to, hiking and bird watching.

53.     These conservation areas were all purchased, in part, with Florida Communities Trust Funds and environmental bond funds.  The Florida Communities Trust was established by Florida statute to conserve "natural areas" in the state, which are linked to "quality of life, environmental quality, as well as the viability and vitality of urban areas."  Fla. Stat. § 380.502(1).  To obtain funding from the Florida Communities Trust, the County was required to demonstrate that it would "restore areas" to be used for open space or to "enhance natural resources" that may have "suffered loss of natural and scenic values."  *Id.* at § 380.508(4).

54.     The "primary purpose" of the County's acquisition and maintenance of the North Sebastian Conservation Area was (and is) to "preserve and restore scrub and wetland habitats for the benefit of rare and endangered species."  *See* North Sebastian Conservation Area Annual Stewardship Report, July 11, 2005.

55.     In particular, the North Sebastian Conservation Area is a key property for the preservation and protection of the Florida scrub-jay, a federally listed threatened avian species, as part of the Sebastian Area-Wide Florida Scrub-Jay Habitat Conservation Plan (the "Scrub-Jay Conservation Plan" or "HCP"), finalized March 2000.  The Scrub-Jay Conservation Plan is a local government effort initiated and funded by Indian River County and the City of Sebastian, which serve as the lead agencies for its implementation.  HCP at 1.  The purpose of the Scrub-Jay Conservation Plan is to protect the broad range of native species characteristic of the Atlantic Coastal Ridge scrub ecosystem and to enhance the recovery potential of the local scrub jay population.  *Id.* at 1, 4.

56.     The goals of the Scrub-Jay Conservation Plan include reducing "extinction risk" and increasing "population persistence" for the local scrub-jay population, which is the fourth largest scrub-jay metapopulation in Florida.  HCP at 75.  Further, the Scrub-Jay Conservation Plan is designed to protect "biological integrity and species diversity" of the scrub ecosystem by returning the designated areas, including the North Sebastian Conservation Area, "to conditions representative of the historical landscape and thereby optimal for native species of conservation concern . . . ."  *Id.*

57.     The Project would harm protected wildlife species and their habitat, including "effects from construction, grading, vegetation management, and mortality associated with potential collisions with rail traffic" and "degradation of ecological function and loss of habitat."  DEIS at 5-111.  Indirect effects caused by the Project "may include habitat fragmentation and associated edge effects, the loss of genetic diversity of rare plant and animal populations, increased competition for resources, and physical or psychological restrictions on

movements." *Id.* at 5-118.  In addition, "[n]oise and vibration associated with the active rail line may cause indirect effects if wildlife avoid habitat near the embankment." *Id.*

58.     Observations made during a survey included as part of the DEIS noted the presence of scrub-jay in the North Sebastian Conservation Area along the railroad tracks.  DEIS Appendix 4.3.6-A, June 4, 2013 Scrub-Jay Survey at 4 and Figure 1a.  Further, scrub-jays observed as part of this survey disappeared into the scrub when a train approached.  *Id.* at 6.

59.     As documented in the DEIS, the scrub-jay has experienced higher mortality and lower reproductive success in roadside territories.  DEIS at 5-119.  Accordingly, the construction of the Project, with its associated vehicular and construction traffic, as well as the pass-by of an additional 32 trains each day abutting the North Sebastian Conservation Area and other scrub-jay habitat is expected to harm the local scrub-jay population in direct conflict with the County's management goals for the North Sebastian Conservation Area.

60.     In addition to serving as a natural habitat area for the scrub-jay and other species, the North Sebastian Conservation Area includes walking and hiking trails, picnic pavilions, an equestrian corral, and shoreline fishing areas.  These areas are used by County residents, as well as by the many tourists who visit Indian River County, to enjoy and experience its natural beauty, including bird watching.

61.     Several of these trails lie in the portion of the North Sebastian Conservation Area that is near and adjacent to the railroad right-of-way, including "Reindeer Ridge," "Roseland Trail" and "Osprey Hideaway."

62.     These trails, as well as the other trails and recreational facilities at the North Sebastian Conservation Area, are intended to permit visitors to observe scrub-jay and other native Florida plant and animal species in a quiet, natural setting.

63.     Use of these trails, as well as the other natural areas adjacent to the railroad tracks, will be negatively affected by the noise, vibration, air emissions, and traffic generated by the Project's construction and operation.  Further, to the extent animal species move away from the railroad tracks as a result of the train traffic, the trails in the area closest to the tracks will no longer offer the ability to observe these species.

64.     In addition, the North Sebastian Conservation Area lies to the west of the tracks.  Many of the hotels and other tourist rentals in Indian River County are to the east of the tracks, closer to the coast.  Access to the North Sebastian Conservation Area thus necessitates crossing the tracks, typically by car, at the at-grade crossings that will be substantially impaired by increased rail operations caused by the Project.

65.     Thus, the Project's environmental impacts will harm the County by frustrating its management objectives for its North Sebastian Conservation Area.

66.     The Project's environmental impacts would also result in similar harms to the County at the Hallstrom Farmstead Conservation Area, which includes sand pine scrub, maritime hammock, scrubby flatwoods and bottomland forest, and is home to the scrub-jay and the federally listed endangered plant species Lakela's Mint.  The Hallstrom Farmstead Conservation Area surrounds the historic Hallstrom Farmstead home, which is owned and maintained by the Indian River County Historical Society, an entity that provides, in coordination with the County, historic and environmental education tours of the Hallstrom Farmstead Conservation Area.  The Project would also degrade the experience at the Harmony Oaks Conservation Area, which the County manages to protect natural communities, including wetlands, and which includes a canoe and fishing dock, pedestrian and bike trails and a parking area.

*Harm to Historic Resources*

67.      The North-South Corridor is rich with historical and archeological resources that abut or are in close proximity to the Project.  The Project would have adverse effects on numerous historic resources in Indian River County, including without limitation the St. Sebastian River Railroad Bridge; the Vero Man site; the Gifford Bones site; and the Old Town Sebastian Historic District East and Old Town Sebastian Historic District West.

68.      The St. Sebastian River Railroad Bridge, constructed in 1926, spans the St. Sebastian River, which in this area forms the northern border of Indian River County.   The southern half of this bridge is located in Indian River County.  The Project would demolish this historic bridge, which is visible from the County's Roseland Community Center and Park, a County-owned park on the St. Sebastian River approximately 530' south of the historic bridge. The park contains a pier that allows visitors to take in the magnificent view of the St. Sebastian River and this historic railroad bridge.  The Project's demolition of this visual resource will adversely affect the viewshed from the County's park, thereby harming the County.

69.      The Vero Man site is located along the Main Relief Canal (Van Valkenburg Creek), where Project-related work would be performed to upgrade an existing railroad bridge, and to construct a second track.  Archaeologists from Mercyhurst University in Erie, Pennsylvania have been excavating at this site in connection with the OVIASC over the past two years.  Significant human, animal, and plant remains uncovered at this site provide evidence of the earliest humans in Florida (dated to ca. 14,000 and 13,000 years ago) as well as the environment within which these earliest humans operated.  Although the traditional thinking was that the first humans arrived in North America over the Bering Strait Land Bridge about 12,000-13,000 years ago, it has been inferred from material from the Vero Man site and other

locations that this is not the case, and that instead humans first entered the New World perhaps as early as 20,000+ years ago following multiple routes of entry from Northeast Asia.  The archaeological activities, research, and continued excavations at the Vero Man site are expected to uncover additional data that will help to identify more precisely when those early humans arrived, how they lived, and how they died.  Based on these findings, the Vero Man site has been determined to be eligible for the National Register by the Florida State Historic Preservation Office.

70.     The Vero Man site excavation conducted under the OVIASC is currently in its second season, and it is anticipated that perhaps another fifteen to twenty years of work remains.  The Vero Man site excavation season runs from January-May each year, for six days each week and for up to ten hours each day.  Excavation cannot be conducted during the hurricane season because the effects of a hurricane on an excavation site would result in extensive and irreversible harm to the site and related artifacts and remains.

71.     The Vero Man site lies in or adjacent to the railroad right of way, and Project work is planned to occur at and adversely affect this site.  Project work is planned to occur at and adversely affect the Vero Man site.  *See* Appendix 5.3.1-A to the DEIS.  Important archeological finds at this site may be forever lost due to Project construction, since activities such as pile driving, movement of large construction vehicles, and earth moving or removal may remove or damage artifacts at the Vero Man site.  Due to the great importance of the Vero Man site, excavation there is conducted using state-of-the-art data recovery and documentation protocols, including recording of the exact position of all encountered materials.  Such precision is necessary to establish not only the chronological context of recovered materials, but also their relationships or associations.  If construction activity directly disturbs the extant stratigraphy

(i.e., geological layering) of the site and/or damages artifacts or plant and animal materials, the ability to reconstruct the history of human activities at the Vero Man site will be significantly impaired, and the site will not be conserved or properly excavated, hampering OVIASC's operations and frustrating the achievement of its objectives.

72.     Further, once the second track is installed near the Vero Man site, no longer can any excavation work be conducted close to or under that track.  Consequently, if excavation cannot be performed in those additional areas, the artifacts there will remain undiscovered and potentially unrecoverable, hampering OVIASC's operations and frustrating the achievement of its objectives.

73.     Vibration associated with the construction and operation of the Project is also a concern for the OVIASC.  The focus of excavation at the Vero Man site is eight to twelve feet below the modern ground surface.  As a result, the walls of the excavation are deep and easily disturbed by vibration.  Additionally, the sediments at the site are dominated by sand which is far more easily disturbed by vibration than are many other forms of sediment. Accordingly, vibration will have a negative effect on the sediments and, therefore, the archaeology at the Vero Man site.  This harms the OVIASC since harm to the archeology at the site directly contravenes the OVIASC's core functions and objectives.

74.     The Gifford Bones site is located at the North Relief Canal/Houston Creek, and is a site where ground sloth, camel, mastodon, a stemmed flint projectile, and fossilized bones have been found.  There is a significant risk that this site would be disturbed or destroyed by the Project's upgrade of the railroad bridge over the North Relief Canal, thereby directly affecting OVIASC's ability to excavate the archeological resources at this site.

75.     The harms to these archeological resources would also harm the County, as the Vero Man site is a tourist attraction in the County, and the County's tax revenues are heavily dependent on the County's attractiveness as a tourist destination.  The public is encouraged to visit the Vero Man site, where the OVIASC offers free tours of the excavation site to the public five days a week during the excavation season.

76.     The Old Town Sebastian Historic District East and Old Town Sebastian Historic District West are comprised of nearly 30 contributing sites or buildings.  The two districts are listed on the National Register of Historic Places and would be bisected by the Project.  When a train traveling over 100 miles per hour blasts through this area 32 or more times per day, the resultant vibration affects surrounding receptors, including people and structures.  DEIS at 4-42-44; 5-51.  The DEIS acknowledges that "noise, vibration, and visual impacts may also affect historical resources."  DEIS 4-122.

77.     Other historic cultural attractions in Indian River County include the Vero Beach Train Station located in Vero Beach, immediately adjacent to the train tracks (within 57 feet), and the historic Hallstrom Farmstead, located on Old Dixie Highway, which runs parallel to the train tracks.  The Vero Beach Train Station was constructed in 1903 and is listed on the National Register of Historic Places.  It has been preserved for use as an office and education center for visitors to learn about the history and cultural heritage of Florida.  The Hallstrom Farmstead is a historic pineapple plantation, originally established in 1909, listed on the National Register of Historic Places.  The home is open to the public during the week, where a collection of artifacts, photographs, paper documents, furniture, and memorabilia are displayed.

78.     The noise, vibrations and other Project-related harms to these historic resources will reduce their attractiveness as tourist destinations, causing fiscal and other harms to the County.

### *Harm to Socioeconomic Conditions*

79.      The DEIS indicates that the Project, while in operation, will have "severe, unmitigated impacts" to noise at 159 grade crossings if "locomotive-mounted horns" are used. DEIS at 5-29.  Although the DEIS states that the project sponsor may install wayside horns at these grade crossings to be used in lieu of locomotive-mounted horns, which would purportedly "substantially reduce the noise footprint," it nonetheless remains that horns will be sounded at each at-grade crossing, generating noise, an additional 32 times a day as a result of the Project in the first year of operation, with more frequent train traffic as passenger ridership increases over time.

80.     In addition to the noise created by horns, whether locomotive-mounted or wayside, the trains themselves, traveling at speeds in excess of 100 miles per hour and pulled by diesel locomotives, generate intrusive noise levels.

81.     The net result of the Project's construction-associated and operation-associated noise, vibration, air pollution, and increased train and vehicular congestion at railroad crossings will cause adverse socioeconomic impacts to the surrounding communities.  Property values in the immediate area adjacent to the railroad tracks are expected to decline due to the adverse effects of the Project, and the tourism industry essential to Indian River County will be harmed by the effects of traffic, noise, and harms to historic and archeological resources. Moreover, residential, businesses and County-owned properties adjacent to the Project will be adversely affected by air pollution related to both construction and train activity.  At the same time, the purported benefits of the Project will not accrue to the County, which is not slated for

23

any train stops.  All of these effects have the potential to result in blighted socioeconomic conditions along the spine of Indian River County, in the area adjoining the railroad tracks.  Such environmental harms would create adverse socioeconomic conditions in the County and cause it fiscal and other harms through the loss of sales and property tax revenues, a decline in tourism and other economic activity in the County, and increased demands for County-provided social services.

82.     Indian River County has a 1% county sales tax, over and above the Florida state sales tax of 6%, used to fund infrastructure in the County.  This sales tax helps to take advantage of tourism spending and provides a significant source of revenue for the County.

83.     The County also has a Tourist Development Tax of 4%, pursuant to Section 125.0104, Florida Statutes.  This tax is applied to the rental or lease of any living quarters or accommodations in a hotel, motel, rooming house, trailer camp, condominium, apartment, multi-unit structure, mobile home, trailer, single-family home or any other sleeping accommodations that are rented for six months or less.  This tax is applied over and above the total 7% sales tax in Indian River County (6% state sales tax and 1% County sales tax).  The proceeds from this tax (less administration costs) are returned by the State to the County for the County's use for statutorily-outlined purposes, including to fund beach park facilities and beach improvement, maintenance, restoration, and erosion control.

84.     Given the breadth of accommodation types to which the Tourist Development Tax applies and the length of time tourists typically stay in the County, the Tourist Development Tax applies to most tourists who choose to rent or lease overnight accommodations in Indian River County.

85.     Access to and enjoyment of the abundant natural, historic, and cultural resources in the County will be harmed by the construction and operation of the Project.  As traffic, noise, vibration, and local air quality are affected by the Project, tourists may choose to visit other coastal communities that do not have such issues.  As a result, Indian River County may experience a decline in revenue received from its County sales tax and its Tourist Development Tax, which will harm the County's ability to maintain its operations and its numerous facilities and parks.

86.     Indian River County collects real property tax from County property owners, based upon the assessed value of that real property – both the land and improvements. Real property tax is due to the County on an annual basis.  The Project would reduce the County's overall property tax revenue because it will adversely affect the value of real property located adjacent to the railroad tracks.

87.     As noted above, the Project, both in the construction and operation phases, will result in increased noise, vibration, and traffic for the surrounding areas, and may have a negative impact on local air quality.  As a result, adjacent real property may become less desirable, and may decline in value.  Further, as the real property becomes less desirable, it is less likely to be developed or redeveloped with improvements to structures.  A decline in property value and a reduction in improvements to track-adjacent real property, in turn, will result in less property tax income to Indian River County.

* * * *

88.     In addition to their substantial interest in preventing direct injury to each of them, Plaintiffs have a substantial interest in ensuring that Defendants' decision-making is in conformity with the requirements of law, and in having those requirements properly executed and Defendants' public duties enforced.

89.     Defendants' failure to comply with federal law will result in irreparable harm to the environment, protected historic resources, each of the Plaintiffs and the residents and businesses who live and operate near the Project, and would deprive Plaintiffs of their legally cognizable interests under NEPA, Section 106 and Section 4(f).

90.     The harms to the Plaintiffs result from the Project's impacts on the human environment, including historic resources.  Accordingly, the Plaintiffs' interests in this action fall within the zone of interests protected by the laws sought to be enforced in this action.

## THE CLAIMS FOR RELIEF – FACTUAL BACKGROUND

91.      As the "lead agency" for the purposes of coordinating the environmental review of the Project, the Federal Railroad Administration (the "FRA"), on April 15, 2013, published a notice of its intent to prepare an Environmental Impact Statement ("EIS") for the Project under NEPA (the "Notice of Intent").  *See* 78 Fed. Reg. 22,363-64.

92.     The Notice of Intent stated that the EIS would evaluate, among other things, the "potential environmental and related impacts" of the Project and a "No Action Alternative" to the Project.  78 Fed. Reg. at 22,363.

93.     The Notice of Intent stated that the "purpose of the EIS will be to provide the FRA, reviewing and cooperating agencies, and the public with information to assess alternatives that will meet the Project's purpose and need; to evaluate the potential environmental impacts; and to identify potential avoidance/mitigation measures, associated with the proposed Project alternatives."  *Id.*

94.     The Notice of Intent further indicated that in addition to being prepared under NEPA, the EIS will address the requirements of other applicable statutes, regulations and executive orders, including Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act.  78 Fed. Reg. at 22,363; *see also* 78 Fed. Reg. at 22,364 (further discussion of Section 106).

95.     As noted above, on September 19, 2014, the FRA published the DEIS for the Project.

96.     On September 26, 2014, a notice was published that the DEIS had been released, and that the public comment period on the DEIS would end on December 3, 2014.  79 Fed. Reg. 57,929, 57,930 (Sept. 26, 2014).

97.     Numerous persons, including Indian River County, submitted extensive comments on the DEIS during the public comment period.

98.     The next step in the NEPA process – after publication of the DEIS and the public comment period noted above – is the publication of an FEIS (or a Supplemental DEIS, to be followed by an FEIS).  *See* 40 C.F.R. § 1502.9.

99.     No FEIS has been prepared for the Project.  Accordingly, this complaint does not challenge or seek to call into question the DEIS or FEIS, because they do not yet constitute final agency action ripe for challenge.

100.     After publication of the FEIS, each federal agency that has discretionary decision-making with respect to the Project must prepare a Record of Decision (the "ROD") *before* taking any action to approve, assist, permit or otherwise facilitate the Project.  *See* 40 C.F.R. §§ 1500.1(b), 1505.2, 1506.1.

101.     No ROD has been prepared for the Project.

102.     As outlined in the Notice of Intent, it is anticipated that the FEIS and/or the ROD will address the findings required by Section 106 and Section 4(f).

103.     On or before December 1, 2014, Indian River County submitted a written request that it be invited to join the consultation process required by Section 106.

104.     Yet neither the Defendants nor any other federal agency has consulted with Indian River County under Section 106, or invited Indian River County to join the consultation process that Section 106 requires.

105.     No findings under Section 106 or Section 4(f) have been issued for the Project.

106.     While the statutory environmental and historical review processes under NEPA, Section 106 and Section 4(f) were pending, but not yet completed, as outlined above, the Under Secretary issued the Project Approval authorizing the issuance of $1,750,000,000 in tax-exempt private activity bonds for the Project.

107.     The conditions imposed upon the Project Approval acknowledge that the Under Secretary has the authority to impose conditions upon approving an application for the issuance of private activity bonds, including conditions relating to environmental matters.

108.     For example, one of the conditions imposed by the Under Secretary is that the private sponsor of the Project "cause its subsidiaries to complete and implement the measures specifically set forth in the EIS and any supplemental EIS … to avoid, minimize, or mitigate any adverse effects of the Project on the environment."  Exh. A at 2.  In addition, although the Project Approval greenlights the marketing and sale of $1,750,000,000 of tax-exempt private activity bonds, it requires that the bond proceeds not be used "until 45 days following the issuance of the Final Environmental Impact Statement."  *Id.*

109. The fundamental mandate of NEPA is that a federal agency consider potential environmental impacts, as well as alternatives and mitigation measures, *before* it takes action with respect to a proposal – a directive that a federal agency "look before it leaps." In this case, the Under Secretary pursued the opposite approach. He leaped first, without having completed the statutorily mandated review of potential environmental impacts, alternatives and mitigation measures, and without making the findings required by NEPA. And he did so in violation of a specific prohibition in the NEPA regulations, discussed below, against moving forward with a project approval in the midst of the NEPA review process.

110. Likewise, the Under Secretary acted before completing the review processes or making the findings required under Section 106 and Section 4(f).

111. Accordingly, his action and the Project Approval were not in accordance with law, and were arbitrary, capricious, and an abuse of discretion.

## FIRST CAUSE OF ACTION
### (Violations of the APA by Violating NEPA and its Implementing Regulations)

112. Plaintiffs incorporate by reference each of the allegations of Paragraphs 1 through 111 of this Complaint as though set forth in full.

113. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

114. NEPA has two primary purposes: to ensure that a federal agency taking a major federal action takes a hard look at the environmental impacts of that action before deciding how to proceed, and to ensure that relevant information about the impacts of a proposed action and its alternatives is made available to members of the public, in order to provide the public with a meaningful opportunity for comment and participation in the federal decision-making process.

115.   To effectuate these purposes, NEPA requires federal agencies undertaking, approving or assisting any major federal action to review the environmental impacts of the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action."  42 U.S.C. § 4332(2)(C), (E).

116.   The Council on Environmental Quality ("CEQ") has promulgated regulations that apply to all federal agencies conducting an environmental review under NEPA. 40 C.F.R. Part 1500.

117.   The CEQ regulations provide that "NEPA procedures must ensure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken*."  40 C.F.R. § 1500.1(b) (emphasis added).

118.   The CEQ regulations further provide that "[a]n environmental impact statement is more than a disclosure document.  It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions."  *Id.* § 1502.1.

119.   Under § 1502.2(g) of the CEQ regulations, the EIS is supposed to "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

120.   The requirement to prepare an EIS applies to "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

121.   The terms "affecting" and "human environment" are broadly defined.

122.   The CEQ regulations define "effects" or "impacts" to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."  40 C.F.R. § 1508.8.

123.    The CEQ regulations state that the term "human environment" is to "be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment" and cross-references the above-quoted definition of "effects." *Id.* § 1508.14.

124.    The CEQ regulations further provide that in deciding whether a project "significantly" affects the human environment, the following types of issues must be taken into account: "effects in the locale" of the project, "short- and long-term effects," "severity of the impact," the "degree to which the proposed action affects public health or safety," "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources," "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27.

125.    The term "major Federal actions" is also broadly defined and includes federal approval or assistance of privately sponsored projects.  The CEQ regulations define the term as follows:

Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§1508.27)….

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies….

(b) Federal actions tend to fall within one of the following categories: ….

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18.

126.    The Defendants' Project Approval and the All Aboard Florida Project are a Major Federal action that would have significant effects on the human environment.

127.    The Project is subject to multiple federal approvals, and its private sponsor has asked for, and received, substantial federal assistance.

128.    The Defendants' approval of the use of tax-exempt bonds, by which the federal government foregoes the collection of taxes on the interest paid to bondholders, allows the sale of the bonds at a lower interest rate and represents a significant federal subsidy and material financial assistance for the Project.

129.    According to the private sponsor, the tax-exempt private activity bonds approved by Defendants are the "linchpin" for financing the Project. *See* Exh. B (cover letter, page 1).

130.    The Defendants, as well as other federal agencies such as FRA, have already determined the Project to be a "major Federal action," as evidenced by the publication of the DEIS for the Project under NEPA and Defendants' imposition of a condition to the Project

Approval that the bond proceeds not be used until 45 days after publication of the FEIS for the Project.

131.    A federal agency preparing an EIS must discuss in detail the environmental impacts of the proposed action and its alternatives, including issues related to "[u]rban quality, historic and cultural resources, and the design of the built environment."  40 C.F.R. § 1502.16(g).

132.    Essential to a federal agency's obligations under NEPA is the duty to ensure that "high quality" environmental information is available to the public before decisions are made and before actions are taken.  *Id*. § 1500.1(b).

133.    Public involvement is crucial under NEPA.  Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  *Id*. § 1506.6(a); *see also id.* § 1500.2(d).  Further, federal agencies must hold or sponsor public hearings or meetings whenever appropriate, including when there is "[s]ubstantial environmental controversy concerning the proposed action or substantial interest in holding the hearing."  *Id*. § 1506.6(c)(i).

134.    The CEQ regulations require that federal agencies "make every effort to disclose and discuss at appropriate points in the draft environmental impact statement all major points of view on the environmental impacts of the alternatives including the proposed action."  *Id.* § 1502.9(a).  Federal agencies are required to discuss at appropriate points in the FEIS any responsible opposing view which was not adequately discussed in the draft statement and to indicate the agency's response to the issues raised.  *Id.* § 1502.9(b).

135.    The CEQ regulations further require federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or

minimize adverse impacts of these options upon the quality of the human environment." *Id.*

§ 1500.2(e).

136.    The regulations emphasize that the alternatives analysis of an EIS "is the

heart of the environmental impact statement," and the regulations therefore require agencies to

"[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* § 1502.14.

137.    Federal agencies must supplement a draft or final EIS if "(i) [t]he agency

makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) [t]here are significant new circumstances or information relevant to environmental concerns

and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).

138.    The CEQ regulations also contain a specific prohibition on "jumping the

gun" once the NEPA process has begun.  The prohibition states as follows:

> (a) Until an agency issues a record of decision … , no action
> concerning the proposal shall be taken which would:
>
> (1) Have an adverse environmental impact; or
>
> (2) Limit the choice of reasonable alternatives.
>
> (b) If any agency is considering an application from a non-Federal
> entity, and is aware that the applicant is about to take an action
> within the agency's jurisdiction that would meet either of the
> criteria in paragraph (a) of this section, then the agency shall
> promptly notify the applicant that the agency will take appropriate
> action to insure that the objectives and procedures of NEPA are
> achieved.

40 C.F.R. § 1506.1.

139.    Defendants acted arbitrarily and capriciously and in violation of federal

law by failing to comply with the requirements of NEPA, 42 U.S.C. § 4321 *et seq.*, and its

implementing regulations, 40 C.F.R. § 1500 *et seq.*, by unlawfully issuing the Project Approval

prior to the consideration of public comments on the DEIS, prior to the publication of the FEIS

and prior to issuance of a Record of Decision.  As such, their actions are subject to review by this Court under the APA.

140.    Defendants also acted arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA and its implementing regulation by "jumping the gun" on the Project Approval in violation of the gun-jumping regulation codified at 40 C.F.R. § 1506.1.  As such, their actions are subject to review by this Court under the APA.

141.    The actual sale of $1,750,000,000 of private activity bonds, as authorized by Defendants in the Project Approval, would severely limit the choice of alternatives to the Project.

142.    In addition, the Defendants also acted arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA and its implementing regulations by failing to take the action required by subsection (b) of the gun-jumping regulation (40 C.F.R. § 1506.1(b)) because, on information and belief, the Defendants have failed to notify the entity that applied for permission to issue the private activity bonds that the Defendants will take appropriate action to ensure that the objectives and procedures of NEPA are achieved.  To the contrary, the Project Approval issued by Defendants expressly allows the sale of the private activity bonds, thereby foreclosing alternatives, before the FEIS is published and a ROD is issued.  As such, their actions are subject to review by this Court under the APA.

### SECOND CAUSE OF ACTION
#### (Violations of the APA by Violating Section 106 of the NHPA and its Implementing Regulations)

143.    Plaintiffs incorporate by reference each of the allegations of Paragraphs 1 through 142 of this Complaint as though set forth in full.

144.     Section 106 of the National Historic Preservation Act (the "NHPA") requires that federal agencies "take into account the effect of the *undertaking* on any historic property."  54 U.S.C. § 306108 (emphasis added).

145.     The NHPA defines an "undertaking" as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including— … (2) those carried out with Federal financial assistance; [and] (3) those requiring a Federal permit, license, or approval…."  54 U.S.C. § 300320.

146.     The Project Approval constitutes federal financial assistance or a federal permit, license or approval and is therefore an "undertaking" within the meaning of Section 106, implicating its requirements.

147.     Federal agencies are required to consider the effects of the Project on historic properties in accordance with the NHPA regulations codified 36 C.F.R. Part 800, unless the agency substitutes the NEPA procedures for those required under the NHPA.  *See* 36 C.F.R. § 800.8(c).  Here, the Defendants complied with neither NEPA nor the NHPA regulations, and did not elect to substitute the NEPA procedures for those required under the NHPA.

148.     The NHPA regulations state that "[a] representative of a *local government with jurisdiction over an area in which the effects of an undertaking may occur is entitled to participate [in the Section 106 process] as a consulting party*."  36 C.F.R. § 800.2(c)(3) (emphasis added).

149.     Accordingly, the regulations provide that the federal "agency *shall* invite any *local governments* …" to join in the consultation.  *Id.* § 800.3(f)(1) (emphasis added).

150.    The term "local government" is defined in the regulations to include any "county."  36 C.F.R. § 800.16(n).  Accordingly, Indian River County is a "local government" that is entitled to participate in the Section 106 consultation.

151.    Notwithstanding this clear and explicit requirement, the Defendants did not invite Indian River County to participate in the Section 106 consultation for the Project.  Nor has any other federal agency invited Indian River County to join the consultation process that Section 106 requires.

152.    Similarly, the Defendants have not invited the OVIASC to consult with respect to the Project's effects on the archeological resources at the Vero Man and Gifford Bones sites.

153.    The Defendants acted in an arbitrary and capricious manner, in an abuse of discretion, and contrary to law in excluding Indian River County from the consultation on the basis that the Project would not affect historic resources in the County.  The Project would destroy or harm these resources, as discussed above.

154.    Since the Defendants did not undertake a Section 106 process, and did not identify the County's significant historical resources, they failed to assess whether project construction would affect the archeological sites in the County by disturbing *paleo* artifacts lying beneath the surface; whether vibration from increased freight and new passenger operations could damage those artifacts; and whether the lateral expansion of active rail operations would foreclose or hinder future artifact recovery efforts.  Likewise, they failed to address ways to avoid, minimize or mitigate any adverse effects on these resources.

155.    Since the Defendants did not undertake a Section 106 process, they failed to identify either of the Old Town Sebastian Historic Districts, or consider the effects of the

railroad corridor that bisects such historic districts, or account for the contextual effects (such as noise, vibration, safety and visual impacts) that increased rail traffic associated with the Project would have on them.  Nor did it address the measures that could be implemented to address those effects.

156.    Thus, the Defendants failed to consult with Indian River County as required by the Section 106 implementing regulations and did not make any findings under Section 106 or otherwise comply with the statute.  The issuance of the Project Approval therefore violated Section 106 and its implementing regulations and was arbitrary, capricious, and an abuse of discretion, and not in compliance with applicable law.

### THIRD CAUSE OF ACTION
### (Violations of the APA by Violating Section 4(f))

157.    Plaintiffs incorporate by reference each of the allegations of Paragraphs 1 through 156 of this Complaint as though set forth in full.

158.    Section 4(f) of the Department of Transportation Act of 1966, codified at 49 U.S.C. § 303 and 23 U.S.C. § 138, requires that the Secretary of Transportation make a special effort to preserve (a) publicly owned parks, recreation and wildlife areas and (b) publicly or privately owned historic resources.

159.    Specifically, Section 4(f) prohibits the Secretary of Transportation from "approv[ing] a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, local significance" unless "there is no prudent and feasible alternative to using that land" and "the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c).

160.     A "use" occurs when land is permanently incorporated into a transportation facility; when there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose; or when there is a constructive use of a Section 4(f) property. *Cf.* 23 C.F.R. § 774.17 (23 C.F.R. Part 774 is the Section 4(f) regulation applicable to the Administrator of the Federal Highway Authority and to the Administrator of the Federal Transit Administration).

161.     A temporary occupancy of a Section 4(f) property constitutes a use unless the scope of the work is minor; there are no anticipated permanent adverse physical impacts or interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis; and the land being used is fully restored.  *Cf.* 23 C.F.R. § 774.13(d)(3) and (4).

162.     A "constructive use" occurs when a transportation project does not incorporate land from a Section 4(f) property but is sufficiently close to the property that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired.   *Cf.* 23 C.F.R. § 774.15(a).  "Substantial impairment" occurs when the protected activities, features, or attributes of the property are substantially diminished. *Cf. id.*

163.     A constructive use is based on the identification of the current activities, features, or attributes of the property which render it a Section 4(f) property and which may be impacted due to proximity of the project; an analysis of the net proximity impacts of the project on the Section 4(f) property; and consultation regarding the foregoing factors with the official(s) having jurisdiction over the Section 4(f) property.  *Cf.* 23 C.F.R. § 774.15(d).

164.    The Project will increase the utilization of existing railroad tracks and require the construction of parallel railroad tracks adjoining parks, conservation areas, recreation areas and historic sites in Indian River County and will "use" these resources within the meaning of Section 4(f).

165.    The new tracks and increased train service would abut three conservation areas owned and operated by Indian River County, including the North Sebastian Conservation Area, the Hallstrom Farmstead and the Harmony Oaks Conservation Area.  These areas have been reserved to protect wildlife and plants, and as a recreational resource for hikers.  The construction activity and frequent high speed trains would constitute a "constructive use" of these protected Section 4(f) resources.

166.    The Project would also construct a new railroad bridge in and thereby "use" the St. Sebastian River, which is a publicly owned resource.  The St. Sebastian River is a recreation area used by boaters, fisherman and swimmers and is part of the Indian River – Malabar to Vero Beach Aquatic Preserve, and is therefore a protected Section 4(f) resource.

167.    Section 4(f) does contain a statutory *de minimis* provision with respect to publicly owned parks, recreation areas and conservation areas, but this provision requires that the Secretary of DOT "make a finding of *de minimis* impact only if—(A) the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and (B) the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge."  49 U.S.C. § 303(d)(3).

168.     Here, however, neither the Secretary, nor the Defendants or any other federal agency has made such a *de minimis* finding with respect to the conservation and recreation areas in Indian River County, nor have they obtained the concurrence with any such finding of the County or other public officials who manage these areas.

169.     The southern portion of the St. Sebastian River Railroad Bridge, constructed in 1926, is located in Indian River County.  The Project's demolition of this historic bridge constitutes a "use" within the meaning of Section 4(f) and would harm the County by destroying a historic and visual resource and potential tourist destination.

170.     The Vero Man site is located along the Main Relief Canal (Van Valkenburg Creek), where Project-related work would be performed to upgrade an existing railroad bridge, and to construct a second track.  The Project would "use" this historic site within the meaning of Section 4(f).

171.     The Gifford Bones site is located at the North Relief Canal/Houston Creek, and is a site where ground sloth, camel, mastodon, a stemmed flint projectile, and fossilized bones have been found.  The Project would "use" this historic site within the meaning of Section 4(f).

172.     The Old Town Sebastian Historic District East and Old Town Sebastian Historic District West are comprised of nearly 30 contributing sites or buildings.  The two districts are listed on the National Register and would be bisected by the expanded breadth of tracks constructed by the Project.  The noise and other adverse effects of the Project would constitute a constructive "use" of these and other historic resources discussed above.

173.     Section 4(f) also contains a statutory *de minimis* provision with respect to historic resources, but this provision requires that the Secretary of DOT "make a finding of *de*

*minimis* impact only if—(A) the Secretary has determined, in accordance with the consultation process required under section 106 of the National Historic Preservation Act … that—(i) the transportation program or project will have no adverse effect on the historic site; or (ii) there will be no historic properties affected by the transportation program or project; (B) the finding of the Secretary has received written concurrence from the applicable State historic preservation officer … ; and (C) the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A)."  49 U.S.C. § 303(d)(2).

174.    Here, however, neither the Secretary, nor the Defendants or any other federal agency has made such a *de minimis* finding with respect to the historic resources in Indian River County, nor have they complied with the Section 106 consultation process, as required for such a *de minimis* finding.

175.    Notwithstanding the "use" of protected Section 4(f) resources, the Defendants failed to make any findings under Section 4(f) prior to the Project Approval and, on information and belief, have not made any Section 4(f) findings as of the date of the filing of this Complaint.

176.    Defendants' actions as set forth above were arbitrary, capricious, and an abuse of discretion and not in compliance with law.

WHEREFORE, Plaintiffs pray that this Court grant relief, as follows:

A.    Adjudge and declare that the Defendants have violated NEPA, Section 106, and Section 4(f) by issuing the Project Approval;

B.    Vacate and nullify the Project Approval;

C.      Issue a temporary restraining order, preliminary injunction and/or permanent injunction requiring Defendants to comply fully with the provisions of NEPA, Section 106 and Section 4(f) prior to considering any application for the allocation of private activity bonds for the Project;

D.      Issue a temporary restraining order, preliminary injunction and/or permanent injunction requiring Defendants to take appropriate action to prevent the issuance of any private activity bonds for the Project until the adjudication of this lawsuit has been completed and the provisions of the aforementioned statutes have been followed;

E.      Require the Defendants to invite Indian River County and the OVIASC to the consultation that Section 106 requires prior to considering any application for the issuance of private activity bonds;

F.      Award Plaintiffs reasonable attorney's fees, expert witness fees, and other costs of participating in this action, pursuant to Section 305 of the National Historic Preservation Act, 54 U.S.C. § 307105, the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable laws; and

G.      Award such other and further relief as the Court deems just and proper.

Dated: March 31, 2015

                              BRYAN CAVE LLP

                              By:   /s/  Daniel C. Schwartz
                                    Daniel C. Schwartz (D.C. Bar No. 017749)
                                    1155 F Street, N.W., Suite 500
                                    Washington, D.C. 20004-1357
                                    Telephone: 202-508-6025
                                    Email: dcschwartz@bryancave.com


                                    Philip E. Karmel
                                    (*pro hac vice* motion to be filed)
                                    BRYAN CAVE LLP
                                    1290 Avenue of the Americas
                                    New York, New York  10104-3300
                                    Telephone: 212-541-2311
                                    Email: pekarmel@bryancave.com

                                    *Attorneys for Plaintiffs*