```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - - - x
       INDIAN RIVER COUNTY, et al.,
 3                                     CA No:  1:15-cv-00460-CRC
                    Plaintiffs,
 4                                     Washington, D.C.
                                       Friday, May 29, 2015
 5     vs.                             10:05 a.m.

 6     PETER M. ROGOFF, et al.,

 7                    Defendants.
       - - - - - - - - - - - - - - - x
 8     _____

 9           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10                 UNITED STATES DISTRICT JUDGE

11     _____

       APPEARANCES:
12
       For the Plaintiff:        PHILIP E. KARMEL, ESQ.
13                               BRYAN CAVE LLP
                                 1290 Avenue of the Americas
14                               New York, New York  10104-3300
                                 (212) 541-2311
15                               pekarmel@bryancave.com

16                               CAITLIN DOWNS, ESQ.
                                 BRYAN CAVE LLP
17                               1155 F Street, NW, Suite 500
                                 Washington, DC 20004
18                               (202) 508-6000
                                 caitlin.downs@bryancave.com
19
       For the Defendant         LUTHER L. HAJEK, ESQ.
20     Peter M. Rogoff:          U.S. DEPARTMENT OF JUSTICE
                                 Environment and Natural Resources
21                               999 18th Street
                                 South Terrace, Suite 370
22                               Denver, CO 80202
                                 (303) 844-1376
23                               luke.hajek@usdoj.gov
       (Continued on Next Page)
24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription
```

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendant              ALISON D. GARNER, ESQ.
       Peter M. Rogoff:               U.S. DEPARTMENT OF JUSTICE
 3                                     601 D Street, N.W.
                                      Washington, D.C.  20004
 4                                     (202) 514-2855
                                      alison.garner@usdoj.gov
 5

 6     For the Intervenor Defendant:  EUGENE ERNEST STEARNS, ESQ.
                                      STEARNS WEAVER MILLER
 7                                     WEISSLER ALHADOFF & SITTERSON
                                      150 West Flagler Street
 8                                     Miami, Fl 33130
                                      (305) 789-3200
 9                                     estearns@stearnsweaver.com

10                                     DAVID H. COBURN, ESQ.
                                      STEPTOE & JOHNSON, LLP
11                                     1330 Connecticut Avenue, NW
                                      Washington, DC 20036
12                                     (202) 429-8133
                                      dcoburn@steptoe.com
13
                                      JENNER & BLOCK
14                                     MATTHEW E. PRICE, ESQ.
                                      1099 New York Avenue, NW
15                                     Washington, D.C.  20001
                                      (202)619-6873
16                                     mprice@jenner.com

17     For Martin County:             STEPHEN M. RYAN, ESQ.
                                      AMANDEEP S. SIDHU, ESQ.
18                                     JACOB HOLLINGER, ESQ.
                                      McDermott, Will & Emery
19                                     The McDermott Building
                                      500 North Capitol Street, NW
20                                     Washington, DC 20001
                                      (202) 756 8000
21                                     sryan@mwe.com

22
       Court Reporter:                Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                      U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                      Washington, DC  20001
25                                     202-354-3187
```

```
 1                        P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Civil Case No. 15-460,
 3    Indian River County, et al. vs. Peter Rogoff, et al.
 4              Counsel, will you please come forward and each
 5    identify yourselves for the record.
 6              MR. KARMEL:  Good morning, Your Honor, Philip
 7    Karmel for the Indian River County plaintiffs.
 8              THE COURT:  Mr. Karmel, how are you?
 9              MR. RYAN:  Good morning, sir.  For Martin County,
10    Steven Ryan, and may I introduce the other lawyers that are
11    here with me?
12              THE COURT:  You may.
13              MR. RYAN:  First of all, Aman Sidhu; Mr. Michael
14    Durham, who is here from the Southern District of Miami and
15    is our county attorney.
16              THE COURT:  Welcome.
17              MR. RYAN:  Mr. Hollinger, who is in my office in
18    New York; and Mr. Sam Neel.  And I just wanted to say that
19    Sam Neel just passed the bar, and this is the first time
20    he's walked in front of the bar at the district court.  But
21    he's not yet admitted here, so I will be responsible for his
22    conduct here today.
23              THE COURT:  And I will hold you responsible.
24              MR. RYAN:  Thank you, sir.
25              THE COURT:  Welcome, and congratulations.
```

```
 1                MR. HAJEK:  Good morning, Your Honor.

 2                THE COURT:  Good morning.

 3                MR. HAJEK:  Luther Hajek on behalf of federal

 4      defendants.

 5                THE COURT:  I'm sorry, your last name?

 6                MR. HAJEK:  Luke Hajek.

 7                THE COURT:  Luke Hajek, okay.

 8                MS. GARNER:  Good morning, Your Honor; Alison

 9      Garner, also for the federal defendants.

10                THE COURT:  Hi, Ms. Garner.  How are you?

11                MS. GARNER:  Good, thank you.

12                THE COURT:  Good.

13                MR. STEARNS:  Your Honor, good morning; Gene

14      Stearns, on behalf of the intervenor.  And I'm appearing

15      here with Mr. Coburn, David Coburn, from Steptoe & Johnson,

16      also on behalf of the intervenor, and also Mr. Matt Price,

17      from Jenner & Block on behalf of the intervenor.

18                THE COURT:  Mr. Stearns, welcome to Washington.

19                Okay.  We have quite a bit to cover this morning.

20      I have read all of your papers and the bulk of the key

21      cases, so you can assume a general degree of knowledge.  Why

22      don't we start first with the plaintiffs.

23                Will Indian River or Martin County be leading us

24      off?

25                MR. KARMEL:  Your Honor, this is Phil Karmel from
```

```
 1   Indian River County.

 2              THE COURT:  Okay.

 3              MR. KARMEL:  I'll speak first, thank you.

 4              THE COURT:  Let's start with the standing issue,

 5   if you will.

 6              MR. KARMEL:  Thank you, Your Honor.  I think, when

 7   it comes to standing, we need to start with the issue of

 8   what is the harm that we're focused on.

 9              THE COURT:  Okay.

10              MR. KARMEL:  And the harm has two components.  One

11   is prejudice to the selection of alternatives, and the other

12   is the fact that the bonds are critically necessary for the

13   project to be built.

14              THE COURT:  Okay.  Let's focus on the second.  As

15   I read the redressability standard, and there was quite a

16   bit of discussion in the brief as to what the appropriate

17   standard is, it seems to me you need to show that there is a

18   significant risk -- not just a risk, but a significant risk

19   -- that sitting here today AAF would not proceed with the

20   project were I to enjoin the issuance of the bonds at issue.

21              MR. KARMEL:  I disagree with that, Your Honor,

22   respectfully.

23              THE COURT:  Okay.

24              MR. KARMEL:  Let me explain why.

25              THE COURT:  Okay.
```

```
1              MR. KARMEL:  As to the first harm that I
2    articulated, which is prejudice to the selection of
3    alternatives, I think that harm exists and would exist even
4    if the project could go forward theoretically without the
5    bonds, and let me explain why.  If we go to the -- so what
6    are these alternatives?  There's a figure in the draft
7    environmental impact statement.  It discusses an alignment.
8    Just by way of orientation, West Palm Beach is the terminus
9    of Phase I.  That's the northern terminus of Phase I.  And
10   then the rail line has to get up to Orlando.
11             There are three alternatives outlined in the draft
12   EIS:  the CSX alternative, all the way to the west; then
13   there's an alternative that follows the Florida Turnpike,
14   and an alternative that follows I-95; and then the All
15   Aboard Florida alternative, which follows the alignment of
16   the Florida East Coast Railway.
17             THE COURT:  And are these alternatives outlined in
18   the draft EIS --
19             MR. KARMEL:  Yes.
20             THE COURT:  -- or has the draft EIS already
21   eliminated certain alternatives?
22             MR. KARMEL:  The draft EIS has determined that
23   certain of these alternatives do not meet the project
24   sponsor's objectives.  In Indian River County's comments on
25   the draft EIS, we thought that the alternatives were
```

 1    prematurely dismissed, and those comments are still being

 2    considered by the Federal Railroad Administration while

 3    they're preparing the final environmental impact statement.

 4    So that is still an open issue.

 5              In 2003 there was an analysis done by the Florida

 6    High Speed Rail Authority.  This is in the record, Docket

 7    15-19 at Page 6.  This is a summary of its analysis of the

 8    four alternatives.

 9              FECR, Florida East Coast Railway, is the All

10    Aboard Florida alternative.  That was the only one to

11    receive a poor rating from an environmental perspective.

12              And there are many environmental harms associated

13    with the project.  Those are reviewed in the papers.

14              What I'd like -- I'd like to focus -- so let's

15    talk about standing now, which was the focus of Your Honor's

16    question.

17              THE COURT:  Yes.

18              MR. KARMEL:  One of the issues when examining

19    alternatives -- and alternatives need to be examined both

20    under NEPA and under Section 4(f), two of the statutes at

21    issue here.

22              One of the issues that needs to be examined is the

23    feasibility of these different alternatives.  It is our

24    contention that providing massive federal subsidies in the

25    form of these tax-exempt bonds to the All Aboard Florida

1    project makes that project relatively more feasible than the

2    alternatives and therefore prejudices the selection of

3    alternatives as between those four alternatives.

4            It also prejudices the selection of alternatives

5    with respect to the project, All Aboard Florida, against the

6    no action alternative, because it boggles the imagination to

7    imagine that the U.S. Department of Transportation, after

8    approving issuance of the bonds, would then select the no

9    action alternative as part of the NEPA process.

10           So there's prejudice to the selection of

11   alternatives, and that prejudice exists even if

12   theoretically All Aboard Florida could find some alternative

13   financing mechanism.

14           THE COURT:  So in reading the papers, I understood

15   that the only alternatives that were still being considered

16   in the EIS process, putting aside the no build alternative,

17   was the routing between Orlando and Cocoa.  You're telling

18   me that that's not the case because the draft EIS has not

19   been crystallized into a final EIS; is that fair?

20           MR. KARMEL:  Yes, Your Honor.  According to the

21   draft EIS, those alternatives that I put on the board there

22   were determined not to meet All Aboard Florida's needs, but

23   that's still an open issue.  We don't think that was

24   appropriate, to dismiss those alternatives prematurely, and

25   that's an issue that's still under advisement at the FRA.

```
 1                THE COURT:  Okay.

 2                MR. KARMEL:  So let's talk now about the issue

 3      Your Honor raised, which is can the project go forward

 4      without massive federal subsidies, and I think it's crystal

 5      clear from the record that the answer is no.  Let's start

 6      off with what All Aboard Florida told the FRA in its loan

 7      application in 2013.  This is in the record and cited in our

 8      papers.

 9                All Aboard Florida said, "Due to the project's

10      status as a new development and the required construction

11      period and operational ramp-up, traditional debt financing

12      in the capital markets is not feasible."  That was their

13      statement.

14                THE COURT:  That's two years ago.  That's not now,

15      correct?

16                MR. KARMEL:  They made that statement two years

17      ago, but they haven't shown any changes in the intervening

18      two years that are relevant.

19                Now, let's try to understand why it might be the

20      case that traditional financing in the capital markets is

21      not feasible as All Aboard Florida itself has stated.

22                They did try to float notes, and they did float

23      notes for Phase I of the project.  $405 million of

24      commercial notes.  They paid a nominal interest rate of 12

25      percent.
```

1          Since those notes were floated, the value of the

2     notes have declined.  The current yield is 16 percent.

3     That's practically credit card type interest.  It's not

4     feasible to go forward with this project on that basis, and

5     there's no testimony in the record to the contrary of that.

6          According to All Aboard Florida's own witness,

7     Dr. Marcus, the tax-exempt bonds will save All Aboard

8     Florida $630 million over the next ten years.

9          THE COURT:  Okay.  So if you do the math, that's

10    $63 million in additional debt service a year, right?

11         As I read their projections, they believe the

12    project will be cash flow positive I think in Year 4.  If

13    you add an additional $63 million in debt service, it makes

14    it cash flow positive in Year 5 or 6 maybe.

15         Okay.  So the question is, how does that present a

16    significant risk that sitting here today, given all of the

17    investments that AAF has sunk into the project, they would

18    make a determination to pack up and go home?

19         MR. KARMEL:  Well, cash flow is only -- first of

20    all, there is a gap where they have no cash at all.  They

21    run out of cash for two years, and that's insolvency.

22         But if you put that --

23         THE COURT:  I'm not sure that there would still

24    not be a cash reserve, but just on an operational basis, as

25    I read their projections, an extra $60 million in debt

1    service would, you know, just take out by a year or two the

2    time in which the operations would turn cash flow positive.

3          MR. KARMEL:  Well, under Gaurav Jetley's

4    declaration, he shows that for two years they would actually

5    be negative in cash, meaning they have no cash to pay their

6    bills.

7          But the cash flow projections are -- don't take

8    into account depreciation.  That doesn't mean income.  That

9    simply is a projection of cash flows.  And the market

10   itself, when it demands 16 percent interest for holding

11   these notes, has indicated that this is extraordinarily

12   risky, and that was -- that assumes the federal subsidies

13   that have been approved.

14         So I think the --

15         THE COURT:  But Mr. Jetley doesn't assume 14 to 16

16   percent for taxable debt.  He assumes 8 or 9 percent,

17   doesn't he?

18         MR. KARMEL:  Their witness was told that they

19   could finance the project at 9.6 percent interest.  The

20   basis for that is not set forth, what the basis for that

21   estimate is.  So these cash flow projections assume an

22   interest rate which is not consistent with the current

23   interest rates that the market, the investors, are demanding

24   for this project.  And there's no basis for 9.6 percent in

25   the record.

1    He doesn't even testify that that's his -- it's

2    his opinion that that's reasonable.  He just says he was

3    told to use 6 percent for the tax-exempt bonds, and then he

4    has a professional opinion as to what the gap should be

5    between tax-exempt and taxable bonds, and that's how he

6    calculated 9.6 percent.  There's no actual basis for that

7    data point in the record.

8    The estimate of $630 million is far too low, and

9    we've explained why.  First of all, that cuts off the

10   calculation at only ten years.  If you go out to the 30-

11   year life of the bonds, it's much higher.  It's $1.3 billion

12   of savings from All Aboard Florida, and that is assuming

13   they could actually float bonds at 9.6 percent, which was

14   Dr. Marcus's testimony.

15   Another set of statements by All Aboard Florida

16   itself occurred in their preliminary offering memorandum for

17   the notes, and in the preliminary offering memorandum, they

18   noted that they -- at that time they were trying to rely on

19   the subsidies through the FRA loan process.  They said that

20   "The NEPA findings that are required, if you attain federal

21   subsidies, may require substantial modifications or changes

22   to our existing plans which could result in material delays,

23   result in additional, unforeseen costs, or may prevent us

24   from completing the railway at all."  That was All Aboard

25   Florida's statement.

1          Now why?  Why would the NEPA process prevent them

2     from completing the railway?

3          The reason is they need the federal subsidies to

4     build the project.  So if they don't get what they want out

5     of the NEPA process, for example, if the no action

6     alternative were selected or expensive mitigation were

7     imposed making the project commercially difficult to

8     perform, they can't just step away and go to the capital

9     markets.  That's what they said to FRA in 2013, and they

10    continue to believe that because otherwise they could simply

11    say, "Well, we don't like dealing with the federal

12    government.  Dealing with the federal government requires

13    compliance with environmental laws.  We just want to do a

14    project without federal subsidies."

15         They've said they can't do that, and, of course,

16    as pleaded in the complaint --

17         THE COURT:  Isn't that sort of the standard, you

18    know, almost boilerplate disclosure that you would find in

19    an offering memorandum?  I mean, didn't the lawyers draft

20    that?

21         MR. KARMEL:  There's absolutely nothing in the

22    record to suggest that this is boilerplate.  Here they are

23    saying they cannot proceed with the project without the

24    approval of the federal government.

25         THE COURT:  Right.

1          MR. KARMEL:  And to say it's boilerplate, I just

2     don't think there's a basis for that in the record.  They

3     don't address this quote at all in their papers.

4          And, of course, as we all know because it's been

5     briefed --

6          THE COURT:  Not to place a pejorative word on it,

7     but don't you often see overly cautious statements reflected

8     in disclosure statements like that in the context of SEC

9     disclosure statements?

10          MR. KARMEL:  Cautionary statements are provided to

11     investors --

12          THE COURT:  Right.

13          MR. KARMEL:  -- frequently, but these statements

14     were not just made to investors.  They were made to the

15     federal government in 2013 when they sought the loan

16     application.  In their application, they said, "We need this

17     loan because the capital markets are not available to us."

18          In the same statement -- or statements to the same

19     effect were made in 2014 in their application to the

20     Secretary of Transportation for the tax-exempt bonds.  They

21     said, as Your Honor well knows because it's stressed

22     repeatedly in the papers, that "The bonds are a crucial

23     factor for ensuring our project is financed and completed."

24     For them to come to court now and say it's not even a

25     substantial factor is inconsistent with their own

1    statements.

2          And what evidence have they put before Your Honor

3    to back up their theory that it's not a substantial factor?

4    There's a declaration from Michael Reininger.  All he says

5    in the declaration is, "I believe that alternative funding

6    is available."  He does not tell you what the factual basis

7    of his belief is.  He does not tell the Court what

8    alternative funding he has in mind.

9          If we were here on summary judgment, I don't think

10   a statement as to his subjective belief would even raise a

11   disputed issue of material fact on this point.  His

12   subjective belief is not probative of anything.  They have

13   not laid out an alternative financing plan and explained how

14   it could possibly work.  The loss of $1.3 billion of

15   subsidies for this project would make it have no substantial

16   returns and would not be attractive to investors.

17        MR. RYAN:  Your Honor, may I be heard on this

18   issue separately?  Because I have other facts on this issue.

19   I don't know how you want to run this.

20        THE COURT:  Let him finish first.

21        MR. KARMEL:  That's what I have to say on

22   standing, Your Honor, in terms of the relationship between

23   the bonds and the environmental harm.  It prejudices a

24   selection of alternatives.

25        THE COURT:  Okay.

1    MR. KARMEL:  And it makes -- the bonds are a

2  substantial factor in All Aboard Florida's ability to do the

3  project.

4    THE COURT:  Tell me this, would FDFC guarantee --

5  first of all, would FDFC issue nonfederally tax-exempt bonds

6  if this bond issuance were to be enjoined?  What would

7  FDFC's role be?

8    MR. KARMEL:  Well, I apologize, Your Honor, you

9  may be taking me a little outside my comfort area in terms

10  of expertise.  The whole reason why FDFC is involved in this

11  project is as a conduit entity to issue tax-exempt bonds.

12    THE COURT:  Are they guaranteeing the bonds in any

13  way?

14    MR. KARMEL:  No, no, no.  The FDFC has no credit

15  risk whatsoever.

16    THE COURT:  Okay.

17    MR. KARMEL:  The money to pay these bonds comes

18  from All Aboard Florida, and if they default, the

19  bondholders have claims against All Aboard Florida.  FDFC is

20  not liable for the bonds.

21    THE COURT:  Okay.

22    MR. KARMEL:  That I'm quite comfortable saying.

23    THE COURT:  Okay.  So the only difference between

24  a taxable bond issuance and a tax-exempt bond issuance is

25  the difference in the debt financing, the interest rate that

1    AAF would have to pay?

2          MR. KARMEL:  That's certainly the principal

3    difference.

4          THE COURT:  Okay.

5          MR. KARMEL:  And that's the difference that's been

6    identified in the record in terms of -- should Mr. Ryan

7    speak?

8          THE COURT:  Mr. Ryan.

9          MR. RYAN:  Thank you, Your Honor.  So on this

10   issue of standing, I won't repeat what counsel for Indian

11   River has said, but I want to talk briefly -- excuse me one

12   second -- I want to talk briefly about Professor Friedman.

13   Attached to our papers in the rebuttal was the affidavit of

14   Professor Friedman.  Professor Friedman is at Brown

15   University, and before that was at Harvard University, but

16   most recently he was at the White House at the NEC.

17          And Professor Friedman is unlike the two experts,

18   the one retained most recently by AAF and the one most

19   recently retained by my brother.  Professor Friedman made a

20   thorough study of the project and released a public paper in

21   February of this year, and in February of this year he

22   basically concluded in that paper, which is in the materials

23   that have been given to the Court -- in fact, let me just

24   give the Court a cite to where the Friedman --

25          THE COURT:  I have it.

```
 1              MR. RYAN:  Oh, you have it.  Good.  I would ask
 2      the Court to actually read Friedman's original paper and to
 3      read Friedman's affidavit.  I think there are 13 pieces of
 4      paper in this file, candidly, that I want you to read as
 5      opposed to the entire pile.  I think there are 13
 6      dispositive pieces, and the Friedman declaration is very
 7      clear that having read the other two experts' papers,
 8      because he had the opportunity to read them, and doing all
 9      of the previous work that he had done in his report, that he
10      believes they will not get the funding unless it is the
11      tax-exempt bond.
12              THE COURT:  Well, he says that the project is not
13      feasible regardless of the structure of the financing.
14              MR. RYAN:  He says that, but he also says that
15      it's totally unfeasible without the bonds.  In other words,
16      if you --
17              THE COURT:  Well, not feasible versus totally
18      unfeasible.  What's the difference?
19              MR. RYAN:  I understand, but Professor Friedman,
20      frankly, has laid it out for months.
21              Now, yesterday, in a judicial drive-by shooting,
22      they came in with a new affidavit and a ridership study
23      that, while it's dated May 7th, has actually been done for
24      some time.  That may be an updated version of it.  The other
25      side has absolutely refused in the past to give in, and, in
```

1    fact, on December 4th, when the counties were required to

2    give their comments to the FRA on the DEIS, we pointed out

3    that that ridership study had never been made public so that

4    it could be evaluated.

5        And here's my plea to the Court today.  You got a

6    piece of paper yesterday with a ridership study that is

7    essentially a sales document.  I asked in my counterfiling

8    yesterday that we be given an opportunity to have Professor

9    Friedman read that study and reply.  I can have that

10   declaration before the Court no later than Monday night/

11   Tuesday morning with regard to that.

12       And I've talked to Friedman, and I think he'll

13   have something important to say --

14       THE COURT:  Well, let me stop you there.

15       MR. RYAN:  -- in that sense.

16       THE COURT:  The Friedman declaration was filed

17   with your reply brief.

18       MR. RYAN:  Correct.

19       THE COURT:  Is that correct?

20       MR. RYAN:  That's correct.

21       THE COURT:  And the defendants have asked to

22   supplement the record with the Louis Berger report to

23   respond to the declaration that it received in its reply

24   brief.  That's fair.

25       MR. RYAN:  Correct.

```
 1            THE COURT:  Now you want another bite at the
 2    apple?
 3            MR. RYAN:  Well, I think in this case we've seen a
 4    piece of evidence, candidly, that should have been brought
 5    forward earlier.  It certainly was in existence at the time
 6    that the Reininger affidavit was being done for the Court.
 7            THE COURT:  But it's your burden here.
 8            MR. RYAN:  I understand.
 9            THE COURT:  You've attempted to meet that burden
10    in a reply brief, and they've asked for an opportunity to
11    respond to that.
12            MR. RYAN:  Sure.  But I haven't had an effective
13    opportunity to respond to what was filed yesterday, but I'm
14    asking until Monday night for that.
15            But let me go back --
16            THE COURT:  Now, as I understand it, Mr. Friedman
17    had a truncated version of the Louis Berger report.
18            MR. RYAN:  There was a truncated version that had
19    been made public that was redacted and previously was
20    available.
21            THE COURT:  Okay.  And he is -- and you've
22    submitted that for the record as well?
23            MR. RYAN:  I have, Your Honor.
24            THE COURT:  Okay.  And that was the basis upon
25    which Mr. Friedman supplied his declaration.
```

```
 1              MR. RYAN:  Correct.  And now he has a lot more
 2     ability --
 3              THE COURT:  Now you want to say more than that.
 4              MR. RYAN:  I think -- we've seen the document for
 5     the first time, and if the Court's going to rely on it --
 6              THE COURT:  Okay.
 7              MR. RYAN:  The Court's questioning indicated some
 8     intent to at least evaluate that as a serious proposition.
 9     So I ask that, and I'll let the Court decide that.
10              THE COURT:  Fair enough.
11              MR. RYAN:  Let me talk briefly, though, about the
12     Reininger second affidavit.  It's the dog that doesn't bark
13     in this case.  We couldn't have been clearer in our papers
14     that we believe that the lack of a substantive answer of
15     where they were going to find these funds -- other than
16     platitudes that they were confident that they would do it,
17     confident that they could deliver it.
18              They are part of a multibillion dollar investment
19     bank.  They have funding sources available to them, and yet
20     they have not presented a single whit of evidence of where
21     they're going to get that money.  And under the
22     circumstances, I think the Court should not be persuaded by
23     that affidavit or the second affidavit, which was after
24     Paragraph 19 of Friedman's affidavit, that said, "I've read
25     his thing, and it doesn't tell you where that money is going
```

1    to come from, and that that should be important to you."

2            And I think that's at the core of what I wanted to

3    say about this.  Let me just look at my notes for a second

4    on this issue.

5            THE COURT:  Okay.

6            MR. RYAN:  Let me -- there's one other document, I

7    think, that's very compelling here.  That document is the

8    RRIF loan document, and the RRIF loan document is a loan

9    that is still extant.  In other words, the focus of All

10   Aboard Florida switched from the original RRIF loan, which

11   still sits at the Department of Transportation.  It's not

12   gone away.  It's not been refused.  It's subject --

13           THE COURT:  So the application is still pending.

14           MR. RYAN:  The application is still pending, is my

15   understanding.  I'm sure that my brother or sister will

16   correct me, if I'm wrong about that.

17           But when the application was made, it's not just

18   the Reininger letter that was the linchpin or that was

19   necessary in the bond application, but if you look at Page

20   13 of the RRIF loan document, it states in pertinent part,

21   "Due to the project's status as a new development and the

22   required construction period and operational ramp-up,

23   traditional debt financing in the capital markets is not

24   feasible.  AAF believes that a loan under the RRIF program

25   is the optimal source of debt financing for funding

1    construction and development of the project."

2              Now, here's the reason for the Court to be

3    skeptical.  In back-to-back years, when they wanted the

4    government's largesse, they knew how to tell the government

5    under pain and penalty of a false statement what they

6    thought about the financing, and now all you have them

7    doing, candidly, is what we in district court used to call

8    back-walking the document, and that's what Reininger is

9    doing in his affidavits.  But he only back-walks the

10   necessity for it, and he doesn't say where the replacement

11   is.

12             So I think the Court has heard me courteously on

13   this issue.

14             THE COURT:  Okay.  Thank you.

15             MR. RYAN:  Judge, while I'm here, I just wanted to

16   ask permission.  I had put in two PAB-related government

17   documents yesterday about the bridge to nowhere.  I just

18   would like the Court to rule that I can use those in my

19   argument today.

20             THE COURT:  Do you want to hand them up?  I'm not

21   sure I've seen them.

22             MR. RYAN:  Yes.  May I approach?

23             THE COURT:  Sure.

24             MR. RYAN:  So, Your Honor, it doesn't fit on the

25   standing issue.  It does fit on the importance of the NEPA

1    issue and how the letters are written, and I can argue this

2    point now if you --

3              THE COURT:  That's fine.  Go ahead.

4              MR. RYAN:  Okay.  So let me point out the Rogoff

5    letter.

6              Can you put the Rogoff letter up?

7              You know, the Rogoff letter is very important in

8    this case.  It's one of the 13 pieces of paper, and we're

9    going to put that up right now.

10             The Rogoff letter, at the end of the letter, says,

11   "We're looking forward to you delivering the project."  And

12   it caused us to think, is that a standard sort of set of

13   language that the department puts in all things, because it

14   is the key to the argument about prejudgment on the NEPA

15   issue.

16             And what I have put before you is actually a

17   letter dated October 29, 2007.  I'm going to make several

18   points from the letter, but you'll notice at the end there's

19   no boilerplate that would indicate that they look forward to

20   delivery.  And I think the point that I would ask the Court

21   to take from that document is that as we look at very

22   important projects the Department of Transportation puts

23   under PAB funding, they don't necessarily use that language;

24   and, therefore, I ascribe importance to the fact that in

25   Secretary Rogoff's letter he calls for the delivery of the

1    project.

2              This is only days after the comments had been

3    received under the DEIS.  There are literally, as I

4    understand it, tens of thousands of comments that came in on

5    December 4th with regard to the DEIS, and yet on December

6    22nd he says he's looking forward to the delivery of the

7    project.

8              THE COURT:  Now, Mr. Rogoff didn't write those

9    letters, right?

10             MR. RYAN:  I'm sorry, sir?

11             THE COURT:  Mr. Rogoff did not write those

12   letters.

13             MR. RYAN:  The 2007 letter?

14             THE COURT:  Yes.

15             MR. RYAN:  No.  In fact -- but let me talk for a

16   minute about the differences.  All right?

17             THE COURT:  Okay.

18             MR. RYAN:  If we look at the first page of the

19   Rogoff letter, on the first page of the Rogoff letter

20   there's a clear lack of description of the authority of the

21   department to make the loan.  If you look and contrast the

22   Rogoff letter, that doesn't say that they're doing this

23   under Title 23 because they spent $9 million several years

24   ago in 2009 and that, therefore, they can bond out a $1.7

25   billion project.  If you look at the October 29th letter,

1    you'll see that they very clearly know how to state the

2    authority of the department to do these things when they

3    want to do it.

4         The third point that I want to contrast between

5    the Rogoff letter and the letter of October 29th is, if the

6    Court would look at Paragraph No. 2 on the front page of the

7    October 29th letter, it reads, "A final record of decision

8    under NEPA designating the project as the preferred

9    alternative must be issued by the Federal Highway

10   Administration."

11        In other words, the Court could take from this

12   very clearly the difference between the truncated rights to

13   a NEPA analysis that are given in the Rogoff letter compared

14   to how the department knows how to write it when they want

15   to say that NEPA applies and is applicable because the

16   Rogoff letter, Paragraphs 4 and 6 of it, do not equate to

17   NEPA.  They do not talk about the alternatives.  It talks

18   about merely mitigating along the route.

19        Now, I would ask that the Court take a quick look

20   at the October -- pardon me -- April 28th letter because

21   this goes right to the heart of the argument that we should

22   be in a preliminary injunction hearing rather than having

23   this case more judiciously considered and decided on final

24   merits.

25        What happened here is the project couldn't make

1    the timing that was in the original letter.  If you look at

2    the October 29th letter, there's a timing that's given that

3    looks very much like the timing that's given in the Rogoff

4    letter.

5              And then in the April 28th letter, you'll see that

6    when they want to move the timing of it, they simply move

7    it.

8              And so I'm going to come back to this point later,

9    but I thought that these two documents were important in

10   contrasting those activities.

11             THE COURT:  Okay.

12             MR. RYAN:  I think that's all I have on the

13   standing issue that the Court had raised, so I'll reserve --

14   I'll go back and let you resume or --

15             THE COURT:  Okay.  Before we move to the

16   preliminary injunction standards, why don't we hear from the

17   defendants on the standing issues first, okay?

18             MR. HAJEK:  Good morning again, Your Honor.

19             THE COURT:  Good morning.

20             MR. HAJEK:  So I guess I will start with standing,

21   and then turn back to these letters a little bit later.

22             THE COURT:  Okay.

23             MR. HAJEK:  As we've heard today from the

24   plaintiffs, they have two theories as to their harms that

25   are sufficient to establish standing.  The first is this

1    idea that the alternatives analysis in the DEIS prepared by

2    the Federal Railroad Administration would be somehow

3    affected; and the second is that they would suffer harms

4    from the project and their issues with respect to causation

5    and redressability, and a lot of their arguments go to

6    whether the project would or would not go forward without

7    the PAB allocations.

8          On the alternatives point, the procedural point

9    that they make, it's very -- the Supreme Court has made very

10   clear that a procedural injury alone is insufficient to

11   establish standing, and I would point the Court to *Summers*

12   *vs. Earth Island Institute*, 555 U.S. 488 (2009).  Just that

13   procedural injury -- and as the Supreme Court stated, "a

14   procedural injury in vacuo, without concrete interest, is

15   insufficient to establish standing."

16         The other thing I would point out about that

17   argument is that it presupposes that NEPA applies to the PAB

18   allocation.  Their theory of the case is that NEPA applies

19   to the PABs as well as the potential RRIF loan from FRA, but

20   the FRA may or may not ever issue a loan for the project

21   because the only issue in this case is whether the PAB

22   allocation is subject to NEPA.  So going back and arguing

23   that these alternatives discussed in the draft EIS for a

24   separate action that actually would approve the loan, actual

25   money coming from the federal government, $1.6 billion to

1    the project, as opposed to a PAB allocation, which is -- are

2    bonds issued by a state of Florida entity and which would be

3    bought by private investors, which is a very different

4    vehicle for funding the project.

5            And so by mixing those two things up, they make it

6    -- they try to make it appear as if that ongoing EIS process

7    has any relevance, but it doesn't.

8            On the harms aspect --

9            THE COURT:  But in the event that AAF were to be

10   offered the RRIF loan and accept it, it would have to adhere

11   to the EIS results and the conditions attendant to the NEPA

12   review.

13           MR. HAJEK:  Yes, absolutely.

14           THE COURT:  And so there's a contingency there,

15   but there is a likely -- there's a possibility, at least,

16   that they would be bound by the NEPA analysis and the

17   mitigation measures in the NEPA analysis.

18           MR. HAJEK:  If the FRA were to issue a loan?

19           THE COURT:  Yes.

20           MR. HAJEK:  Yes, there's that potential.  I don't

21   know how big that potential is if the PAB allocations are

22   secured.

23           THE COURT:  Okay.  Move to the second injury.

24           MR. HAJEK:  Okay.  So to the second issue, I'll

25   turn first to causation, and there I would point to the

1    *Appalachian Voices* case, district court case in D.C., which

2    is one of only two other cases that we're aware of that

3    involves a NEPA challenge to a tax credit or the conferral

4    of some tax benefit.  The other case was *Florida Audobon*

5    *Society vs. Bentsen*.

6         And both of those cases were decided on standing

7    grounds without even getting to the merits of the NEPA

8    arguments.  And on causation, the *Appalachian Voices* cases,

9    particularly appropriate here, it was a NEPA challenge to

10   the allocation of a tax credit for clean coal technology for

11   certain power plants, including one operated by Duke Energy,

12   and what the Court found was that Duke Energy had made an

13   independent decision to go forward with the project before

14   even seeking the PAB allocation, and therefore it was not a

15   substantial factor motivating the project to go forward.

16         And that's absolutely the case here as well, and

17   what convinces the government that that's true is that

18   planning for this project began in 2011.  Title 23 funds

19   were disbursed for the project in 2012 and 2013 and 2014

20   before seeking the PAB allocation.

21         THE COURT:  So the plaintiffs made the point that

22   Phase I has independent economic value and is sustainable

23   without regard to whether Phase II goes forward or not.  So

24   how much of that -- assuming that's the case, how much of

25   the planning and Title 23 money went to Phase I of the

1    project as opposed to Phase II?

2              MR. HAJEK:  I don't know that I could break it

3    out, by my understanding is that the Title 23 funding went

4    to both segments.  There are many railway highway crossings

5    all up the route of the segment from West Palm to Orlando.

6              And I would also point out another factor that's

7    important to the government is they had committed $400

8    million of their own cash equity, another $600 million for

9    purchases of land and easements --

10             THE COURT:  Again, any of that for Phase II?

11             MR. HAJEK:  I don't know that we can break it out

12   that way, and I think AAF's counsel might be able to better

13   answer that, but my understanding is that it's an amount

14   that's attributable to the whole project.  In any case, I

15   think the *Appalachian Voices* case is very much on point here

16   on causation.

17             I then turn to redressability, which is also a

18   significant problem for the plaintiffs.  One case

19   particularly important is the *Sierra Club vs. The U.S.*

20   *Department of Energy* from the district court in D.C. in

21   2011.  That was a NEPA challenge to loans and loan

22   guarantees which are slightly different from a PAB

23   allocation in that a loan is actual money coming towards the

24   project.  But what the Court found -- and in that case, the

25   plaintiffs made many of the same arguments that are being

1    made today, that the project couldn't go forward without

2    these loans, that the finances didn't support it.  But what

3    the Court found was that this would likely disrupt the

4    current financing, which may or may not be true here, and it

5    would probably make the project more expensive.

6         But it would not cause the project to be

7    abandoned, and that's what's important here.  Given the

8    planning that's gone on, the money that AAF has already put

9    into the project, I think there's very little chance that

10    they would abandon the project, and the plaintiffs certainly

11    can't show that it's substantially likely.

12         And another case is the --

13         THE COURT:  Well, I mean, this goes back to the

14    question that we've been discussing.  Notwithstanding AAF's

15    stated commitment to the program, you know, isn't the

16    question whether alternative taxable debt financing would be

17    available to the project?  And what is there in the record

18    to establish that?

19         MR. HAJEK:  I would defer that discussion more

20    specifically to AAF.  I think there certainly is evidence in

21    the record to support that.

22         I just would like --

23         THE COURT:  It seems to me in the cases that

24    you've cited it was pretty clear that alternative financing

25    was available or at least --

1          MR. HAJEK:  Well --

2          THE COURT:  -- or at least the project proponents

3     represented that it was available.

4          MR. HAJEK:  And I think the -- AAF's declarations

5     have done so in this case as well.

6          THE COURT:  Okay.

7          MR. HAJEK:  The *Chesapeake Climate Action*, this is

8     the case involving the Export-Import Bank, and there again

9     the Court found that the -- if the loan guarantees were

10    taken away, this would not materially alter the company's

11    exportation of coal.

12         And I would defer a lot of the discussion of the

13    specifics to AAF's counsel, but I think the law in this case

14    is important because the two cases that were brought

15    challenging tax credits both resolved on standing grounds.

16         I think, then, unless the Court's --

17         THE COURT:  Tell me this.

18         MR. HAJEK:  Yes?

19         THE COURT:  Whether AAF will proceed with the

20    project seems to me not to matter on whether we're dealing

21    with a direct grant or another benefit in the form of a tax

22    credit or a tax exemption in this case.  Do you agree with

23    that?  The fact that this is a tax exemption in connection

24    with the redressability analysis, does that matter?

25    Couldn't it have been just a $300 million grant?  Would that

1    have changed the analysis at all?

2              MR. HAJEK:  I think that wouldn't necessarily

3    change the analysis, but I think what it speaks to is the

4    nature of the funding source.  I mean, this --

5              THE COURT:  I think it helps you on the -- whether

6    it's major federal action or not, but on the redressability

7    issue, I'm not sure it makes a difference.

8              MR. HAJEK:  Well, if, for example, there was just

9    a loan for a billion dollars, that would be $1 billion.

10             What we're talking about here is the difference

11   between private or nontax-exempt interest rates versus

12   tax-exempt interest rates.  That's going to be some amount,

13   but it's always going to be a percentage of the overall

14   amount, and then we're going to be talking about the tax on

15   that subportion of the amount.

16             So I do think it's different.  I do think it's

17   harder to establish standing if your theory is based on this

18   percentage that there would be a tax credit.

19             THE COURT:  What do you calculate the percentage

20   of the benefit to be relative to the overall cost of the

21   project?  That seems to be a factor in a number of the cases

22   that you've cited.

23             MR. HAJEK:  Well, based on the declarations that

24   have been submitted in which we said in our brief, you know,

25   it can be valued at roughly $300 million in present value,

1    and compared to the cost -- overall cost of the project, it

2    would come in at about 10 percent.

3                    THE COURT:  10 to 13 percent?

4                    MR. HAJEK:  Yes, something like that.  Yes.

5                    So unless there are other questions, I would just

6    address these letters.  They came in at the last minute.

7                    THE COURT:  I understand.

8                    MR. HAJEK:  I didn't really have a chance to look

9    at it.  I think if the Court was interested in more

10    information about these, I would request the opportunity to

11    submit a short filing within a couple of days.

12                    But I think as to the first, this is one PAB

13    allocation letter.  There have been many that DOT has made

14    in the past, and it's really not that significant at all.

15    It's a -- it shows that a PAB allocation was made for a

16    project.

17                    One of the points that plaintiffs made about this

18    is that there was -- there doesn't seem to be a sentence at

19    the end saying that we look forward to the work on the

20    project, or something to that effect, and really, that's --

21    that's not really a material sentence at all.  It's just a

22    nice way of closing a letter.

23                    THE COURT:  Well, I take it their point is that it

24    reflects some degree of predetermination on the part of the

25    transportation department as to whether the project will

1    ultimately go forward or not.

2              MR. HAJEK:  Predetermination --

3              THE COURT:  Predetermining the NEPA analysis.

4              MR. HAJEK:  Well, that's not even a claim that

5    they've brought, but no, it was simply a reference to the

6    PAB allocation.  There wasn't any reference to the FRA loan,

7    if that's what they're suggesting.

8              THE COURT:  Okay.

9              MR. HAJEK:  The second, I believe, was a reference

10   to a standard that's stated in one letter and not the other,

11   and I'm not sure I fully understand the significance of

12   that.

13              I think the main reason they brought this to the

14   Court's attention is that there's a reference to a ROD for

15   an ongoing NEPA process by the Federal Highway

16   Administration.  In that instance, there was a separate NEPA

17   process for a project that required approval from the

18   Federal Highway Administration independent of the PAB

19   allocation, and that's why there was an ongoing NEPA

20   process.  And there was a provision in the letter,

21   essentially a timing provision, saying that the project --

22   what's it say? -- that the final record of decision would

23   have to designate the project for the -- as the preferred

24   alternative.  That was a condition of the letter.  And I

25   think another reason for that is they wanted to make sure

1       that the Federal Highway Administration actually selected

2       the alternative in the project so that there would be a

3       project for which there would be a PAB allocation.

4              THE COURT:  Okay.

5              MR. HAJEK:  The second one is the April 2009

6       letter, the clarification of PAB allocation availability.

7       And I think it really just clarifies the deadline by which

8       the bonds would issue.  And I think, if you read the letter,

9       what it says is that the bonds must be issued within two and

10      a half months of some private/public agreement taking place.

11             And that was always the trigger.  And there was

12      always an example of a potential deadline in the first

13      letter, and the DOT agreed that that was just an example.

14             THE COURT:  Okay.

15             Mr. Stearns, are you going to take the oar?

16             MR. STEARNS:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. STEARNS:  Standing, of course, is the

19      appropriate place to start in an analysis like this because

20      the question is whether the Court has jurisdiction under

21      Article 3 to hear the case, and standing is an analysis that

22      this Court sees a lot of because so many of these kind of

23      cases are brought here as opposed to the place where the

24      project is actually underway.  And obviously the three

25      elements of standing, nobody disagrees, are causation --

1    rather injury and fact, causation or traceability, and

2    redressability.

3              And with respect to traceability, which hasn't

4    been discussed in any meaningful way to this point, but I do

5    think it's important to look at it, which is if what these

6    plaintiffs are seeking to do is to avoid a harm by stopping

7    a benefit -- that's their claim.  And so their claim to stop

8    the benefit of tax-exempt bonds, according to their claim,

9    will ultimately lead through a series of steps to avoiding

10   the harm that they've claimed will otherwise exist.  So we

11   need to look at those steps.

12             The first step is that the -- there be an FEIS

13   that's issued that will, in fact, not address the harms that

14   they've claimed; and, therefore, the mitigation that will

15   come from that process will not be adequate to address their

16   concerns.  So that's a hypothetical that they've advanced.

17             The next is an independent agency of the state of

18   Florida is going to have to approve an allocation of these

19   tax-exempt bonds to this project as opposed to potentially

20   other projects.

21             THE COURT:  Wasn't that supposed to have happened?

22             MR. STEARNS:  It didn't happen, Your Honor.  It

23   got moved to later in June simply because -- by the way,

24   they've had hearings.  They have not reached a conclusion

25   and, therefore, that event has not occurred yet.

1           And as a --

2           THE COURT:  And how, if at all, does that affect

3     the timing of the issuance of the bonds?

4           MR. STEARNS:  Your Honor, we don't have a date

5     yet, but it will be -- we're told by that agency that they

6     will hear -- it has to happen first.

7           THE COURT:  Yes.

8           MR. STEARNS:  So that will be sometime in mid-

9     June, we are told.  And nothing can happen until that agency

10    acts.  And if it acts and rejects the application, then you

11    have a Florida agency saying no; and, therefore, nothing

12    happens.  Therefore, that is an intermediate step that has

13    to be crossed before these plaintiffs can suffer any harm.

14           In addition to that, there's another agency of

15    Florida government under the governor's office that also has

16    to approve it even if the Florida Development Finance

17    Corporation approves it.  That's another step, unless we

18    think that this is a coercive or demanded outcome.

19           If there's anything that's quite clear in the

20    current political environment, the state of Florida has

21    rejected numerous efforts by the federal government to fund,

22    directly and indirectly, projects in the state of Florida.

23    It rejected a couple of billion dollars for a rail project

24    from Orlando to Tampa.  It rejected Medicaid funding that

25    would be funded almost entirely by the federal government.

1          So the certainty -- they can't establish certainty

2     that the Florida Development Finance Corporation and the

3     governor's office is going to say, "Yeah, this is terrific,"

4     and Your Honor can be assured -- they don't deny it -- that

5     these counties are aggressively lobbying, arguing,

6     presenting evidence, the same kind of arguments they've made

7     to the Federal Railroad Administration, that this is a bad

8     project that should not be approved.  So that is a step that

9     has to be taken before we ever get to the point of harm.

10          Then we have another step, which is they've got to

11    sell the bonds into the marketplace, and that requires, of

12    course, disclosure and the existence of a market to sell the

13    bonds.  So that's an intermediate step because investors

14    have to sign on to this program.

15          And certainly you've heard counsel for Martin

16    County suggest that nobody with a brain would buy the bonds

17    because, according to Professor Friedman, this project will

18    never make any money.  Now, while we believe that this

19    expert opinion is not worth the paper it's printed on, it is

20    nonetheless an opinion that asserts an uncertainty about the

21    outcome of that process.

22          And then, after the bonds are sold, you have to

23    assume that All Aboard Florida is now -- now, as an

24    independent actor, is going to decide to go forward with

25    this project despite all of those things.

1          And those are all interim steps that have to be

2     taken before any harm that has been alleged will actually

3     occur in these two counties.

4          THE COURT:  Well, Mr. Reininger has told us that

5     they're going to go forward in any event; is that right?  Or

6     at least that's what he believes.

7          MR. STEARNS:  Your Honor, respectfully, they are

8     going forward in any event.  I'm only making the point that,

9     with respect to the issue of the uncertainty about the

10    process of issuing the bonds, there are steps that have to

11    be taken by independent actors that, in fact, under the

12    principles of traceability -- and if Your Honor will look at

13    *Simon vs. Welfare Rights*, for example, that's a case decided

14    in the United States Supreme Court in 1976 where Justice

15    Stewart, for example, said, "I cannot now imagine a case

16    that leaps outside the First Amendment area where a person

17    whose own tax liability was not affected ever could have

18    standing to litigate the federal tax liability of someone

19    else," and that's essentially what they're doing here.

20         Plus *Florida Audobon Society vs. Bentsen*, a

21    decision of the D.C. Circuit which, addressing the absence

22    of traceability, concluded that the chain of causation was

23    protracted and most, if not all, of the links inescapably

24    presume certain independent actions of some third party.

25    When that exists, there's no traceability.

1        Similarly, the decision in the D.C. Circuit,

2   *Fulani vs. Brady*, and also *Appalachian Voices vs. Bodman*,

3   which is a decision by Judge Urbina here in 2008, where Duke

4   Energy -- a complaint about Duke Energy was rejected on the

5   grounds that the allocation of tax credits was at least a

6   substantial factor motivating Duke Energy's conduct because

7   Duke Energy was prepared to build the plant even before it

8   was awarded the tax credit, which is exactly what the case

9   is here.

10        But then we have to address the issue of

11   redressability, and the redressability issue is, are we

12   going to build it anyway, and what is the evidence on that

13   point?  And I would submit to the Court that the governing

14   case here on that issue is your colleague Judge Bates's

15   decision in 2011 in *Sierra Club vs. Department of Energy*.

16   This case could not be more clearly on this point.  And the

17   same argument was made in that case that you've already

18   heard this morning, about claims that were made to obtain

19   the benefit, and the Court, Judge Bates, said, "The relevant

20   question is what effect an order from this Court would have

21   now."

22        On that point, Mississippi Power had produced an

23   affidavit declaring in no uncertain terms that given the

24   advanced state of development of the Kemper project,

25   Mississippi Power would continue to construct the Kemper

1    project even if enjoined temporarily or permanently from

2    using the federal funds.

3            THE COURT:  Well, Mr. Stearns, this goes to my

4    point regarding the relationship between Phase I and Phase

5    II.  As I understand it, Phase I is substantially along the

6    track, so to speak.

7            MR. STEARNS:  It is.

8            THE COURT:  And Phase II is not, and the

9    plaintiffs make the argument that those two phases should be

10   considered economically independent of one another.

11           MR. STEARNS:  That would be a mistake, Your Honor.

12           THE COURT:  And tell me why that is.  And what is

13   there in the record to support your position?

14           MR. STEARNS:  The record, Your Honor, is replete

15   with evidence of the fact that while one is approvable from

16   a permitting stage -- that is, Miami to Palm Beach -- the

17   record reflects that the economics of the train running from

18   Miami to Palm Beach are quite different than the train

19   connecting Orlando, which is the largest tourist destination

20   in America, to Miami, which is the largest port facility in

21   America, which, when you're connecting those two tourist-

22   related activities, you make and have the longer haul, and

23   you have fewer competing transportation-available means.

24           I mean, let's face reality --

25           THE COURT:  But certainly the increase in interest

1    payments that would be required if the debt were taxable

2    would increase the risk that the project -- that AAF would

3    choose not to pursue the remainder of the project.  Would

4    you not agree with that?

5            MR. STEARNS:  Well, there's no issue that the

6    project is more viable, the success is more likely, with the

7    tax-exempt bonds.  No one can say other than that.

8            THE COURT:  Right.  But let's say -- as I

9    understand it, your current $405 million debt facility is

10    priced at 16 percent, 14 to 16 percent.

11            MR. STEARNS:  That, Your Honor, respectfully is

12    misleading.  That argument --

13            THE COURT:  Okay.  We'll get to that.  But let's

14    assume that, you know, that's what you would have to pay to

15    finance the remainder of Phase II if the tax-exempt bonds

16    were unavailable.  Wouldn't that increase the risk to some

17    extent that your client would say, "It's not worth the

18    candle.  We'll stick with Phase I and abandon Phase II"?

19            MR. STEARNS:  No, actually not.

20            THE COURT:  Why not?  What if it were 25 percent?

21    I mean, at some point it becomes an irrational fool's

22    errand.

23            MR. STEARNS:  Actually not, Your Honor, because if

24    you think about it from this perspective, Phase I consists

25    of three terminals:  Miami, Fort Lauderdale, and Palm Beach,

1   West Palm Beach.  Phase II consists of a single additional

2   terminal, which is in Orlando, which is being constructed.

3   As we speak they're getting ready to start -- they've done

4   all the A&E drawings.  They're just going to connect in this

5   phase all of the intermodal areas from Disney World to the

6   city of Orlando to all the other major transportation

7   facilities, including the airport.  It is what is called in

8   modern parlance an intermodal facility.

9            THE COURT:  I understand that it makes sense to do

10   them both together and that there was a rationale for it.

11            MR. STEARNS:  But it's being done, is my point.

12   It is being built, and All Aboard Florida needs to be able

13   from -- when it gets to the point of where it ends in West

14   Palm Beach with a terminal which is under construction, it

15   goes north on an existing Florida East Coast Railway line

16   that's existed since the 19th Century, and then only when it

17   gets to Brevard County near Cocoa does it make a left turn

18   going north -- goes to the west and connects up to Orlando,

19   a 40-mile stretch.

20            THE COURT:  I understand.

21            MR. STEARNS:  All of which is grade-separated

22   because it's new.  And so what you have is the length of the

23   line running from Miami to that point where it turns does

24   have a grade of crossings, roughly thirty in both Martin and

25   Indian River Counties, thirty grade crossings.

1          But, Your Honor, I didn't -- I think it's

2     important to see what Judge Bates said about -- because his

3     last conclusion is, "The plaintiff got the burden

4     backwards," Judge Bates said.  "It's the Sierra Club, not

5     the defendants, that must make the showing if the

6     preliminary injunction fails."

7          And so they're arguing we've failed to prove that

8     there are alternative sources of financing, but in reality

9     they've failed to prove that they don't exist.  They've got

10    it backwards.

11         And if we can -- and they assume a complete lack

12    of sophistication because Fortress has raised $70 billion.

13    That's in the record.  Fortress is the parent --

14         THE COURT:  But it's not in the record that

15    they're going to spend any of that if I enjoin the bonds,

16    right?  Can I take judicial notice that because Fortress has

17    $70 billion under management that they're going to use some

18    of that if there's no tax-free facility together?

19         MR. STEARNS:  Well, Your Honor, first of all, the

20    practical thing is we need to know, and then what's in the

21    record.

22         THE COURT:  Okay.

23         MR. STEARNS:  You can't go identify a revenue

24    source until you've done a prospectus, gone out to the

25    public and said, "Okay, this is what we're offering to

 1     sell," and there are buyers appearing at that moment in time

 2     to buy it.  You can't eliminate all uncertainty.  That is

 3     clear.

 4              You can have somebody file an affidavit and say

 5     there is no uncertainty, but such a person would not be

 6     speaking truthfully.  You have to speak, if you're truthful,

 7     in the qualified terms that exist in this market where you

 8     say, "Look, this is how much we've invested already," which

 9     is hundreds of millions of dollars; "This is how much we've

10     committed to invest," which is hundreds of millions of

11     dollars more; "These are the economics of our project,"

12     which Miami to Palm Beach is less economically viable when

13     it includes the link to the largest tourist destination in

14     the world.

15              And let's keep in mind, we're talking about a

16     railway that connects 36 percent of the state of Florida's

17     population, which is the fourth-most congested urban area in

18     the entire United States of America; where I-95 has already

19     reached a level of service failure in critical junctures

20     along the entire length of its process every time it hits an

21     urban area; where what can be a five-hour drive from Orlando

22     to Miami; where plane service is unreliable and

23     extraordinarily time-consuming to the intrastate plane

24     service.

25              And so we're talking about an existing rail

1    corridor that has existed for over 120 years, and complaints

2    being brought by people who moved to that corridor --

3           THE COURT:  I understand the business case for the

4    project.

5           MR. STEARNS:  Yes, Your Honor, so let's get to the

6    standing issue, which is the question of what is the

7    evidence in the record that they've established, and we go

8    to the Friedman affidavit; the Friedman affidavit which they

9    offered in their reply brief, for whatever reason.  Let's

10   talk about that.

11          What Professor Friedman does is -- first of all,

12   let's look at his background.  His background is educational

13   economics.  He has no recognized background at all in

14   transportation planning.  He acknowledges that Florida is a

15   major tourist destination, which, of course, is

16   acknowledging that the sun comes up in the east and goes

17   down in the west.

18          He doesn't acknowledge the extent to which the

19   port of Miami is the largest cruise ship capital of the

20   world.  He doesn't acknowledge that Orlando is the

21   entertainment capital of the world; that there are 35

22   million tourists that come into the state of Florida every

23   single year.

24          And so what does he do?  He does a transportation

25   study that compares this activity to the Northeast Corridor,

1    which is a commuter rail system.  This, so we're clear, Your

2    Honor, while there may be -- part of the ridership is

3    commuter, that is not the principal economics driving this

4    business.

5         It is, by the way, recognized by the Obama

6    Administration, by transportation planners that have been

7    involved here -- establishing a rail link that connects

8    these four urban areas of Miami, Fort Lauderdale, Palm Beach

9    and Orlando is critical to taking the pressure off I-95.

10   It's critical to dealing with the collapsing intrastate

11   airplane system and connecting these intensely developed

12   tourist communities that otherwise would not be served.

13        And so what we have is what is their standing to

14   complain about it?  It is what is the likelihood that having

15   invested $400 million, committed another minimum of $400

16   million, having already dedicated $600 million of dedicated

17   land, that they're going to walk away from it?

18        THE COURT:  How much of those investments that

19   you've just described were devoted to Phase II as opposed to

20   Phase I?

21        MR. STEARNS:  Well, Phase II development, Your

22   Honor, is primarily rail because, for example, Martin and

23   Indian River County, they're not adding anything other than

24   track.  That's it.  They're taking the existing right-of-

25   way.  They're not buying any land.  They're simply

1    installing new track.  They're obviously -- by the way, when

2    this is done, this rail system will have positive train

3    control, which they should have had in Philadelphia.  It

4    will have the most modern systems.

5            THE COURT:  Can you quantify the Phase II to date?

6            MR. STEARNS:  They've already spent $43 million on

7    Phase II, Your Honor.

8            THE COURT:  $43 million.

9            MR. STEARNS:  $43 million already.  And as a

10    practical matter, but as you're going to see from the study

11    that was done, the Berger study, the economics of this deal

12    are driven by the fact that half of the train volume is long

13    haul, Orlando to Miami.  He projects over five million

14    annual passengers of that.  Approximately 50 percent is the

15    Orlando-to-Miami market which involves a single terminal,

16    which is the terminal in the Orange County airport.

17            And so what you're left with, in terms of the

18    probability at this juncture, as Judge Bates found in the

19    case that he addressed, they're trying to shift the burden

20    of proof.  They had the burden to come forward to show that

21    we couldn't do it.  They cannot do that.  Instead they say,

22    "Well, where are the revenue sources?  Where are the funding

23    sources?"

24            If Your Honor were to enjoin this, you would have

25    to assume that these folks, who are obviously pretty

1    sophisticated in so many parts of their world, are obviously

2    trying to do something that no one has ever done in recent

3    memory, since Henry Flagler built the railroad in the 18th

4    Century, which is to do something that needed to be done.

5           Now, I just want to make one comment, Your Honor,

6    about the difference between a tax-exempt bond and a tax

7    credit or a direct allocation of credit, because we do get

8    to this obviously on the issue of major federal action, but

9    it also -- it is an assistance.  That is, nobody can argue

10   that giving tax-exempt bonds is an assistance.  It is an

11   incentive for private investors to come into a

12   transportation market that is failing.  The infrastructure

13   in this country is failing, and the idea is to incentivize

14   private money to come into this deal.

15          If the Federal Railroad Administration were to

16   approve a bond of $1.6 billion, it would be a lender.  It

17   would have credit risk.  As a -- waiving tax revenues is

18   different than extending a credit risk.

19          It's not that it isn't assistance; it clearly is.

20   It's not that it doesn't incentivize the activity; it

21   clearly does.  But as a practical matter, what it comes down

22   to as far as standing is are there intermediate steps that

23   are between this Court and a decision.  Of course.  And can

24   they go either way?  Of course.  And that's the end of the

25   conversation.

 1              Has the plaintiff, at this juncture,

 2      established -- and the standard is substantially probable.

 3      That's the standard they must meet today.  And how do they

 4      propose to meet that standard?  They say, "We didn't prove

 5      the opposite."

 6              But that's not how you establish substantial

 7      probability.  Showing us documents in 2013, Your Honor --

 8      Your Honor, I can assume the world is quite a bit different

 9      in 2015 than it was in 2013 in Washington, D.C.  I can tell

10      the Court it's quite a bit different in the state of

11      Florida.

12              THE COURT:  But does Mr. Reininger ever say that

13      alternative financing is available?

14              MR. STEARNS:  I'm sorry?

15              THE COURT:  Does Mr. Reininger ever say that

16      alternative financing is available, sitting here today?

17              MR. STEARNS:  He does, Your Honor.  If you look at

18      Page 12 of his affidavit, he goes through and lists each of

19      the elements of what All Aboard Florida has already done.

20              THE COURT:  Is this the supplemental affidavit?

21              MR. STEARNS:  The first affidavit, Your Honor.

22              THE COURT:  The first affidavit, okay.

23              Okay.  I'm with you.  Which paragraph?

24              MR. STEARNS:  Well, you start with Paragraph --

25      Page 11, and this is where we discuss Paragraph 58.  "It

1   would certainly disrupt the current financing plan, make the

2   project more expensive to complete and may delay its

3   progress.  It would not imperil the project.  AAF intends to

4   complete the project with or without tax-exempt private

5   activity bond financing.  If this Court were to grant an

6   injunction, it would compel the financing through

7   alternative means, will proceed with conventional financing,

8   and," he says, "it will not have prevented it from going

9   forward."

10          In the supplemental affidavit, by the way -- and

11   the following page details exactly what the current

12   commitment is.  In the supplemental affidavit, the language

13   that is used is almost verbatim from the language that Judge

14   Bates found to be sufficient when he said that, "On that

15   point, Mississippi Power had produced an affidavit" -- I'm

16   quoting -- "declaring in no uncertain terms that given the

17   advanced state of development of the Kemper project,

18   Mississippi Power will continue to construct the Kemper

19   project even if enjoined temporarily from using the federal

20   funds."

21          And, in fact, if you go back and look at that

22   case, what was presented in that case was virtually

23   identical to what Mr. Reininger has presented to this Court

24   here.

25          We can't say, "Are they going to go to this bond

1    market or that bond market?  Are they going to an equity

2    market or not an equity market?"

3            What they're saying is, "We're too far down the

4    road here with too much -- too many hundreds of millions of

5    dollars invested.  We're not backing up."

6            Is the federal government's interest served by

7    allowing this important transportation project to be

8    incentivized?  Of course.  This is a critically important

9    project for the state of Florida.  But are they going to

10   back down now and say because the PABs are not available?

11   No, they can't do that.

12            THE COURT:  Okay.

13            MR. STEARNS:  Thank you, Your Honor.

14            THE COURT:  Thank you, very much.

15            Mr. Karmel, I'll give you an opportunity to

16   respond to Mr. Stearns.

17            MR. KARMEL:  Thank you, Your Honor.

18            Starting with the points raised by the Department

19   of Justice.

20            THE COURT:  Yes.

21            MR. KARMEL:  There was a citation to *Summers vs.*

22   *Earth Island* that procedural injury without concrete

23   interests doesn't provide for standing, but the plaintiffs

24   in this case do have concrete interests.  Those are the

25   environmental harms from the project.

1          So we are not claiming abstract procedural injury

2     as our harm.  It's environmental harm, and that is our

3     concrete injury.

4          And the fact that the --

5          THE COURT:  That assumes that this is a major

6     federal action that requires NEPA review.

7          MR. KARMEL:  Your Honor, we're entitled to assume

8     that.  Under the *Karst* case, which we cite in our reply

9     brief at Page 4, a 2007 case from the D.C. Circuit, for

10    purposes of standing, the Court should assume that our

11    claims are meritorious.  So we are entitled to assume that

12    this project is subject to NEPA for standing analysis

13    purposes.

14         And there was mention of cases, *Appalachian*

15    *Voices*, the *Sierra Club* case, the *Chesapeake Climate Action*

16    case.  It's clear from Your Honor's questions that the Court

17    has read those cases.  The cases are clearly distinguishable

18    because here we have a very strong record that the project

19    is crucially dependent upon the tax-exempt financing that

20    was not present in those cases.  In two of the cases, the

21    project at issue was substantially advanced in construction.

22    In Phase II here, construction has not begun.  So it's

23    completely distinguishable on those grounds, on factual

24    grounds.

25         THE COURT:  Counsel, I think, you know, one

1    problem you have is that, you know, the defendants have

2    cited a number of cases where standing has been denied

3    because the plaintiff has not shown that the injunction

4    would prevent the third party from doing whatever it is the

5    third party wants to do, from completing the project.  Okay?

6    So there's one goal post.

7            You've not given me the other goal post.  I

8    haven't seen any cases where plaintiffs have been held to

9    have standing because they've shown a substantially

10    increased risk that the defendant or the project proponent

11    would cease the project.

12            Am I -- did I not see those cases, or -- you've

13    attempted to distinguish the defendants' cases, but you

14    haven't cited any yourself to establish the other goal post,

15    so to speak.

16            MR. KARMEL:  Well, I think the -- first of all, I

17    don't think Your Honor missed anything in our papers.

18            THE COURT:  Okay.

19            MR. KARMEL:  There's well-established standards,

20    which is we have to prove that the federal agency action

21    that we are challenging is a substantial factor.  Some of

22    the cases say "substantial factor"; some of the cases say

23    "substantial probability."  I'm not sure there's a

24    difference between those two things, but --

25            THE COURT:  That's the traceability standard.  The

1        redressability standard is whether there's a significantly

2        increased risk that enjoining the challenged action would

3        affect the third party from going forward with the project.

4                MR. KARMEL:  We have to show an increased risk,

5        and it has to be material.  I agree.  I agree with that,

6        Your Honor.

7                Under one of the two types of injuries that we've

8        alleged, which is the environmental harm from the project,

9        the injury that this prejudices the selection of

10       alternatives, as I explained earlier, I don't think that

11       that applies.  I'm not going to repeat that because that

12       would be a waste of our time.

13               THE COURT:  I understand.

14               MR. KARMEL:  In terms of, you know, how much money

15       is at issue, how does that compare to the size of the

16       project?  I think there's been some incorrect information

17       provided on that topic.

18               If you take out the subsidies for 30 years, the

19       present value is $541 million, and that's using Dr. Marcus's

20       interest rates.  $541 million.  And so it's not $300

21       million, which is the number that was put forward to Your

22       Honor.  It's $541 million.

23               That cannot be compared to the nominal value of

24       the -- the nominal cost of the project.  If you want to take

25       present value, you have to take the present value of the

1    savings, which reduces it from $1.3 billion to $541 million.

2    You'd also have to take the present value of the capital

3    costs, so that would reduce those costs substantially as

4    well.

5              So it's a much higher percentage than some of the

6    cases that have found, well, this is just marginal support

7    or something like that.  This is critically important to the

8    economics of the project.  Even their own witness says that.

9              THE COURT:  But isn't it fair to assume that the

10   bonds would be called after ten years?  Isn't that a -- is

11   that not a standard assumption that would apply in a

12   circumstance like this?

13             MR. KARMEL:  Not at all.  That would make no sense

14   to me at all.

15             If you have subsidized financing where you're able

16   to sell bonds far below what it would ordinarily cost you to

17   sell bonds, why would you call them in after ten years?

18   This is a cheap source of capital for the project.

19             So I don't understand the concept of calling in

20   the bonds after ten years.  And Dr. Marcus says that's his

21   assumption.  He doesn't explain why it would be economically

22   rational to pursue that course of action.

23             In terms of the issues raised by counsel for All

24   Aboard Florida, it said that there's only hypothetical

25   injury here because it depends on what the FEIS may or may

1    not do.  That's not the case.  The Secretary of

2    Transportation under NEPA was supposed to take a hard look

3    at environmental impacts before deciding whether this

4    project warrants $1.3 billion of federal subsidies.  The

5    whole point of NEPA is to infuse agency decision-making

6    with --

7                THE COURT:  That was under the RRIF program.

8                MR. KARMEL:  No, under the application that All

9    Aboard Florida made for the tax-exempt bonds.  That

10   application was before the Secretary of Transportation.

11   Under NEPA, the Secretary of Transportation was supposed to

12   think about environmental issues before deciding whether

13   this project warrants federal support.

14               THE COURT:  Where is that codified?  I thought

15   the --

16               MR. KARMEL:  That's NEPA.

17               THE COURT:  I thought the department has taken the

18   position that these tax-exempt bond facilities do not

19   require NEPA review.

20               MR. KARMEL:  Well, of course that's their

21   position, but that's the merits of the case.

22               THE COURT:  That they've historically interpreted

23   the statute that way.

24               MR. KARMEL:  They have historically not complied

25   with NEPA.  They actually haven't explained what the basis

1     of that is.  They don't have anything in terms of an

2     interpretive guidance or something like that actually

3     explaining why NEPA does not comply, and as this Court is

4     well aware, even if they did have such guidance, which they

5     do not have, it's entitled to no deference whatsoever

6     because NEPA is not a statute that is peculiarly within

7     their jurisdiction; and, therefore, it's de novo review in

8     this court.  And I'll rely on my briefs for that.

9           In terms of the other hypothetical type of injury,

10    there's reference to FDFC.  You know, perhaps they won't

11    approve the bonds, or something like that.  I'll call this

12    Court's attention to the document on file.  It's Docket

13    15-40.  It's a resolution of the Florida Development Finance

14    Corporation supporting the bond issuance, and it's signed by

15    the head of FDFC -- excuse me, the vice chairman of FDFC,

16    upon concurrence of all the board members.

17          So they still have some legal process to do, but

18    the entire -- this was delayed.  It would have occurred

19    yesterday.  It was delayed at All Aboard Florida's request

20    so they could make this argument.

21          THE COURT:  Okay.

22          MR. KARMEL:  In terms of what's in the record in

23    terms of alternative funding, the Court asked that question.

24    It never obtained an answer.  There is no alternative

25    funding in the record.

1              It's stated by counsel for All Aboard Florida that

2      the plaintiffs are trying to shift the burden of proof.

3      That's not correct.  We've met our burden with their own

4      statements that the tax-exempt bonds are crucial to the

5      project.  Those statements stand alone, and they have not

6      explained why they shouldn't be accepted as factually

7      accurate.

8              THE COURT:  Why is it not implicit in the

9      statement of the project proponent that the lack of tax-free

10     bonds will not imperil the project; that alternative

11     financing, or at least their good faith belief that

12     alternative financing would be available?

13             MR. KARMEL:  It's completely conclusory.  I mean,

14     if this was at the summary judgment stage -- and we're not

15     even at that stage -- that would not raise a material issue

16     of fact.  I mean, if someone submits an affidavit saying X

17     is the case, but they don't explain what the factual basis

18     of that is, that's a sham affidavit.  It's conclusory.

19             And I'm not making any statement about

20     Mr. Reininger's honesty.  I'm not asking you to evaluate his

21     credibility.  I'm saying that that statement standing alone

22     as a conclusion without any factual basis is not worth

23     anything.  It is not a -- it is not probative that there is

24     a conclusory statement made to a court.  You can't create an

25     issue of fact on that basis.

```
 1                    In terms of --

 2             THE COURT:  How is that any different than the

 3    affidavits that were submitted in the Sierra Club case that

 4    Mr. Stearns just cited where the Mississippi Power executive

 5    says, "We fully intend to continue with the project given

 6    its advanced stage regardless of whether the federal subsidy

 7    is available or not"?

 8             MR. KARMEL:  The power plant was already under

 9    construction.

10             THE COURT:  Isn't this already under construction?

11             MR. KARMEL:  No.  There's been no construction in

12    Phase II that I'm aware of.

13             THE COURT:  So that argument requires a

14    segmentation of the two phases?

15             MR. KARMEL:  I don't know if it requires

16    segmentation.  A power plant is a unified capital

17    improvement.  Half a power plant is useless.  It generates

18    no electricity.

19             This is a project that has been phased.  They've

20    started Phase I; they've financed Phase I separately; and

21    they're building Phase I.  And it's a useful asset.

22             They talk about commitments to fund Phase II, but

23    there's nothing in the record that those commitments were

24    made under any regime other than receipt of the tax-exempt

25    bonds.  The commitments were made that if the tax-exempt
```

1    bonds are given, then additional equity will be invested in

2    Phase II.  There is nothing in the record that those

3    commitments would survive the inability to tap low-cost

4    financing.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. RYAN:  Very short.

8              THE COURT:  Very short, and then we're going to

9    take a quick break before we get to the other issues.

10             MR. RYAN:  Thanks.  And I won't belabor this, but

11   let me talk about the Palm Beach segment that the Court has

12   asked about.  They took the risk of segmenting this, and

13   mazel tov to them that they have a lovely commuter railroad

14   between two places where they can do their real estate

15   development and do what they do, which is work in a corridor

16   that actually looks like a corridor that can sustain rail

17   traffic; but they should not be able to then get the benefit

18   in this court that there was a decision made by regulators

19   that you could segment the project in this way and that you

20   had to get separate approvals for it.

21             And what we're looking for is the day that we can

22   actually fight about the alternatives issue.  If this Court

23   does not rule in our favor today, or when the Court issues

24   its decision, then we will never truly be heard on that

25   because $1.7 billion worth of bonds will be sold to bona

1    fide third parties who then become a part of the equation

2    when we have to come before the United States District Court

3    in Florida or, as a related case, come back to you and stand

4    here and talk about the release of the actual final

5    environmental impact statement and the ROD.

6              THE COURT:  Is there any discussion in the draft

7    EIS when Federal Highway or FRA is considering the

8    alternatives?  Is there any discussion as to the financing

9    or the cost of the project?

10             MR. RYAN:  Give me 30 seconds.

11             Let me answer it this way.  I'm slightly -- I

12    didn't prepare to answer that question, but I think I can.

13             THE COURT:  Let me put the question in context.

14    You've argued that allowing the tax-free facility to proceed

15    will put an anvil on the scales in favor of this particular

16    alternative because of the cost issue.

17             MR. RYAN:  Correct.

18             THE COURT:  Has FRA considered costs at all in

19    making determinations regarding competing alternatives thus

20    far?  If it hasn't, it seems to me you have a harder

21    argument to make.

22             MR. RYAN:  In our -- in comments, for example, one

23    of the documents that was attached yesterday was the

24    comments of one of the commentors of the thousands of

25    commentors who are adverse to the project, and in that

1    comment set that I asked the Court to review -- it's from

2    Care Florida, which is many people in Martin County as

3    well -- there is an exposition, and I can give you the

4    direct page number, where we discuss what should have been

5    in the DEIS that was not, and it included the ridership

6    study that they were scared enough to put into the record

7    yesterday.

8              In other words, we called for that document to be

9    made available so it could be tested fully, and so there is

10   clearly a discussion in the comments to the DEIS that

11   address the financial capability of the project to be

12   effective and to do that.

13             So I'm answering in the alternative, in essence,

14   that comments were put in that address that issue; but in

15   truth, it would be very, very harsh to the millions of

16   people north of Palm Beach if their rights were done away

17   with simply because of the bluster of the plaintiff, AAF,

18   that they're going to build the rest of it because it would

19   not be a prudent expenditure to have built that latter

20   portion.  They took that risk, not the people of the

21   Treasure Coast.

22             THE COURT:  I understand.

23             MR. RYAN:  Let me make a couple of other points.

24             You know, this citation to the cases about other

25   tax-exempt facilities are nothing like this because here the

1    tax-exempt facility that they're getting is 60 percent of

2    the project costs that they were seeking.  It is a

3    tremendous percentage of it, and the Court smoked out my

4    brother who came up, and he's just great at the podium, but

5    you asked him the key question, "What have you actually

6    spent on this?" and he said $40 million.

7              So I want the Court to recognize when the Court

8    asked that very important question, that $40 million is not

9    even -- it's not a complete first year of the benefit of the

10   tax exemption, which is probably on the order of $60 million

11   to $75 million.

12             Now, the other point the Court made in talking

13   with counsel was does it matter that it's not a federal

14   contract or a federal loan, but that it's tax-exempt?  Well,

15   let's say this, we can't buy an F-16 with the money.  We

16   can't send children to Head Start.  We can't build a

17   government facility that we need because the money is

18   flowing out of the Treasury, and there's an enormous amount

19   flowing out here, and that goes to whether this is the kind

20   of federal action under which NEPA applies.  And I cite the

21   Court -- I don't have the exact paragraph number, but in our

22   citation we cited to the Department of Transportation's own

23   issuance of regulations that we think is dispositive of this

24   and is slightly different than Indian River's complaint, and

25   I'll give the paragraph number for the record on that.

```
 1                    THE COURT:  Okay.

 2                    MR. RYAN:  Last point, the population on this

 3       corridor has grown by a factor of 10,000.  That is, there

 4       are 10,000 times more people along this than when the

 5       railroad was built.  But the bridges that they're going to

 6       use to run the additional 32 passenger trains and to double

 7       their freight train traffic, the bridges were built during

 8       Franklin Roosevelt's administration.

 9                    The bridges, in the comments that we've raised,

10       impede the maritime traffic in this area.  That maritime

11       traffic is worth billions and billions of dollars to the

12       commercial vessels that have to passage Martin County to the

13       marinas that have the pleasure and the charter boats.

14                    THE COURT:  What does NEPA have to do with the

15       economic effect of the --

16                    MR. RYAN:  NEPA has to do with the effect, by the

17       way, Your Honor, that with that bridge closed you can't get

18       the boats back and forth.  It's the safety of the vessels

19       and the environmental impact of having those vessels, for

20       nine hours a day, having to loiter and create environmental

21       fumes.

22                    What they've done in the DEIS, for example, is

23       they've estimated the car traffic -- the pollutants that

24       would be saved by taking cars off the road.

25                    THE COURT:  So it's the idle time --
```

```
1              MR. RYAN:  It's the idle time.

2              THE COURT:  -- for a train to move.  How long does

3       it take for the train to get over the bridge?

4              MR. RYAN:  Well, right now it takes approximately

5       20 minutes from the time that the bridge begins to close and

6       closes until the time it goes back up for each train.  These

7       are bascule bridges, Your Honor, that swing up and down, and

8       when that happens, by the way, if the train -- if the bridge

9       isn't down completely, then the train has to loiter.

10              The towns that we're looking at -- could I have

11       one of the maps, please?

12              This is a highly urbanized area in some of Martin

13       County.  In every courthouse in America there's software

14       that every fire chief has to have in order to model what a

15       railroad accident looks like, and that software can take the

16       inputs of what's the temperature today, what is the wind

17       factor.  And this is in Chief Wouters's affidavit, which

18       we've submitted.

19              So what you have in terms of the danger to the

20       community is you have 32 additional opportunities for trains

21       to collide with vehicles or pedestrians or other trains if

22       you add the AAF project, and the testimony that is in the

23       record that's unrebutted is that in effect the fire chief

24       says, "I've got facilities on either side of the tracks

25       where if the trains are parked there, I may not be able to
```

1    get across even in a normal situation."

2            And so the community is deeply affected by the

3    evaluation that we're being denied under NEPA, and with

4    regard to that, today's going to be the day for us because

5    if we don't get relief once the bonds are sold, it will all

6    be different.

7            Let me go to my last point.

8            THE COURT:  Well, Counsel --

9            MR. RYAN:  Yes?

10           THE COURT:  -- the merits of your argument that

11   the EIS or any EIS down the line is inadequate cannot affect

12   my consideration of the standing analysis.  Either you have

13   it or you don't, regardless of what harms you may show down

14   the line.

15           MR. RYAN:  It's not ripe yet, is the point that I

16   would make to the Court.  We haven't tried to argue the case

17   of what's wrong in the DEIS.

18           Hold up the DEIS, please, the 500 pages of it.

19           There's 500 pages of issues in the DEIS, okay.

20   We're never going to get to a court.  We're not going to get

21   to a United States District Court because the money will be

22   spent, according to the Department of Transportation's

23   point, before we can have that hearing.

24           THE COURT:  Okay.

25           MR. RYAN:  Thank you.

1          THE COURT:  Thank you.  We're going to take a --

2    Mr. Karmel, one final point briefly.

3          MR. KARMEL:  Yes, Your Honor.

4          Your Honor asked was relative costs between

5    alternatives considered.

6          THE COURT:  Yes.

7          MR. KARMEL:  And the answer is yes.  I would

8    direct Your Honor's attention to Docket 15-8, Page 89 in the

9    record.  Now, tax-exempt bonds are not discussed there

10   because that's not what the DEIS is about, but the relative

11   costs of different alternatives were considered in the DEIS.

12         THE COURT:  But not the relative cost to AAF of

13   financing the project.

14         MR. KARMEL:  That's correct, Your Honor.  That is

15   not.

16         THE COURT:  Okay.

17         MR. KARMEL:  I'm not representing that that is in

18   the DEIS.  Thank you.

19         THE COURT:  Okay.  We're going to take a short

20   break.  When we come back, we'll talk about irreparable harm

21   and major federal action and the 142(m) issue.  Okay?

22         (Recess taken)

23         THE COURT:  Okay.  Mr. Karmel, do you want to

24   start us off?

25         MR. KARMEL:  Thank you, Your Honor.

1           If I understood Your Honor's instructions, you

2      first want to hear about irreparable harm?

3           THE COURT:  Yes.  Let's go there.

4           MR. KARMEL:  Okay.  Well, the irreparable harm

5      from this project is multifaceted.  We start with the

6      problem that this alternative, as opposed to a couple of the

7      other alternatives, runs through a very populated area.

8      Most of the population of Indian River County is on the

9      eastern side of the county, near this railroad alignment.

10          The --

11          THE COURT:  Let me just cut you off.

12          MR. KARMEL:  Okay.

13          THE COURT:  What I'm most interested in is why is

14     that an imminent harm that would entitle you to an

15     injunction now when the EIS is at least a year off in the

16     distance?

17          MR. KARMEL:  Well, then, we're just -- we're --

18     thank you, Your Honor, because I think I misunderstood the

19     Court's direction.

20          THE COURT:  Yes.

21          MR. KARMEL:  We are back to the close nexus

22     between the agency action we're seeking to enjoin and the

23     project.  If the bonds cannot be sold, then the project will

24     not go forward, and those harms will not be inflicted upon

25     the plaintiffs.  And if the vacatur is issued with respect

1    to the approval of the bonds, then the concern that the

2    plaintiffs have that the evaluation of alternatives in the

3    NEPA process will be prejudiced, that prejudice will no

4    longer exist; and, therefore, there will be a proper

5    evaluation that's not -- doesn't have the anvil on the

6    scale, which the Court picked up from our papers.  So that

7    is the irreparable harm.

8            But if the -- the flip side is if the bonds go

9    forward, then there's no way to make up those harms.  Once

10   the bonds go forward and $1.3 billion of federal subsidies

11   have been provided to All Aboard Florida, at that point it's

12   too late for the federal government to take a look at

13   environmental impacts and say, gee, in light of all these

14   impacts and the fact that this corridor is through such a

15   heavily populated area and the fact that this alignment will

16   involve the destruction of historic resources and all the

17   other environmental impacts associated with the project, at

18   that point it will be too late for the Secretary of

19   Transportation to say this project is not worthy of $1.3

20   billion of federal subsidies.  That is, the commitment of

21   resources is permanent once the bonds are issued.

22           So there is irreparable harm that cannot be made

23   up later.  No order of this Court, you know, two months from

24   now or a year from now, whenever this -- whenever we come

25   back here to talk about environmental impacts when the FEIS

1     is actually issued, no order of this Court can somehow undo

2     the massive federal subsidies that this project will enjoy

3     that were done without consideration of environmental

4     impacts, which violates the entire point of NEPA, which is

5     that the agency decision-making should consider impacts at

6     the time that they make their decision.

7          So that's an irreparable permanent commitment of

8     resources, and that's why we need immediate relief now

9     rather than waiting until after the bonds are on the street.

10         THE COURT:  Okay.  Mr. Hajek, do you want to

11    address that?

12         MR. HAJEK:  Your Honor, the plaintiffs have not

13    demonstrated any irreparable harm.  Their harms are tied to

14    the construction and operation of the project, which the

15    Court has recognized is not imminent.  It is their burden to

16    demonstrate irreparable harm.

17         As the Supreme Court said in *Winter*, this is an

18    essential element of their case.

19         THE COURT:  Well, isn't their point that the

20    issuance of the bonds cannot be unwound or it would be very

21    difficult to unwind the issuance of the bonds in the event,

22    two years down the road, the EIS is determined to be

23    inadequate?

24         Respond to that argument.  You can't unring the

25    bell.  That's their point.

1          MR. HAJEK:  Well, they can't rely on an alleged

2     NEPA violation to make their case for irreparable harm, and

3     there again the *Appalachian Voices* case addressed this very

4     point, and what the Court said was, "Plaintiffs, in all of

5     your arguments about irreparable harm, what you're really

6     talking about are the alleged NEPA violations.  You're not

7     actually talking about the concrete harms to you."

8          And in that case, and in other cases in the --

9          THE COURT:  Well, the harm is -- their argument is

10    that they're harmed by the effect that the bonds will have

11    on the consideration of various alternatives.  Why isn't

12    that a link to the harm aside from the procedural violation

13    that they've alleged with respect to the issuance of the

14    bonds?

15         MR. HAJEK:  Right.  Their standing arguments and

16    arguments of irreparable injury are similar.

17         THE COURT:  They're very similar.

18         MR. HAJEK:  They want to mix and match the

19    procedural violations of NEPA and the actual harm to them.

20         Counsel mentioned the *Karst* case.  And I'm talking

21    about the context of standing now; that the Court could

22    assume that their claims were meritorious for purposes of

23    standing.  That is to say, the contract can consider them as

24    separate questions, consider standing based on concrete

25    injury first and then the NEPA violation separate, but what

1      it can't do is base standing on the alleged procedural

2      violation.

3              And the same thing is true of irreparable harm.

4      You can't come into court and have the only allegation of

5      irreparable harm be that you're going to be harmed by these

6      alleged procedural violations.  That just assumes the merits

7      of their case.  That's a wholly separate prong because it

8      goes to the likelihood of success on the merits of their

9      case.

10             THE COURT:  Okay.  Anything else?

11             MR. HAJEK:  No.  I just have the question of --

12     they say, "Well, this will be difficult to unwind later."

13     Certainly it may be.  This could cause a lot of problems.  I

14     have no doubt that bringing the instant lawsuit maybe will

15     cause problems for the company in potentially marketing the

16     bonds, but the Court should not add to that by imposing an

17     injunction.  It may or may not cause difficulties later, but

18     that, in and of itself, is not an irreparable harm to the

19     plaintiffs warranting a preliminary injunction.

20             THE COURT:  Thank you.

21             MR. STEARNS:  Your Honor, may I address the Court?

22             THE COURT:  You may.  Come on up.

23             MR. STEARNS:  Your Honor, if we -- first of all,

24     their harms, we need to identify what they start with they

25     say they are, and then talk about whether they're

1    irreparable and when they're supposed to occur.

2            Looking at their complaint, what you see is

3    allegations of idling times, fuel consumption and delays at

4    railroad crossings.  The passenger trains are in the record

5    established at 900 feet long and will go through each of

6    these grades in 45 seconds.  That is from the time the thing

7    goes up until it goes down is 45 seconds.

8            By contrast, the existing rail line that's been

9    there for 120 years runs freight at speeds of 40, 45 miles

10   an hour that go as long as 14,000 feet long, and the average

11   time for a freight car that's been running there for 120

12   years is over ten minutes.  And so what you have is the

13   difference between 10 minutes in existing use in an

14   intersection and 45 seconds for the new use about which they

15   complain.

16           And they're talking about freight, which are heavy

17   loads which carry the kinds of things that exist, and now

18   we're talking about passenger service, which are relatively

19   light trains, brand-new equipment, the state-of-the-art

20   equipment, and the money -- much of the money they're

21   complaining is going to be invested is going to be invested

22   to make this the safest train in the United States of

23   America.

24           So I'm -- but you go through each of these issues.

25   For example, we heard about bridge issues.

1          THE COURT:  How many more trains will cross each

2    bridge?

3          MR. STEARNS:  A total of each day at the maximum

4    use 32.  That will be 16 in each direction.  So a total of

5    32 trains today, and those trains are 900 feet long.  If you

6    add up the entirety of those 32 trains in any given

7    interaction, it doesn't equal one freight train.  That is to

8    say --

9          THE COURT:  But you've got to open and close the

10   bridge each time.

11         MR. STEARNS:  Well, let's talk about bridges

12   because that's important.  There are several.  There are, I

13   believe, two bascule bridges involved in this litigation.

14   That's not -- there are others in the system I might point

15   out.  For example, Coast Guard and the Corps of Engineers

16   has to approve -- it's one of the things now going on with

17   or without NEPA.  Coast Guard has to approve this, Corps of

18   Engineers have to approve it, and Coast Guard's view is

19   making it safe for navigation.

20         Federal Register has published the fact that the

21   New River Bridge, they have been doing a lengthy test case

22   of the openings and closings of that bridge in Fort

23   Lauderdale to see how it works, and it found no difficulty.

24   That is to say what is going to happen, Your Honor, is

25   freight service is going to be moved to later in the day.

1    Passenger service will occupy the time from 6:00 a.m. to

2    9:00 p.m., and so what you're going to have is freight

3    service will be on these bridges at the time when there is

4    the least amount of navigation traffic.

5             And that is the kind of thing that you work

6    through a process so that, for example, the company said,

7    "Well, you know, you've been working with this RRIF loan for

8    all this time.  Are you going to abandon your commitments?"

9             The answer is, "No.  We're going to do all of

10   those things."

11            But as a practical matter as to the immediacy of

12   the harms, I would point the Court to instructive language

13   that was in *Sierra Club vs. Clinton* where -- this was a

14   district court decision which rejected a similar claim on

15   irreparable harm, where -- this was where there was going to

16   be a construction of a pipeline on the right-of-way of an

17   existing pipeline.

18            Now, if we look at Indian River and Martin

19   Counties, the construction of rails that it's going to take

20   over a relatively short period of time -- that construction

21   activity -- I mean, there's no mystery, the relative minor

22   level of construction for constructing those rails over the

23   course of the year that it will take to complete from one

24   end of Martin County and Indian River County all the way to

25   Orlando, that is minor construction.  In fact, this goes

 1    back to the economic analysis.

 2            The expensive construction is the three stations

 3    that are being built in South Florida.  And what the Orlando

 4    leg allows you to do is take advantage of the economics of

 5    the substantial capital investment, which is, in the record,

 6    over 400 millions of dollars in this right-of-way, to be

 7    able to connect that up so the entire thing is profitable.

 8            So now what do we find out about the delay?  If

 9    you look at Judge Urbina's decision in *Appalachian Voices*

10    *vs. Chu*, he concludes that plaintiffs did not assert that

11    the allegation of a tax credit will directly cause them

12    irreparable harm.  That's exactly here.  Rather, they

13    predict there will be harm when the Cliffside plant becomes

14    operational, which they concede is not expected to occur

15    until the summer of 2012.

16            They also conceded that an injunction would not

17    prevent Duke from proceeding with the project.  That's

18    clearly the case.  And the Court then denied the injunction

19    that was requested on exactly the same legal grounds that

20    are argued here.

21            And of course Your Honor, in the *Committee of 100*

22    which was entered recently by this Court, found that --

23    almost rejected the same kind of arguments about vibration

24    and noise and dust and possible collisions.  It's entirely

25    too speculative and insufficient to justify the issuance of

1    preliminary injunctive relief.

2           Now, Your Honor, I don't blame people who are

3    seeing a train that goes through their communities for

4    wanting it to go away and not liking it because it's not

5    stopping there.  We understand they're unhappy about it.

6    But the arguments that are being made in terms of

7    irreparable harm border on the specious.

8           Thirty-two trips of a 900-foot train that will go

9    through an intersection at 45 seconds isn't even the

10   equivalent of a stoplight.  It's not even a stoplight.  And

11   so what you have is arguments of idling cars.  Those idling

12   cars exist in every intersection in America, including in

13   Indian River and Martin County, so there's no way in the

14   world on this record that they've established irreparable

15   harm.

16           THE COURT:  Thank you very much.

17           MR. STEARNS:  Thank you.

18           THE COURT:  Make it short.

19           MR. RYAN:  I will.  So with regard to the

20   bridges --

21           THE COURT:  Yes.

22           MR. RYAN:  -- I'm showing the Court, and I --

23   Aman, do you know how to make the numbers bigger?

24           With regard to the bridges, the bridges will be

25   closed nine hours a day, according to the DEIS.  In other

1    words, not an estimate that we've made, but that those

2    bridges will be down nine hours a day.  That ends the

3    navigation for that time period.

4         With regard to what this looks like, I'm going to

5    show you, from the DEIS comments, pictures taken by Captain

6    Goward, who used to be --

7         THE COURT:  Is that a comment in the DEIS, or is

8    that a finding in the DEIS?

9         MR. RYAN:  It is a factual finding in the DEIS

10   that it would be nine hours a day, and so what I was

11   trying --

12        THE COURT:  A finding by whom?

13        MR. RYAN:  By the consulting company hired by AAF

14   or, pardon me, hired by the DOT but paid for by AAF with

15   regard to what the impact of the project would be on the

16   community.

17        THE COURT:  Okay.

18        MR. RYAN:  In other words, it's not my expert

19   saying that that would be, you know, a Friedman-type issue.

20   It's the admission of the parties that are involved.

21        Now, just so the Court can get a sense of what

22   these bridges look like.

23        THE COURT:  Counsel, I saw that in your papers.

24        MR. RYAN:  Okay.  Very good.  I'll move on from

25   that.

1          Let me make a couple of points.

2          So the irreparable harm, there really are -- it's

3     not just the sale of the bonds, but it's then the

4     expenditure of the proceeds.

5          THE COURT:  The expenditure of the proceeds won't

6     happen until the EIS is completed.

7          MR. RYAN:  But the timeline that's --

8          THE COURT:  That's two years from now.  How is

9     that imminent?

10         MR. RYAN:  It's not going to be two years from

11    now, by the way.

12         THE COURT:  When will it be?

13         MR. RYAN:  I'm sorry, sir?

14         THE COURT:  When will it be?

15         MR. RYAN:  Well, according to the information most

16    recently available, and I think we could ask counsel for the

17    Department of Transportation, the department said it

18    wouldn't issue in the next two weeks, but that it is very

19    close to issuance.

20         And so one of the games that's being played here

21    is the timing of all of these elements; the AAF cancelling

22    the FDFC hearing the day before this Court's hearing, the

23    delay in the release of the DEIS or, pardon me, the FEIS.

24    And so what I want to say is all of that is within their

25    control.

1    But if you look at the timing, just the 45-day

2    aspect of the timing, that is not enough time necessarily to

3    -- it puts the District Court of Miami or this Court in a

4    position where you're going to have a window that will be

5    extraordinarily close to the issuance of that where normally

6    comments are heard on the FEIS and issued -- and a ROD is

7    then issued.

8    They've changed it so that they can issue the ROD

9    at the same time that they put out the FEIS, is my

10   understanding of it.  I'm not an environmental lawyer, but

11   it's my understanding that they have the right to do that,

12   but that normally there would be a 60-day period in many of

13   these cases, so that 60 days actually exceeds the 45 at

14   which they start to spend money.  So I wanted to point that

15   out.

16   The third aspect of irreparable harm is that the

17   Rogoff letter, with regard to what it describes as what they

18   have to do, is not the same as NEPA, and so those are the

19   three irreparable harms.

20   Now, counsel made the point -- and, again, we

21   start to need to be candid with the Court that the little

22   passenger train goes through pretty quickly.  The problem,

23   of course, is the nine hours and the 20-minute opening and

24   closing of the bridges each time.

25   Then with regard to the freight, there's literally

1    no commitment, none whatsoever, ever, that the freights

2    would run at night as opposed to during the day.  In other

3    words, they keep saying things up here that aren't in the

4    record, that aren't even provable, and that are not

5    commitments.

6            And the final thing, I think, we want to say here

7    is, I don't know if the Court is aware of it, but they want

8    the county to pay for its own safety with regard to this.

9    They have made no arrangement with Martin County, for

10   example, that the safety gates for the at-grade crossings

11   would be provided by the railroad.  And, in fact, the way

12   they've taken that issue to people is they've said, "Well,

13   if you'll do everything that we want you to do, including

14   signing a release of all liability, we'll pay for the gates,

15   but seven years from now you'll have to pay for all the

16   maintenance."

17           So they actually expect the taxpayers of our

18   county in the future to pay for the safety on the project

19   that they're bringing.  And that's my last remark on this.

20   Thank you.

21           THE COURT:  Mr. Karmel, do you want to address

22   major federal action?

23           MR. KARMEL:  Yes.  Thank you, Your Honor.

24           Just to clear up one point about traffic, I would

25   call the Court's attention to Docket 15-10, Page 37.  This

1    is a page from the draft EIS.  It says that when a train --

2    a passenger train goes by, not a freight train, a passenger

3    train goes by one intersection, there will be a 656.2-second

4    delay.  That's 11 minutes.  So the idea that this is just a

5    stoplight is not borne out by the DEIS analysis.

6             THE COURT:  Well, 11 minutes times 32 trains, how

7    do you get to nine hours of navigation closing?

8             MR. KARMEL:  That's the bridge.

9             THE COURT:  That's the bridge.

10            MR. KARMEL:  This has to do with back-up at an

11    at-grade crossing.

12            THE COURT:  Okay.  Got it.

13            MR. KARMEL:  In terms of major federal action, let

14    me start off with what is not in dispute between the

15    parties.  It is not disputed that the Secretary of

16    Transportation's approval in December 2014 was final agency

17    action.  It's also not disputed that this action was

18    discretionary as opposed to ministerial.  So the Secretary

19    could have Granted it.  The Secretary could have denied it.

20    The Secretary could have granted it but only with

21    conditions; it was not ministerial.

22             So this is not like an ordinary tax credit where,

23    you know, someone fills out their forms, and the IRS

24    determines they're entitled to the tax credit, or something

25    like that.  That's ministerial.  We're not claiming

1    something like that is subject to NEPA.

2           This is a discretionary subsidy of the project

3    with massive sums of money.  And even the fact that there

4    are massive sums of money involved is not disputed.  I mean,

5    their witness says it's $630 million.  We've said it's $1.3

6    billion.  So perhaps there's a dispute there, but it's not

7    disputed that this is a discretionary decision to provide

8    massive federal subsidies to this project.  That's not

9    disputed.

10          THE COURT:  The dispute is whether it's major or

11   not, and defendants have cited a number of cases where the

12   provision of discretionary tax benefits in the form of

13   credits or loan guarantees, et cetera, have been held not to

14   be major federal action, and I'm having the same trouble

15   locating the goal posts here that I had in the

16   redressability area, which is I don't see a case on the

17   other side where that sort of action has been held to be

18   major federal action.

19          MR. KARMEL:  Well, there's two answers to that,

20   Judge.  First, there was mention of tax benefits in the

21   *Sierra Club vs. Department of Agriculture*.

22          THE COURT:  It was in conjunction with other

23   benefits.

24          MR. KARMEL:  You're absolutely correct.  But it

25   was considered by the Court, so it's not somehow off limits.

1          But I think the more fundamental point is that the

2     language of NEPA and the language of the CEQ regulations,

3     which are binding, talks about federal assistance and,

4     there's no question that massive federal subsidies are

5     federal assistance.  I think even counsel for All Aboard

6     Florida said that in his remarks.

7          THE COURT:  So you're relying more on the quantum

8     of funding or assistance rather than this notion of federal

9     control.  Is that fair?

10          MR. KARMEL:  That's not correct, Your Honor.  We

11     are --

12          THE COURT:  I'm wrong on both.

13          MR. KARMEL:  We think that under either theory

14     there would be a basis -- under either theory, this is a

15     major federal action, so the -- let's talk about federal

16     subsidies because that's where we started, okay?  Let's

17     finish that and go to control.

18          THE COURT:  Okay.

19          MR. KARMEL:  Certainly the amount of the subsidy

20     is relevant to whether it's a major federal action.  There

21     are many cases cited by both parties where a project

22     received money.  And in some cases the courts held that's a

23     lot of money, it's a major federal action.  In some cases

24     the courts held that's not really -- that's just marginal

25     assistance.

1          So the amount of money is important, and the

2     amount of money here is extremely substantial.  So it

3     crosses a threshold to be major federal assistance.

4          The word used in many of the cases is "marginal."

5     Marginal federal assistance will not subject an entire case

6     -- an entire project to NEPA, and we would agree with that.

7     If this were only marginal federal assistance, then we would

8     not have a good argument about the federal assistance prong

9     of major federal action.  But this is massive federal

10    subsidy.

11         So let's move to control.  The control can take

12    place through several mechanisms.  One is regulatory

13    control, and the other is control by contract.  And there

14    are a number of cases where there is contractual control by

15    the federal agency, and that contract takes place in the

16    form of a grant assistance agreement or a loan agreement,

17    something like that.  Those contract conditions are deemed

18    to be controlled.

19         The best example I could think of is the FRA loan.

20    The FRA loan, which was a form of federal subsidy, all

21    parties, as far as I can tell from the papers, agree the FRA

22    loan is a major federal action.  And why is that?  It's not

23    because the FRA has regulatory control over the project.

24    It's because the FRA would have control over the project by

25    virtue of covenants in the loan document.  That is the

1    jurisdictional handle by which the FRA controls the project

2    and, therefore, the jurisdictional handle that gives this

3    project its status as a major federal action vis-a-vis the

4    FRA loan.

5         This is no different.  This is -- there is also an

6    agreement.  There were conditions imposed in the Secretary

7    of Transportation's approval letter of the tax-exempt bonds.

8    Those conditions impose certain covenants or certain

9    requirements relating to environmental matters, but they

10   didn't impose others.  And so they have the requisite

11   control.

12        The fact that they have chosen -- in the words

13   of DOJ's brief, they've chosen to only impose, quote,

14   limited conditions, unquote.  The fact that that was their

15   choice doesn't mean that they don't have control.  They

16   could have imposed much more substantial conditions.  They

17   could have --

18        THE COURT:  So the test is hypothetical control

19   rather than actual control?

20        MR. KARMEL:  The test is the ability of the agency

21   to impose conditions on the project as a condition for

22   receiving federal assistance.  This should be viewed as a

23   principle that follows logically from the scope of NEPA as

24   interpreted by the U.S. Supreme Court in *Public -- DOT vs.*

25   *Public Citizen*.  In that case, the Court said the point of

1    NEPA, the point of an EIS, is to provide information

2    relevant to agency decision-making pertaining to

3    environmental matters.

4          So the point here is for the EIS to be done, then

5    the Secretary of Transportation to look at that information,

6    and they can use that information to decide whether to

7    subsidize this project; and if they do want to subsidize the

8    project, what environmental conditions should be imposed on

9    the project.  They have that discretion.  That's not

10   disputed by the defendants, that they have that discretion.

11   And that means the EIS would have been useful in providing

12   information to the agency because they have the authority to

13   use that information.

14          THE COURT:  Okay.

15          MR. KARMEL:  Thank you.

16          MR. HAJEK:  Your Honor, the DOT's allocation of a

17   private activity bond was not a major federal action.  As

18   the Court is aware, there's no case finding that such an

19   action would be subject to NEPA.

20          And as we've discussed, there have been two cases

21   involving NEPA challenges to a tax credit.  One was the

22   *Appalachian Voices* case and the other is *Florida Audobon*

23   *Society vs. Bentsen*, and neither of those resulted in any

24   NEPA finding on the merits at all because they were resolved

25   on standing.

1            I also want to address briefly the --

2            THE COURT:  So neither of those cases held that

3     the extension of the benefit was or was not major federal

4     action?

5            MR. HAJEK:  That's right.  Those cases never

6     reached the merits.  But not only that, there's no other

7     case that we're aware of in which such a challenge was

8     brought and there was such a finding.  There's no goal post

9     on the other side, in other words.

10           In the *Sierra Club vs. The U.S. Department of*

11    *Agriculture* case that Your Honor mentioned, the rural

12    utility service did issue actual loans and loan guarantees,

13    and then it approved a restructuring of the debt which was

14    necessary for the expansion of a power plant.  The Court

15    also noted that the company updated the tax benefit as a

16    result of the restructuring and as a result of the write-

17    down of a debt.

18           But that was not the basis of the Court's finding

19    that it was a major federal action.  The decision that it

20    was major federal action was based on the agency's direct

21    control over the finances of the project, the write-down of

22    the debt, and the ongoing -- and the initial funding for the

23    project.

24           THE COURT:  Okay.

25           MR. HAJEK:  The All Aboard Florida project is a

1    private one.  I think that's a good place to start.  It's

2    not a federal project in any way.

3         NEPA does not apply to state actions or nonfederal

4    actions.  In some instances the role of the federal

5    government can be significant enough that NEPA would apply,

6    but that threshold was not reached here, and I think there

7    are three main reasons why.  There was no approval of the

8    project; second, DOT does not exercise control over the

9    project; and third, DOT did not provide significant funding

10    for the project, which is what is required under NEPA.

11         First, DOT did not approve the project.  It

12    approved a PAB allocation allocating a portion of the funds

13    that Congress set aside for tax benefits of this type.  But

14    it did not approve the project, and it's not a requirement

15    for the project to move forward.

16         Martin County cited to DOT's NEPA procedures in

17    DOT Order 1506.1.  Those procedures list many different

18    types of actions, including loans, but they do not list PAB

19    allocations.

20         Second, DOT lacks control over the All Aboard

21    Florida project.  They have no regulatory control.  There's

22    no ongoing approval.  Once the PABs are issued, it's pretty

23    much out of DOT's hands.

24         Plaintiffs make much of the fact that there were

25    conditions in DOT's approval letter to the company and the

1    condition -- the PAB allocation of the completion of the

2    FEIS by the FRA in compliance with the mitigation measures

3    in that FEIS, but they did so solely as a matter of policy

4    knowing that the EIS process had been ongoing for some time,

5    and they wanted to ensure that if the loan process were not

6    completed, that there would be compliance with the

7    mitigation regardless.

8            Now, DOT also recognized that Section 142(m) did

9    not necessarily give it statutory authority to issue those

10    conditions, and I think it is, to be candid, questionable

11    whether they have that authority.  But no such authority

12    exists in the statute, and that's the question that the

13    Court should look to.  Is there control by the agency within

14    the statute?  And there's none.

15           And so DOT negotiated with AAF and asked to

16    include these conditions in the approval, and they did so,

17    but that does not give the agency control over the project.

18           There are no cases squarely on point, Your Honor,

19    but I would point the Court to the *Sugarloaf Association vs.*

20    *FERC* from the Fourth Circuit in 1992, which is a useful

21    comparison.  In that case, the plaintiffs claim that the

22    agency's certification of a cogeneration facility under --

23           THE COURT:  I'm familiar with it.

24           MR. HAJEK:  Okay.  Okay.

25           I think the --

```
 1              THE COURT:  Move --

 2              MR. HAJEK:  Okay.

 3              THE COURT:  -- to substantial or significant

 4    financial assistance.

 5              MR. HAJEK:  Okay.

 6              THE COURT:  We've obviously talked a lot earlier

 7    this morning about the value to be placed on the tax benefit

 8    at issue.

 9              MR. HAJEK:  Right.

10              THE COURT:  AAF's projections, through Mr. Marcus,

11    estimate them to be in the 9 to 13 percent range of the

12    overall project costs.  Mr. Jetley's competing declaration

13    interpreting Mr. Marcus's declaration puts it in the 13 to

14    18 percent range, something like that.  We've heard

15    additional numbers today, depending on whether the bond --

16    the cash flow or the financing goes over ten years or

17    longer, upwards of 40 to 60 percent of the project.

18              When does it become significant based on the case

19    law?

20              MR. HAJEK:  Okay.  So I think there are two things

21    for the Court to look at.  The Court should look at both the

22    nature of the funding and also the significance of the

23    funding.

24              This is not a loan.  The money doesn't come from

25    the federal government.  There is no direct money coming
```

1    from the federal government.  It's all based on interest

2    that would be paid on bonds sometime down the line in that

3    foregone tax because of that.

4            I think in terms of that, again, it's different

5    from a loan guarantee because that -- in that case, the

6    government commits to providing funding later if the loans

7    fail.  But, for example, in the *Center For Biological*

8    *Diversity vs. HUD* case from the District of Arizona in 2008,

9    which was affirmed on appeal, that was a NEPA challenge to

10   HUD loan guarantees, and the Court found that because HUD

11   did not actually fund the various projects, it had no

12   ongoing control over the projects sufficient to make that

13   action a major federal action.

14           So we disagree that just based on the nature of

15   the funding it should be considered a major federal action,

16   but going to the amounts.

17           So if the Court were to look at it in terms of it

18   actually being a loan, which we don't believe it is at all,

19   one calculation is that it would be $300 million.  Other

20   calculations have been higher.  Where the courts have found

21   that funding is in the neighborhood of 10 percent, they've

22   found it insufficient to be major federal action, and I

23   would point the Court to *Sancho vs.* --

24           THE COURT:  Insufficient or sufficient?

25           MR. HAJEK:  Insufficient.

1          THE COURT:  Insufficient.

2          MR. HAJEK:  Insufficient.  I don't know of an

3    upper level threshold that's been reached, but where there

4    has been only 10 percent funding, that has been found to be

5    insufficient.

6          And pointing to -- in particular to *Sancho vs.*

7    *U.S. Department of Energy*, which is a District of Hawaii

8    case from 2008, at issue there was construction of a

9    $5 billion super glider.  And hundreds of millions of

10   dollars were provided in direct loans for the project, and

11   the Court found that that was not sufficient to render it a

12   major federal action.

13         That's pretty much all I have on that point, Your

14   Honor.

15         THE COURT:  Okay.  Thank you.

16         Mr. Karmel, very briefly.

17         MR. STEARNS:  May I, Your Honor?

18         THE COURT:  Of course.

19         MR. STEARNS:  I'll try not to abuse my role, but

20   my client would expect to be heard, if you don't mind.

21         THE COURT:  You pay for your ticket.

22         MR. STEARNS:  Thank you, Your Honor, and if I may

23   just correct the record of something said previously, that

24   All Aboard Florida cancelled the hearing in Tallahassee or

25   Orlando.  That is not true.  All the parties asked that the

1    hearing be moved, including the two plaintiffs here.

2              MR. RYAN:  That's not true.

3              MR. KARMEL:  No, that's not correct.

4              MR. STEARNS:  Okay.  The transcript will speak for

5    itself.

6              THE COURT:  It's neither here nor there.

7              MR. STEARNS:  And with respect to who pays for the

8    gates, there's no issue that All Aboard Florida has agreed

9    to pay for all of the -- taking all of these grade crossings

10   to the highest safety level existing in the United States of

11   America at its expense, which normally is an expense of

12   local government.  It is their obligation to maintain them;

13   but because they'll all be new, their maintenance costs will

14   be deferred for a number of years.

15             With regard to the passenger train study of 11

16   minutes, if Your Honor will look at the page -- and I've

17   unfortunately left it on the table here.  In the draft EIS

18   you will see that it shows obviously significantly lower

19   minutes per hour of 1.7 minutes per hour of closings at

20   these grades and concludes that the project will have a

21   minor but not significant impact on local traffic by

22   increasing the frequency of at-grade crossing closures and

23   does a fairly detailed analysis.  So I don't know where they

24   came up with their number.

25             But turning now to the issue of major federal

1    action, and ultimately the issue is control.  Does the

2    federal government -- in fact the DOT, rather.  Does DOT

3    itself control this project?  And the answer is

4    unequivocally no.  It does not control the project.

5          Now you get to the issue -- it doesn't make rules

6    and regulations.  It doesn't govern it.  It didn't, in a

7    two-page letter, undertake to control anything.  That's not

8    what Congress charged it to do when it charged it or gave it

9    the option to be able to make decisions on projects that

10   would be qualifying for these private assistance bonds,

11   private activity bonds.

12         And their argument is, "Well, it was a

13   discretionary decision to allocate these bonds."  But if the

14   mere exercise of discretion would automatically trigger

15   NEPA, then every single federal decision ever made would

16   trigger a NEPA analysis, which is an absurd conclusion.

17         The cases that conclude that the magnitude of the

18   money is not sufficient to establish the federal control

19   would be *Sancho*, *Friends of the Earth*, *St. Johns vs. FAA* and

20   *Sugarloaf*, all of which have been cited, all of which

21   address this issue pretty conclusory.

22         But I think we need to go beyond just the mere

23   statement that it's not just the magnitude and understand

24   the economics, because that's what drives those cases.  If

25   the federal government, for example, under various programs

1    -- for example, the RRIF loan.  It's a lender.  As any

2    lender, it's going to have conditions of the loan, and the

3    conditions of the loan are going to be very detailed about

4    what can be done, when it can be done, how it can be done to

5    protect the security of repayment.

6            THE COURT:  Well, you're the lender.

7            MR. STEARNS:  Absolutely.  There's no -- the whole

8    point of this program was to incentivize private investment

9    in public infrastructure to survey public purpose, so you

10   end up with public/private relationships, but the idea is to

11   bring private money and private investment into a

12   disastrously crumbling infrastructure of the United States

13   of America.  And this was a step to see, does it work?  Is

14   it going to work?

15           And so what you have is no control by the federal

16   government, but -- and no credit risk.  It has no credit

17   risk, and if you believe Professor Friedman, it's not going

18   to lose a dime of tax revenue because there will be no

19   interest income paid for which taxes will be liable.  I

20   mean, Martin County makes the absolutely strange argument

21   that there will be no interest income because there will be

22   no earnings, and yet somehow or other they do the

23   calculation of all the money that's going to be lost for the

24   interest, according to them, that's never going to be paid.

25   And that is just an example of the problem with Professor

1    Friedman's analysis.

2            But let's go to the issue of how much and how did

3    you calculate it.  And there's no case law that drives this.

4    There's no statute that drives this in doing these

5    calculations.  This is pretty much the common law of how we

6    address these kinds of issues, but I think we have to look

7    at it rationally.

8            We know at this moment in time that we have a

9    number that's roughly $3.5 billion.  It started at $2.6

10   billion.  It grew to 2.9.  It's now $3.5 billion when you

11   calculate the $600 million of equity investment in buying

12   the right-of-way rights to connect Orlando to Miami.  That's

13   a substantial investment.

14           Now, by the way --

15           THE COURT:  How is that 2.9 or 3.5, whatever it

16   is, divided between Phase I and Phase II?  Tell me that.

17           MR. STEARNS:  The answer is -- I'm not aware of

18   the division in terms of what it's going to be.  I will say

19   this.  I believe it's fair to say, and I think the record

20   reflects this -- I can't give you the breakdown in

21   percentages.  Because the government in Orlando wants this

22   train and is funding and financing the intermodal center of

23   which we will be a part, we don't have to do that.

24           We pay rent, by the way.  It's not a gift.  It's

25   not a subsidy.  We pay rent.

1          So clearly the advantage to us of going to Orlando

2     is that we pay rent instead of spending money to go there.

3     Clearly the advantage is we take advantage of the track from

4     Palm Beach to Brevard County.  Clearly we take advantage of

5     the fact that because we're building a new system from

6     Brevard County to Orange County, it can all be grade-

7     separated, which is a desirable thing, using, for the most

8     part, existing interstate highway right-of-ways in

9     cooperation with the government entities because they all

10    want this to happen because it's important for the public

11    interest.  And so what you have is an investment in a major

12    investment in Dade, Broward and Palm Beach County that

13    drives the economics that takes you to Orlando that makes

14    the entire, quote, project as a whole make sense.

15         But because the government has no credit risk, all

16    it has is an incentivized, "Okay, if you can go sell these

17    bonds, because of what you generate" -- and by the way, it's

18    not that the government is not going to get income tax

19    dollars and other tax dollars from this.  It's going to get

20    hundreds of millions of dollars because of the project,

21    which is going to throw off those dollars which otherwise

22    wouldn't exist but for the investment.

23         But now, when you look at the cost, why would you

24    reduce to present value a ten-year period of this money?

25    The answer is because you have, today, a fixed investment

1    cost that's going to occur in a brief period.  It's about a

2    year-and-a-half period where the entire capital is going to

3    be invested before this railroad is running.  The plan is to

4    open the railroad for passenger service in the first phase

5    in the first part of 2017, and open it for the second phase

6    in the fall of 2017.  And therefore, we're looking at a

7    relatively brief period of capital investment.

8           But you can't use a 30-year analysis without

9    understanding the capital investment is going to continue

10    for the duration of this project so long as it's

11    successfully operating, so you have -- and by the way,

12    private bonds, you can't go past ten years.  That's why we

13    did a ten-year analysis.  Nobody -- the market isn't going

14    to take you to a 30-year bond.

15           So what you have is --

16           THE COURT:  But to go to Mr. Karmel's point, why

17    would you replace cheap, subsidized debt with more

18    expensive, private debt?

19           MR. STEARNS:  Because, Your Honor, I'm an old

20    person, and I've lived through four depressions, and I will

21    tell you that interest rates during those depressions have

22    been so variable.  And I can tell you the one common

23    denominator at every single point in my life is everybody

24    thought interest rates today were going to be the same

25    tomorrow.

1          I can tell you this, nobody knows what interest

2     rates are going to be in ten years.  Nobody knows whether

3     they're going to be low or going to be high.  No one is

4     going to tell you -- it would be purely speculative to go

5     past ten years, and the reason you use ten years is because

6     if you go for conventional financing, you can't prepay it.

7     In your conventional financing, the form of prepayment is

8     going to be, "Sorry, if we're going to invest our money in

9     your business, once you've committed to it, you're committed

10    to it."  You can't say, "I've got a better deal."

11         That's, by the way, what makes the $400 million of

12    existing debt so expensive, because it's prepayable, and you

13    don't even have to pay interest on it.  That is, this is not

14    your normal garden variety debt.  This is debt that was

15    created for a very special purpose.

16         The debt was created for the purpose of knowing

17    they would meet their time deadlines.  It was debt that they

18    hoped that they're never going to spend.  It's sitting in

19    the bank.  It's never been spent because the idea is on a

20    long-term basis you would not choose to borrow money at that

21    level, but you needed to because when they borrowed it the

22    interest rate environment was such and the credit

23    environment was such that that's what they needed to do to

24    be able to make sure they could meet their obligations on a

25    going forward basis.

1           So what we have here, in looking at major federal

2     action -- the fact is the Department of Transportation has

3     attempted to assess no control with regard to the

4     requirement that All Aboard Florida has agreed to.  They've

5     said, "Absolutely.  We will comply with whatever comes out

6     with the final environmental impact statement.  We will do

7     all the mitigation measures.  We'll do those."

8           But it's important to know DOT is not adopting any

9     of those measures.  It's not evaluating the mitigation.

10    It's not doing any of those things.  It has none of the

11    indicia of control.

12          All it has said is, "Listen, you've spent two

13    years of your life dealing with FRA on these issues.  We

14    don't want you just to abandon ship and say -- having gotten

15    all these governments involved and figuring out you're just

16    going to walk away from the table."  That's all they did.

17    And that's not enough to establish control under NEPA, Your

18    Honor.

19          THE COURT:  You brought up the RRIF loan.  Would

20    AAF still require the RRIF loan if the bonds were available?

21          MR. STEARNS:  Your Honor, the answer is I can't

22    tell the Court one way or the other.  I will say this, there

23    is no plan to abandon the application.  I will say that it's

24    likely they would never ask for the full $1.6 billion.  That

25    is at some point, as credit markets have gotten better since

1    the RRIF loan was first applied for, that as a practical

2    matter the private activity bonds have features that make it

3    more attractive to the company on a going forward basis.

4        But the company has certainly not announced a

5    decision to abandon the RRIF loans.

6        THE COURT:  Okay.

7        MR. STEARNS:  And by the way, that leaves the last

8    point, which is what the plaintiffs are really complaining

9    about is the RRIF loan because the RRIF loan, by the way the

10   statute has been interpreted from the beginning, similar

11   with other lending characteristics which the government

12   actually extends credit, there's clearly a NEPA requirement

13   because the government is extending credit and, in the

14   consequence of extending credit, controlling it.

15       So if they had a complaint, it's directed to the

16   RRIF loan.  It's not directed to the allocation of the tax-

17   exempt bonds.  Thank you, Your Honor.

18       THE COURT:  Thank you.

19       So Martin County raises this 142(m) issue.

20   Mr. Ryan, do you want to address that?

21       MR. RYAN:  Yes, sir.

22       THE COURT:  Okay.

23       MR. RYAN:  So, Your Honor, I'd like to begin the

24   analysis actually at an interesting point in time, which is

25   in 2011.  I'd like to put up what's been attached to the

1    Rahall declaration, and this is the 2011 proposal that was

2    made by the Department of Transportation through the White

3    House, and it is the language that would actually have

4    allowed this project to be bonded.  In other words, the red

5    language, by the way, is not our addition.  It's what the

6    White House and the Department of Transportation were

7    proposing.

8         And what Rahall says is that you would never have

9    needed to do this if the department's theory on 142(m) is

10   correct.  So as you go through this, I don't think I've ever

11   seen a more clear demonstration that the current

12   administration that is giving the path also doesn't believe

13   that it has the authority to do so.

14        Let's go ahead --

15        THE COURT:  We get there only at Chevron Step 2,

16   right?  Tell me why the plain language of the statute does

17   not control.

18        MR. RYAN:  I'm going to go there right now.

19        Okay.  So with regard to 142(m), you have to --

20   yes, in order to get to 142(m), you have to look at the rest

21   of the statute because I think the Court is commanded to

22   read the statute as a whole, not to read one phrase and give

23   that phrase a meaning that would, in effect, swallow the

24   statute.

25        And I don't think there's any doubt here that

1    Paragraph 11, "High Speed Intercity Rail Facilities" --

2    which is not how the project is being bonded because the

3    definition of what a high speed passenger rail is is not the

4    AAF project.  And so with regard to where in the statute

5    would one find the bonding authority for this, the Congress

6    knows how to explicitly make projects like AAF either within

7    the zone for a PAB bond or not.  And, in fact, Congress has

8    repeatedly -- repeatedly -- in the Rahall affidavit asked

9    each other to change that speed limit so that this project,

10   which has a speed limit in the area of 100 to 125 miles per

11   hour, would qualify, because it doesn't under 11.

12           Now, it can go to (m), which was from SAFETEA-LU.

13   With regard to this, I think here the Court has to read this

14   entire amendment under *expressio unius* -- a Catholic boy

15   should be able to do better with the Latin -- the mention of

16   one thing implies the exclusion of another.  So I just want

17   to take a minute with the Court.

18           Obviously I believe that the Department of

19   Transportation is in the Rose Mary Woods position, if Your

20   Honor will recall the picture of Rose Mary Woods describing

21   how she erased the tapes.  That's how I believe the

22   Department of Transportation's statutory interpretation

23   works.  They give all the meaning in the statute to the

24   first sentence or the first line, if you will, of A and give

25   no meaning to B and C.

1              Let's talk about C for a minute.  What C stands

2      for is that the Department of Transportation and the

3      Congress know how to write Title 49 in; Title 23 is

4      highways; and that Congress, also in its crayon box, knows

5      how to use the word "rail."  So in the same amendment that

6      they're claiming now gives them the right to bond $1.7

7      billion of nonconforming intercity railroad, they ignore the

8      fact that under *expressio unius*, that the Congress in the

9      same amendment in SAFETEA-LU actually used words that might

10     very well have benefited them in this argument, if they were

11     in A.

12             Now, let's talk for a moment about the actual

13     words of why did the Congress then use the words "any

14     surface transportation project," and can you divorce it?

15     Can you say that because a dollar of it can be spent under

16     Title 23, that you're home-free home-free to do whatever you

17     want.  Is that what the command of the Congress was?

18             We have scoured the legislative history of

19     SAFETEA-LU.  The Court has very able law clerks who know how

20     to do this.  When they look, they will not find a single

21     word in the legislative history that would indicate that

22     Congress had the anticipated connection that that dollar in

23     Title 23 funding spent over here would enable the

24     expenditure of $1.7 billion over here.  And at the end of

25     the day, you've got to read this statute together and

1    understand in essence that those words "service

2    transportation project" could very well mean toll roads

3    versus highways, county roads versus highways.  In other

4    words, they are taking it to mean any surface transportation

5    project.

6            Put up the original of 14.

7            In effect what they're asking the Court to do is

8    in (m)(1)(a) get rid of the rest of this statute because

9    almost everything in the statute in the existing language

10   that the Congress was working with and in C below are

11   projects that could then be subsumed by the language here.

12   Let's look at B.

13           THE COURT:  The specific list in 142(a), these

14   projects do not necessarily require Title 23 funding in

15   order to qualify.

16           MR. RYAN:  That's correct.

17           THE COURT:  Okay.  So 142(a) can be read with

18   142(m)(1)(a) to create a list of specific projects plus a

19   list of projects that receive federal funding, and there's

20   not necessarily overlap with that; is that correct?

21           MR. RYAN:  That is correct.

22           THE COURT:  Okay.

23           MR. RYAN:  The problem here, though --

24           THE COURT:  The question then becomes whether a

25   penny of federal funding qualifies the project.

1          MR. RYAN:  Well, let me step off for a minute.

2     This is something that I have discovered, I think, that is

3     very important, and I'm going to ask the Court to bear with

4     me for a minute.  I've been assuming that the

5     representations of the United States were correct, that

6     $9 million was spent on the project.  If the Court reads

7     (m)(1)(a) the way the defendants would have us read it, it

8     says any surface transportation project.

9          The project here is AAF, and I don't think they

10    can avoid that.

11         Let's look at the Baumer affidavit.  First of all,

12    Mr. Baumer is a GS-12 at the department who works on these

13    issues.  He's worked there for about four years so it's

14    interesting that he's talking about some projects that have

15    never been talked about before, but I want the Court to pay

16    particular attention -- can you blow that up?

17         I want the Court to look at this particular

18    paragraph in his affidavit and see that what they're talking

19    about is not the project, it's the project corridor.

20         In 2009, AAF, in its current form, did not exist.

21    The money was given for safety mitigation on the rail

22    corridor that happens to be the same rail corridor, but it

23    is not the project.

24         Now, is that a word that is of meaning?

25         THE COURT:  Which paragraph of Mr. Baumer's

1    declaration?

2            MR. RYAN:  I'm on Paragraph 10, Your Honor.  And

3    if you'll see on the end of the first sentence of that

4    paragraph, on Line 3, it says, "They spent Title 23 funds to

5    improve railway-highway grade crossings along the project

6    corridor."  That is not the AAF project.  And, in fact, in

7    2009, when the money was authorized, there was no AAF

8    project to give the money to.  And so even by their own

9    reading of this, there's very careful words there.

10           Now, that caused me to actually ask the question,

11   why didn't the Department of Transportation or AAF attach

12   the actual program documents that they're relying on?

13   Instead, if you look behind the affidavit, there's a list

14   that comes not from government, but from the FEC of which

15   crossings on the corridor they spent the money on.  And so

16   the Court should not assume, and there is no evidence in the

17   record, that they actually spent money on the surface

18   transportation project; that is, the AAF project.

19           Now, they're going to claim that since they want

20   to rebuild that entire FEC corridor with the money from

21   this, that therefore the expenditure under Title 23

22   previously of the $9 million for -- that Governor Scott, in

23   effect, as the governor of Florida, directed FDOT to do

24   gives them the trigger.

25           If we look -- I'd like to put up the Murphy

1    letter.  What's interesting is Congressman Murphy, in

2    December -- and his district sits astride this area -- wrote

3    a letter to the Secretary that it took five months for a

4    Democratic administration to answer a Democratic congressman

5    about their authority.  Other than the 2005 document, which

6    is one government lawyer writing a memo to another

7    government lawyer -- which previously was the only document

8    that the Department of Transportation could come up with to

9    show why there should even be a Chevron 2 analysis.

10           If you look at the words of the Murphy letter, the

11   Foxx letter to Murphy, it actually for the first time tells

12   the Congress of the United States -- it's the only document

13   in the record that we can find that says that they can do

14   this under Title 23.  But more importantly, look at the

15   words.

16           Blow it up to the "project corridor" language.

17           The very same language about the corridor is used.

18   It doesn't say "the project"; it says, "the corridor."

19           So actually, you know, sometimes when you want to

20   take a bleak house view of how people have standing or a

21   bleak house view of the application of all of these legal

22   doctrines to other people, a bleak house view can be done

23   similarly to show that you're not even on the same project;

24   and, therefore, even if you had your reading of the statute,

25   you haven't proven your case.

1          So I would actually suggest that I would leave the

2     record open so that the department can come forward and put

3     in the documents from 2009 that show what the corridor is

4     that's referred to and whether there are any references to

5     the project; that is, to AAF.

6          But returning --

7          THE COURT:  And the specific expenditures in the

8     corridor that you're pointing to are grade enhancements?

9          MR. RYAN:  No.  They were for planning of safety

10    mitigation, I think is what the government has represented.

11         I actually don't have the relevant documents

12    available to me.  And all it is is about safety enhancements

13    in the corridor.

14         Now, the corridor has existed -- my brother has

15    gotten up and bathed himself in the 125 years of history

16    that the corridor has been open.  At what point in

17    attenuation can the department actually argue that it has a

18    reading that a single dollar of expenditure under Title 23

19    enables it to bond out a railroad that the statute indicates

20    is not qualified?  That's the core issue before the Court.

21         THE COURT:  Okay.

22         MR. RYAN:  And I could talk further about the

23    cases, but I think the Court has it.

24         THE COURT:  I understand your argument.

25         MR. RYAN:  Good.  Let me just say I think the

1    Rahall declaration is very important.  Congressman Rahall

2    loves the transportation --

3              THE COURT:  This is retrospective legislative

4    history; is that right?

5              MR. RYAN:  No, that's why I want to talk about it.

6    Because if all he was saying is what the legislative history

7    of SAFETEA-LU was, then the Court would be entitled to say,

8    "Well, that's my job.  I'll decide what the legislative

9    history was."

10             It's the pointing out of all of the bills

11   subsequent to that that would not be needed.  That's the

12   value of the Rahall declaration.

13             He and Jim Oberstar ran that committee on the

14   Democratic side for a long time, and Jim Oberstar wanted his

15   Northern Lights Express.  If he had understood the game that

16   the department is playing, that by paying a single dollar

17   for a transportation highway safety mitigation he could then

18   bond out his project, they would never have introduced the

19   bills they did.  I think that they're totally busted.

20             THE COURT:  Haven't they been doing this for a

21   long time?

22             MR. RYAN:  I'm sorry, sir?

23             THE COURT:  Haven't they been taking the same

24   interpretation for quite some time?

25             MR. RYAN:  They have not put forward a single

1    document to show that they've done that.  They claim in the

2    affidavit that's come forward that there are other projects

3    they've done it for.  I don't -- I think the Court ought to

4    have a motion in limine and disregard those other projects

5    because you can't delve into what was the appropriateness of

6    funding there, what was its analysis here.  The point is the

7    department has come forward with something that is on its

8    face incredible when reading the statute, which is that the

9    words "any surface transportation project" allow them to

10   bond out a railroad that doesn't qualify else-wise.

11            THE COURT:  Okay.  Thank you.

12            MR. RYAN:  Thank you.

13            THE COURT:  Mr. Hajek?

14            MR. HAJEK:  Before I move to Section 142, I'd like

15   to correct something that I heard earlier.  I heard

16   something about the EIS, the final EIS coming out at some

17   point, and my understanding is that it could come out at the

18   end of June, but I have not -- I have no information about

19   any ROD being issued at the same time or subsequently

20   thereafter.

21            THE COURT:  But the authorization is tied to the

22   issuance of the EIS, not to the ROD; is that correct?

23            MR. HAJEK:  That's right.  That's right.  There's

24   nothing in the PAB allocation that relates to the ROD.

25            Turning to the Section 142(m) argument, the Court

1    should not overlook the very significant issues with the

2    zone of interest.  These plaintiffs seek to bring a suit

3    challenging the conferral of a tax benefit on someone, on

4    another party, and that is not something that was

5    contemplated by the statute.  Nowhere does the statute

6    indicate that it was intended to protect the kind of

7    interests that are being put forward in this case, that it's

8    intended to provide an avenue for lawsuits, for entities --

9           THE COURT:  The statute is 28 USC 142?

10          MR. HAJEK:  Yes, that's -- exactly, Your Honor.

11   So yes.  26 USC 142(m).

12          THE COURT:  26.

13          MR. HAJEK:  And the D.C. Circuit's opinion in *Tax*

14   *Analysts & Advocates vs. Blumenthal* from the D.C. Circuit in

15   1977 is right on point.

16          THE COURT:  So who could bring that suit?  A

17   competitor?

18          MR. HAJEK:  Your Honor, there doesn't need to

19   be -- it's not my burden to demonstrate that someone else

20   could bring a suit.  In theory, a company that was designed

21   could bring a lawsuit.  They'd have a difficult time

22   bringing that suit because the allocation is vested in the

23   agency's discretion.

24          But in any case, the rationale of *Tax Analysts*

25   applies here.  This is the conferral of a tax benefit.  It's

1    a not a statute that was designed to confer right of suit

2    for potential environmental issues.

3            But turning to the eligibility under Section

4    142(m), the agency is entitled to Chevron deference, and the

5    plaintiffs have conceded court.  The Court should first look

6    to the plaintiff --

7            THE COURT:  Well, let's go back to the

8    jurisdictional issue.

9            MR. HAJEK:  Okay.

10           THE COURT:  Wouldn't jurisdiction be found under

11    the APA assuming a plaintiff had standing to challenge the

12    Secretary's interpretation of the statute?

13           MR. HAJEK:  The APA provides a right of suit.  It

14    waives the government's sovereign immunity, but it does not

15    provide the legal claim under the -- in fact, the language

16    giving rise to its zone of interest arguments comes from the

17    APA that you have to bring within the meaning of a

18    particular statute.

19           THE COURT:  So you're not raising a jurisdictional

20    argument?

21           MR. HAJEK:  No, no.  In fact, the Supreme Court

22    has clarified in recent cases that this is an aspect of the

23    parties' claim and not an element of Article 3 or even

24    prudential standing.

25           THE COURT:  Okay.

1           MR. HAJEK:  But under Chevron, the first step is

2     to look at the plain meaning of the statute, and if the

3     Court finds that it's ambiguous, then it should proceed to

4     Chevron Step 2.  And under Chevron Step 2 the question

5     becomes whether the agency's interpretation of the statute

6     is permissible.

7           The plaintiffs' arguments fail on Chevron Step 1

8     because their arguments fly in the face of the plain

9     language of the statute, which says that it, quote, applies

10    to, quote, any surface transportation project that receives

11    federal assistance under Title 23.  The All Aboard Florida

12    project receives funding for grade crossings, has received

13    and will receive in the future under 23 USC Section 130.

14          THE COURT:  Now, is that the $9 million that

15    Mr. Ryan just referred to?

16          MR. HAJEK:  Yes.  Those are the amounts referenced

17    in the application.

18          THE COURT:  Okay.  Respond to his arguments that

19    those outlays went to the corridor as opposed to the project

20    and were not specific to the project.

21          MR. HAJEK:  He has an overly narrow view of what

22    the project is.

23          THE COURT:  What were those expenditures for?

24          MR. HAJEK:  They were for -- to improve highway

25    grade crossings which will enable the rails to go across

1    those crossings and make them safer for the highway rail

2    intersection.  And so if a highway rail intersection is not

3    part of a rail project, I don't know what is.  Those are

4    aspects of the project just as are -- just as any other.

5            But before we get there, Your Honor, one point

6    they make is, well, this can't be what Congress meant

7    because there's a separate section for high speed rail

8    projects.  That's Section 142(i).  But plaintiffs are

9    incorrect that provision renders superfluous the other

10   provision under Section 142(m).  High speed rail is a very

11   specific subset of passenger rail, and Section 142(m)

12   applies to any surface transportation project that receives

13   Title 23 funding and therefore could apply to many rail

14   projects that could not receive funding under Section

15   142(i).

16           THE COURT:  So you read 142(a) as covering certain

17   high speed rail projects that do not necessarily receive

18   federal funds?

19           MR. HAJEK:  Section 142(i) covers high speed rail,

20   and so that is a very specific type of transportation

21   project.

22           THE COURT:  Any high speed rail or high speed rail

23   that receives federal funds?

24           MR. HAJEK:  No, (i)'s just high speed rail.

25           THE COURT:  Okay.

1          MR. HAJEK:  It's not contingent on Title 23.  So

2     no, there's no overlap there.

3          THE COURT:  So federal funding is the hook to

4     qualify for (m) when no funding is present for the more

5     specific 15 projects, types of projects?

6          MR. HAJEK:  Yes, yes.  Plaintiffs attempt in

7     various ways to apply that the legislative history supports

8     their arguments, but really, if you look at the legislative

9     history, it's very scant on this section.  And in various

10    places it repeats the same language in the statute, but in

11    no way does it suggest any different interpretation than the

12    one that DOT has put forward.

13         So I'd like to address the Rahall declaration.

14    This was a declaration that was submitted for the first time

15    in reply.  It represents the opinion of only one

16    congressman, and it's based on legislative proposals that

17    came after the statute was enacted.  And so for all those

18    reasons, the Court really should not consider it or should

19    give it very little weight.

20         But even if the Court considers the declaration,

21    it doesn't show that DOT's interpretation of the statute is

22    not a permissible construction of the statute, which is what

23    plaintiffs would have to show under Chevron.  He claims that

24    -- excuse me, Your Honor.

25         He makes some claims that there were proposals for

1    lowering the speed threshold for high speed rail, and that's

2    somewhat irrelevant, and plaintiffs didn't really raise that

3    today.  But what they did highlight today is that

4    Congressman Rahall cited a draft copy of a bill that was

5    never submitted to Congress.  That's the one they've put up

6    here.  And I would say that there's nothing that we can

7    infer about Congress's intent from a draft proposal that was

8    never seen by Congress.

9         But further, Your Honor, the fact that this draft

10    proposed bill would have expanded the authority under

11    Section 142(m) to other types of rail projects does not

12    undermine DOT's interpretation that the existing 142(m) also

13    applies to rail projects.  Indeed, if we're going to go this

14    far, I think we could infer the opposite conclusion; that

15    someone felt that there already was authority in Section

16    142(m), and that this expanded on it, and it was a good

17    place to put it in the statute.

18         I would also note that Congressman Rahall claims

19    that he never knew that DOT interpreted the statute this way

20    as applying to rail, but he should have been aware at least

21    as of May 2010 when DOT made the allocation for the Eagle

22    Project in Denver.  DOT has let it known for some time that

23    it thinks that the statute applies to rail projects of this

24    type, and no one has objected until now, until this

25    litigation.  Therefore, I would say that DOT's

1    interpretation of any surface transportation project that

2    receives Title 23 funding as including rail projects is

3    consistent with the plain language of the statute and is at

4    least permissible under the statute.

5            And I would also address this point about the

6    funds going to only part of the project, and this goes to

7    the point made in the 2005 letter from the acting chief

8    counsel of the Federal Highway Administration to IRS.  And

9    at the time the acting chief counsel said ten years ago that

10   his interpretation was as long as Title 23 funds were used

11   for the project, then the PAB allocations could be applied

12   for the whole project; otherwise it would just encourage

13   applicants to sprinkle these funds throughout the project to

14   make it seem like the entire project was being funded.

15           THE COURT:  Explain that to me.  I frankly didn't

16   follow that argument in your brief.

17           MR. HAJEK:  Yes, right.

18           Well, so if the way it is, the way it's

19   interpreted by DOT is if there are any funds -- and they

20   claim this is wrong because you can't just have any funds,

21   but that's what the statute says.

22           THE COURT:  I understand.

23           MR. HAJEK:  So if there were -- if it were true

24   that the whole project had to receive Title 23 funds, then

25   it would have to be that the applicable state agency would

1     have to somehow sprinkle them broadly enough across the

2     whole project so that -- to make it eligible, to create sort

3     of an arbitrary situation.

4             THE COURT:  So, you know, in this case, instead of

5     using Title 23 money to do grade crossings, they would build

6     a depot in Orlando and rail improvements some place else on

7     the line, et cetera?

8             MR. HAJEK:  It could be.  I don't have the

9     specific details of what they might do, but one reason that

10    that's a counterintuitive interpretation of the statute is

11    if all these aspects of the project were receiving Title 23

12    funds anyway, that would limit the need for a PAB

13    allocation.

14            They've adopted this *expressio unius* principle for

15    interpreting legislative history, and they rely on the

16    *Halverson* case from the D.C. Circuit, but there a statute

17    specifically delegated in one section of the statute

18    authority to delegate certain functions to the Coast Guard,

19    and in another section it did not.  And under those

20    circumstances where one section of the statute specifically

21    addressed an issue and another did not, the Court reasonably

22    found that in the latter situation the same delegation was

23    not authorized.

24            But that's not at all similar to the situation we

25    have here.

1          THE COURT:  Thank you.

2          Mr. Stearns?

3          MR. STEARNS:  Yes, Your Honor.

4          THE COURT:  Something tells me you have something

5      to add.

6          MR. STEARNS:  Not much, but I appreciate your

7      offer.

8          THE COURT:  All right.  I'm well-trained.

9          MR. STEARNS:  If I could point the Court to *Clarke*

10     *vs. Security Industries*, which is Supreme Court 479 U.S.

11     388, it addresses the zone of interest issue, and clearly in

12     this instance what you have is a taxpayer saying he doesn't

13     like the way the government made a decision to allocate

14     these bonds, and that's outside of his zone of interest.

15          This plaintiff doesn't have the right to do that.

16     It is not a jurisdictional issue.  It's not even, according

17     to Lexmark, a prudential issue.  It is something all by

18     itself, if we follow, like I think we must, Judge Scalia's

19     discussion of the issue, but you will find that that

20     discussion is in that case, and I think it concludes that

21     they have no zone -- they're not within the zone of

22     interest.

23          When you go to the definitional interest, they

24     attempt to construct the *expressio unius* argument, which I

25     must, if Your Honor will allow, what Judge Fay of the 11th

1   Circuit once said that there was this lawyer from Wetumpka,

2   Alabama, who was clearly a very bright fellow but very rural

3   in his background, and one of the judges, Judge Fay's

4   colleagues, asked him, "Well, Counsel, have you considered

5   the notion of *expressio unius alterius exclusio?*"  And Judge

6   Fay says the lawyer, without missing a beat, says, "Your

7   Honor, down in Wetumpka we talk about hardly anything else."

8        And I've never forgotten the issue of the

9   expression of one thing is to the exclusion of the other,

10  but it takes us to this interpretation, which is -- that's

11  precisely what Martin County wants to do.  They want to read

12  the 142(a) in a way that says, "Okay, each one of these

13  doesn't need to be there," but they do because in any

14  instances this authorizes funding when you don't get access

15  to these other titles, money in these other titles.

16       When you get, though, to (m)(1)(a), the language

17  could not be more clear and unambiguous, "any surface

18  transportation project which receives federal assistance

19  under Title 23, United States Code."  So you go to Title 23,

20  and what you find is that Congress attempted to provide

21  local governments and railroads with an opportunity to solve

22  a problem, and the problem is just like this one.

23       120 years ago someone built a railroad, but there

24  are towns that grew up around it, and people wanted to cross

25  the railroad, but the railroad owned the right-of-way.  They

1    owned the land.  So the question is, how do you safely cross

2    that railroad?

3              You know, you can go under it, you can go over it,

4    or you can go through it.  And if you go through it, you

5    have a grade crossing; and if you have a grade crossing,

6    you'd need to make it safe.  And safety standards have

7    changed, and Title 23 authorizes money for those grade

8    crossings and all the safety characteristics of a railroad

9    crossing through an urban area to make them safe.

10             And, in fact, the record in this case reflects

11   unequivocally not only has the $9 million been spent since

12   this project began -- which began in '07, by the way,

13   because remember, they want to talk about the time when the

14   application was filed.

15             THE COURT:  Would not those grade crossings and

16   the upgrades and security of those grade crossings be

17   necessary without regard for the AAF?

18             MR. STEARNS:  Absolutely not, Your Honor.

19             THE COURT:  Aren't there trains going over them

20   every day?

21             MR. STEARNS:  Every single day, but the point is

22   that we're taking -- because we're building a brand-new

23   passenger service -- I mean, that's the great irony of this

24   case, which is what is being spent is to make the railroad

25   safer, but the freight could run every day without changing

1    those grade crossings.  They could do it every day.

2         So they're complaining about money that began to

3    be spent after this project began.

4         THE COURT:  I thought you just told me that the

5    purpose of the grade crossing upgrade and security was to

6    protect the people crossing the rail, not to protect the

7    trains.

8         MR. STEARNS:  That's precisely right.

9         THE COURT:  So people crossing the railroads,

10   whether there's a freight train or a passenger train.

11        MR. STEARNS:  But as we've seen from reading the

12   newspaper, what was a grade crossing acceptable 20 years ago

13   is not acceptable today.  And so to meet current modern

14   standards because of the introduction of passenger service,

15   All Aboard Florida, beginning in 2007, said, "We're going to

16   make this a passenger service line."  And the beneficiary of

17   that was the freight company, which is going to be using the

18   same line and the public next to the line, is going to get

19   the enhanced improvements to the grade crossing that

20   otherwise would not have been required.  Because even though

21   -- because to meet a standard today, when you're beginning

22   today, you don't get the benefit of being grandfathered, as

23   so much of our train systems are in the United States, to

24   not have to improve them.

25        So what Congress has done, clearly in reading

1    these statutes rationally, is to say, "We're differentiating

2    between the kind of transportation that accesses 23 money

3    and now high speed rail, which will never access Title 23

4    money because they're operating above grade."  They're

5    operating in a grade-separated environment.  You're not

6    running a 150-mile-an-hour train with grade crossings.  So

7    they've created an environment where you can operate both.

8            Now, I must confess what a pleasure it is always

9    to be in federal court, but I always deal with a federal

10   court that's ahead of me.  If you read *Cobell vs. Norton*,

11   you'll find authority for what Your Honor just said.  This

12   is D.C. Circuit case 428 F. 3d. 1070, "Post-enactment

13   legislative history is not only oxymoronic but inherently

14   entitled to little weight."

15           So in the reply brief, we have a single

16   congressman who said that we should listen to his view of

17   why he didn't pass this bill or why the bill wasn't passed,

18   but there's another equally rational view.  He files an

19   affidavit saying because it wasn't politically acceptable.

20           But there's a perfectly other legitimate

21   interpretation, which is someone figured out you didn't need

22   it.  If you didn't need it, it was already there, why pass

23   the bill and go through any grief to try to change it.

24           So you can't look -- if you look at *Barber vs.*

25   *Thomas*, Supreme Court decision cited at 560 U.S. 474,

1    "Whatever interpretive force one attaches to legislative

2    history, the Court normally gives little weight to

3    statements such as those that the individual legislators

4    made after the bill in question."

5             *Bruesewitz vs. Wyeth*, Supreme Court, quote,

6    "Post-enactment legislative history (a contradiction in

7    terms) is not a legitimate tool."  That's 131 Supreme Court

8    1068.

9             So, Your Honor, respectfully, whether you -- and

10   by the way, as I've seen now, sometimes I sit down and some

11   people make the arguments.  I would refer the briefs to the

12   fact that it doesn't matter that this agency interpretation

13   did not go through a rule-making process.  We have cited the

14   cases; the fact that it's done through its own operations

15   and its own interpretations, whether you apply Chevron or

16   not.

17            And Martin County in its initial brief conceded

18   Chevron.  And, of course, under the Chevron analysis, if you

19   find the statute is unambiguous -- and it isn't ambiguous --

20   then that's the end of the analysis.  If you get to Stage 2,

21   then the reasonable interpretation of the agency is

22   determined.  And frankly, even if Chevron doesn't apply, the

23   fact that the agency has interpreted it that way, it's

24   entitled to a reasonable judgment that it clearly has made

25   in this case.

1          Thank you, Your Honor.

2          MR. RYAN:  Two minutes?

3          THE COURT:  Two minutes.

4          MR. RYAN:  Thank you.

5          So it's very interesting.  It's not Congress's

6     intent but the White House's intent, speaking for the

7     Executive Branch, when this was transmitted to Congress and

8     went nowhere.  That demonstrates the falsity of the claim

9     that the department's position established in a 2005 letter

10    from one government lawyer to another.

11          I have not ever seen a Chevron case based on a

12    description of one lawyer in the government to another being

13    the basis of a Chevron understanding where the department

14    couldn't show a single additional document in the next ten

15    years until I brought to the Court the document from 2015

16    that's the response to Congressman Murphy.  That's the only

17    citing of the government's actual claim that this is

18    something that should be given deference as their

19    interpretation of the statute.

20          I would cite the Court to Congressman Posey's

21    letter, the second letter that Congressman Posey did.  It's

22    in the record.  I don't need to belabor it, but other people

23    are beginning to understand that the department is doing

24    something in this project that is not authorized by the

25    Congress of the United States.

1      So I'm standing here today -- I actually am the

2   torch-bearer for the Congress of the United States in the

3   sense that that statute has to be given full force and

4   effect, and not only the part that they want.

5      And finally, the Court knows that only Office of

6   Legal Counsel and the Attorney General's office, that's

7   about the only place a lawyer in the government can write

8   something that has the full force and effect of law.  In

9   other words, if one were to compare an OLC opinion as a

10   derivative of the Attorney General of the United States,

11   that's the kind of lawyer letter that one would have to give

12   deference to.

13      Let me go to the sprinkles memo.

14      THE COURT:  Yes.

15      MR. RYAN:  And I understand why the Court was

16   troubled by the sprinkles memo because that's exactly what

17   they've done here, by the way.  They've sprinkled a couple

18   of million bucks, which then enables them to bond out 1.7.

19      This should be deeply troubling to the Court, and

20   I think the Court asked the exact right question.  "If we

21   don't have standing, who would?"  Because in the railroad

22   brotherhood, CSX and BNSF are not going to complain because

23   these guys found a way to raid the federal piggy-bank.

24   They're not going to call the motion on this.  We have to do

25   it.

1          And candidly, this should deeply trouble the

2     Court, that this kind of money is being poured through an

3     elephant in a mouse hole.  I mean, they're trying to drag a

4     very, very large object through a very tiny opening, and I

5     -- by the way, if our brief was inept on that, we've

6     certainly clarified it in our reply brief.

7          I'm standing by Chevron 1.  I mean, when you look

8     at this, for them to argue that those words swallow the rest

9     of the statute, it is unreasonable on its face.

10          Thank you, Your Honor.  You've been very gracious

11    hearing us, by the way.  I think on behalf of all of us, I

12    just want to thank you.

13          THE COURT:  My pleasure.

14          A couple of housekeeping matters.  The FDFC

15    meeting has been rescheduled for mid-June.  Did I hear that

16    correctly.

17          MR. STEARNS:  Yes, Your Honor.  I should probably

18    say -- and forgive me if I didn't say it earlier because of

19    the way the procedure worked out.  Because the FEIS is not

20    yet published, and because the FEI -- the commitment is to

21    comply with whatever obligations arise from the FEIS, we,

22    today, will be seeking an extension of the July 1st date.

23          But their credit quality committee meeting does

24    not occur until June 19, and so we do not know whether, on

25    June 19 --

1          THE COURT:  I'm sorry, the credit quality?

2          MR. STEARNS:  Of DOT.  It's a committee that has

3    the authority to approve or deny the extension of the bonds.

4          As a consequence of that, we're anticipating a

5    meeting sometime between June 10th and June 12th of the

6    Federal Development Finance Corporation Committee.  That

7    should occur in that time frame.  That will be before June

8    19th because it needs to be.

9          If, on June 19th, the committee extends it, the

10   word from DOT is they'll not extend it for a period less

11   than six months.  They don't want to do it again.  And they

12   certainly haven't committed to the six months, but after

13   they extend it, it will be for six months.

14         But that's not to suggest we intend for it to be

15   six months because we need to close these as soon as humanly

16   possible.

17         There are -- if we get the FEIS, the objective

18   would be to immediately budget what will be the cost of

19   complying with all the mitigation measures that would be

20   contained in the FEIS because there is a commitment to do

21   those things; and, therefore, the disclosure document needs

22   to disclose those financial commitments.  In that case, what

23   we would anticipate is that if the extension is given, we

24   would advise the Court promptly on June 19th, if Your Honor

25   has not previously ruled.

1     If you have not ruled, then -- or whatever, it

2 would be otherwise our intention to begin marketing on June

3 22nd, no earlier than June 22nd, or selling -- marketing or

4 selling the bonds.  I'm not sure which is the right word in

5 this context.  But therefore, the June 8th date we gave you

6 before is no longer applicable to this conversation.

7     THE COURT:  Okay.

8     MR. STEARNS:  I probably should have started that

9 today, but frankly, the way argument worked out, I found

10 myself last in the chair.

11     THE COURT:  Okay.  Well, if you all have not

12 received an opinion from me by June 19th, please file a

13 status report on that date.

14     MR. STEARNS:  And, Your Honor, I want to be clear

15 that what Your Honor does is, as I think Your Honor knows,

16 extremely important to how the market views the bonds, so

17 therefore, if Your Honor -- it is an element of this case

18 that I think -- I think everybody recognizes is extremely

19 important in terms of where this project goes.

20     THE COURT:  I understand.

21     MR. STEARNS:  Thank you, Your Honor.

22     MR. RYAN:  Can I be heard for a moment?

23     THE COURT:  Sure.

24     MR. RYAN:  So, you know, why are we not disposing

25 this case on the merits instead of us having to climb uphill

1    on an injunction standard when, candidly, the date line,

2    which they totally control at that table -- all of them

3    totally control the date line -- can be marched backwards a

4    couple more weeks?  We can convert this to an SJ, and,

5    candidly, we get much fairer treatment under SJ than we do

6    under the injunction test.  And so I don't understand what's

7    going on right now.

8         Here's what I do know.  I do know that they cough,

9    and FDFC goes like this (indicating) to them.  They order

10   this process around.  The government has not said once today

11   why they can't move the July 1st date.

12        So I don't know why they've put the Court under

13   pressure, frankly, to do a schedule where I had three and a

14   half business days to get my PI motion filed.  I've had only

15   a week on rebuttal.  The Court's had to hear it today out of

16   its schedule, and yet there's no genuine deadline here.  And

17   I think the Court should probe this a little more because

18   you could clear your docket of this case permanently and not

19   have it just be in a PI mode, which is a lot more work for

20   the Court, candidly.

21        THE COURT:  Mr. Stearns?

22        MR. STEARNS:  Thank you, Your Honor.

23        First of all, this committee, the credit

24   committee, schedules its meetings two years in advance.

25   June 19th is the date that was scheduled.  No one on our

1    side of the table wanted to extend it an hour.  We'd been

2    told that the FEIS was coming out over the last two months,

3    next week, next week, next week, next week, and so as a

4    practical matter, selling these bonds -- the market exists

5    today to sell bonds, be they tax-exempt or nontax-exempt.

6    There's no certainty that market's going to exist in 30 days

7    or 60 days or 90 days.  There's no certainty about the rate

8    of interest.  We know what the rate in the market is today.

9    We don't know what it is tomorrow.

10           I mean, this is a critical infrastructure project,

11   and time is money, and in this case it's huge amounts of

12   money because -- and I'm not talking about just the interest

13   rates.  I'm talking about all the financial commitments that

14   are made for every intricate part of a very, very complex

15   undertaking, in which local governments all up and down the

16   coast -- most of whom, by the way, are cooperating with the

17   project and support it, not -- we have obviously two

18   counties in the middle who have a different view, but that's

19   their right.

20           But as a practical matter, what we have is a need.

21   We don't want an extension for six months.  We don't want it

22   for six days.  But we recognized if we didn't make the

23   argument or present it by the 19th, if we don't get the FEIS

24   in time to respond to it, then we're in a position where the

25   deadline would go by, and we can't afford to let that

1    happen.

2              So but as a practical matter, Your Honor, it's our

3    hope that it won't be extended past -- I mean, we won't need

4    the extension past July 1st.

5              THE COURT:  Okay.  For the time being, we're going

6    to keep this on the same track here.

7              There was a motion to file a supplemental

8    Reininger declaration, which we're going to grant.  That

9    includes the Louis Berger report, which will be in the

10   record now.

11             Martin County has moved to supplement the record

12   with the version of the Berger report that Mr. Friedman

13   relied on.  We're going to grant that, but because the

14   Friedman affidavit was not filed until the reply, we're

15   going to deny the motion to file a supplemental Friedman.

16             MR. RYAN:  I'm sorry, Your Honor?

17             THE COURT:  We're going to deny the motion to file

18   a supplemental declaration for Mr. Friedman, and we -- you

19   know, those two declarations are in equipoise as the record

20   stands.

21             Okay.  Thank you all very much.  Thanks for coming

22   up.  Safe travels home.  We will take this under advisement

23   and get back as soon as we can with the decision unless we

24   hear otherwise from you with respect to the timing.  Okay?

25             MR. RYAN:  Thank you, sir.

1          (Whereupon the hearing was

2           concluded at 1:25 p.m.)

3

4

5          **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7          I, LISA A. MOREIRA, RDR, CRR, do hereby

8    certify that the above and foregoing constitutes a true and

9    accurate transcript of my stenographic notes and is a full,

10   true and complete transcript of the proceedings to the best

11   of my ability.

12       Dated this 3rd day of June, 2015.

13

14                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
15                              United States Courthouse
                                Room 6718
16                              333 Constitution Avenue, NW
                                Washington, DC 20001
17

18

19

20

21

22

23

24

25