**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INDIAN RIVER COUNTY, <u>et al.</u>,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00460 (CRC) |
| **PETER M. ROGOFF, <u>et al.</u>,** | |
| Defendants. | |

| | |
|---|---|
| **MARTIN COUNTY, FLORIDA, <u>et al.</u>,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00632 (CRC) |
| **DEPARTMENT OF TRANSPORTATION, <u>et al.</u>,** | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Indian River County and Martin County are located on the Atlantic coast of Florida, south of Orlando and north of Palm Beach. Along their ocean boundaries runs the Florida East Coast Railway, which was established in the 1880s and served as both a commuter and freight rail corridor until it ceased passenger service in the 1970s. AAF Holdings, LLC ("AAF"), a subsidiary of the private equity and asset management firm Fortress Investments Group, aims to renew passenger service along the corridor by constructing and operating an express railway between Orlando and Miami. Although the project, dubbed All Aboard Florida, will be privately owned and operated, AAF has sought public assistance to finance construction of the Orlando to West Palm Beach segment of the line. Among other sources of financing, AAF requested that the United States Department of Transportation ("DOT") exempt from federal taxes, subject to

certain conditions, $1.75 billion in private activity bonds, or "PABs," to be issued by a Florida development agency.  AAF would be solely responsible for marketing and repaying the bonds.

Indian River and Martin Counties contend that construction and operation of the railway will cause a variety of environmental harms to them and their residents.  The Federal Railroad Administration ("FRA") is currently conducting an environmental review of these potential environmental effects.  The counties allege that DOT's authorization of the tax exemption prior to the completion of the ongoing environmental review violated the National Environmental Policy Act ("NEPA") and will slant the review towards approval of the railway as currently proposed.  They also contend that the project does not qualify for tax-exempt financing under the applicable federal statute.  Because the bonds may be issued as early as this month, the counties have moved for a preliminary injunction vacating DOT's authorization of the tax exemption.

DOT and AAF, which has intervened as a defendant, mount several defenses to the counties' motion.  They first contend that the counties lack standing.  They argue that because AAF would proceed with the project with or without the tax-exempt bonds, the counties' alleged injuries are not traceable to DOT's actions and would not be remedied ("redressed" in standing terminology) by the requested injunction.  They also contend that the counties' alleged injuries are not irreparable as required for a preliminary injunction.  Moving to the merits of the suit, the defendants assert that DOT's PAB authorization is not a "major federal action" triggering NEPA requirements due to the indirect nature of the tax benefit and the overall lack of federal control over the project's permitting and operations.  Finally, the defendants insist that DOT acted within its statutory authority in granting the tax exemption.

The Court is mindful of the vigorous debate in Central and South Florida over whether the express railway should be built.  But the relative merits of the project are not for this Court to

decide.  The questions currently before the Court are whether the counties have established

standing to bring their suit and, if so, whether the relatively limited ongoing federal involvement

in the project implicates the environmental statutes upon which plaintiffs have based their

lawsuit.  After careful review of the law and the evidence put forward by the parties, the Court

concludes that the counties have stumbled at the threshold of standing.  They have not, in the

Court's view, met their burden at this stage of the case to establish that enjoining DOT's

authorization of the PABs would significantly increase the likelihood that AAF would abandon

the project.  Nor have they shown that the bond issuance would tilt the FRA's ongoing

environmental analysis towards AAF's preferred routing of the railway.  The Court will therefore

deny the counties' motions for a preliminary injunction.

   **I.**      **Background**

      A.      <u>The All Aboard Florida Project</u>

   AAF Holdings LLC seeks to develop a 235-mile express railway that will carry

passengers between Miami and Orlando with stops in Fort Lauderdale and West Palm Beach.

According to AAF, the All Aboard Florida Project will "capitalize on the efficiencies and

environmental advantages that trains enjoy over other modes of transportation" to provide less

expensive and more convenient transportation options for both commuters and tourists travelling

between the Orlando-area theme parks and the beaches and cruise ship terminals of South

Florida.  Declaration of AAF President Michael Reininger ("Reininger Decl.") ¶ 13;

Supplemental Reininger Declaration ¶ 6.  The project has been divided into two phases.  In Phase

I, AAF intends to provide rail service between West Palm Beach, Fort Lauderdale, and Miami.

Indian River Ex. 1 ("Draft EIS") at S-1.  It is constructing new stations in those cities, adding a

second track along the railroad corridor currently used for freight carriage by the Florida East

Coast Railway ("FECR"), and purchasing five train sets to conduct 16 round-trips a day.  Id.

Phase I has received private funding and is in development.  Id.  AAF and the FRA, an agency of

the Department of Transportation, reviewed the environmental impact of Phase I and issued a

Finding of No Significant Impact.  Id.  In Phase II of the project, AAF seeks to expand the line

from West Palm Beach to Orlando.  Id. at S-2.  To accomplish the extension, AAF plans to add a

second track to the FECR corridor between West Palm Beach and Cocoa, then construct a new

railroad line alongside a state road inland to Orlando International Airport, where it will build a

maintenance facility.  Id.

AAF represents that the project will result in significant economic and environmental

benefits.  A 2014 economic report commissioned by AAF claims that the line's construction and

operation will result in an economic impact of $6.4 billion and generate $653 million in federal,

state, and local tax revenue.  Reininger Decl. Ex. D. Washington Economics Group, Economic

Impacts of the All Aboard Florida Intercity Passenger Rail Project (May 20, 2014) at 4.  It

estimates that construction will create over 10,000 jobs per year between 2014 and 2016, and

that operation of the railway will provide 5,000 jobs on average per year through 2021.  Id. at 9.

AAF also predicts that the project will alleviate traffic along the overburdened Interstate 95,

which runs parallel to the FECR corridor between Cocoa and Miami, as well as reduce air travel

between the cities along the route.  Reininger Decl. ¶¶ 27–28.  According to AAF, the project

will also improve the safety features of the FECR corridor and mitigate noise and vibration

caused by passing trains.  Id. ¶¶ 34–37.

> B.     Funding and Environmental Review of the Project

Not surprisingly given its scope, the costs of the project are expected to be substantial.

AAF currently estimates the cost of both phases at over $2.9 billion, along with $600 million for

the purchase of land and easements.  Id. ¶ 20.  Thus far, AAF and its parent company—which is owned by private equity funds controlled by Fortress Investments Group—have spent over $240 million on development and construction, have committed to spending an additional $160 million, and anticipate committing a further $400 million in the future.  Id. ¶ 64.  They have also spent $600 million to purchase land and easements for the project and have escrowed $405 million in high-yield private debt to cover any gaps in funding.  Id.

To fund Phase II of the project, AAF applied for $1.6 billion in federal funds through the Railroad Rehabilitation and Improvement Financing program ("RRIF").  RRIF is both a loan and loan guarantee program administered by the FRA for the development and improvement of railroad tracks, equipment, and facilities.  49 C.F.R. § 260.5.  RRIF loans are subject to NEPA review of the proposed project's environmental effects.  49 C.F.R. § 260.35.  FRA is acting as the lead agency in preparing an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") to determine the environmental effects of Phase II prior to making a final determination as to AAF's loan application.  Draft EIS at S-1.  FRA, in cooperation with the U.S. Army Corps of Engineers, U.S. Coast Guard, and Federal Aviation Administration, issued a draft EIS in September 2014.  Id.  The draft EIS identified the primary objective of the project as "[p]rovid[ing] a reliable and convenient intercity rail service between Orlando and Miami . . . that is sustainable as a private commercial enterprise."  Id. at S-5.  Against that objective, the draft EIS evaluated a number of alternative routes to connect the Orlando and West Palm Beach stations, as well as a "no action" alternative.  Several alternatives were then eliminated as infeasible, based largely on the lack of existing rail infrastructure and the high cost of acquiring private land.  The remaining alternatives vary primarily based on how they will follow the state road from Orlando International Airport to Cocoa.  Id. at S-5 to S-8.  The draft EIS analyzed a

wide range of potential environmental and other consequences of the project, id. at S-22 to S-23, and proposed numerous measures to mitigate adverse effects, id. at 7-1 to 7-14.  With these mitigation measures in place, the draft EIS concluded that "the combination of the AAF Passenger Rail Project impacts with other impacts would not result in serious deterioration of environmental functions or exceed applicable significant thresholds."  Id. at S-21.  FRA has not issued a Final EIS or a Record of Decision, nor has it made a determination as to AAF's loan application under the RRIF program.

While the RRIF application process was ongoing, AAF requested that DOT exempt from federal taxes $1.75 billion in PABs to finance the remainder of the project.  Reininger Decl. Ex. F, letter from Michael Reininger to Paul Baumer, Office of Infrastructure Finance and Innovation, DOT (Aug. 15, 2014) ("PAB Request").  PABs are bonds issued by state or local government agencies to finance projects of public utility.  Under Section 11143 of Title XI of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub L. 109-59 (2005), DOT may designate up to $15 billion in PABs as tax-exempt in order to encourage private development of certain types of transportation projects by giving project owners access to lower-interest debt than might otherwise be available.  Reininger Decl. Ex. G.  The PABs at issue here would be issued by the Florida Development Finance Corporation ("FDFC"), a Florida development agency, and then sold to investors by AAF, which would be solely responsible for the repayment obligation.  Reininger Decl. ¶ 46.  The FDFC scheduled a meeting for May 28, 2015 to approve or deny the PAB issuance, but the meeting has been delayed until mid-June.  Id. ¶¶ 54, 65.  AAF may begin selling the bonds as soon as it receives authorization from the FDFC.

AAF's application letter to DOT described the PAB financing as "the linchpin for completing our project" and "a crucial factor in ensuring our project is financed and completed." PAB Request at 1. The letter explained that AAF would use the bond proceeds "across the length of [the] passenger rail system, including the Miami-to-West Palm Beach segment." Id. The bond proceeds also would be used to pay off the $405 million in debt AAF had already obtained, as the company was concerned that investors would be unreceptive to a loan structure in which "existing high-yield financing would remain in-place alongside the newly issued debt." Id. at 1–2. The letter concluded: "we are fully committed to deploying the time, energy and resources necessary to complete this project. . . . The private activity bonds . . . will enable us to bring a safe, efficient, cost-effective and environmentally friendly transportation alternative to South and Central Florida." Id. at 2. AAF has represented to the FDFC that none of the bond financing will be used for work within Indian River County or Martin County. Reininger Decl. Ex. I.

DOT provisionally authorized the requested $1.75 billion PAB allocation in December 2014. Reininger Decl. Ex. H, Letter from Peter M. Rogoff, Under Secretary of Transportation, to Michael Reininger (Dec. 22, 2014). The authorization came with several conditions, including that: (1) the bonds must be issued by July 1, 2015 or DOT's authorization automatically expires; (2) "regardless of whether [AAF] pursues the RRIF [loan] application, . . . [it must] facilitate FRA's completion of the environmental review process;" (3) AAF cannot "use the bond proceeds until 45 days following the issuance of the Final [EIS;]" and (4) AAF must "complete and implement the measures specifically set forth in the EIS . . . to avoid, minimize, or mitigate any adverse effects of the Project on the environment." Id. DOT did not

independently conduct an environmental review of the project before issuing the provisional authorization.

           C.      <u>The Plaintiffs</u>

Indian River County and Martin County are both located along the east coast of Florida between West Palm Beach and Cocoa, and the FECR corridor travels along the coast through both counties, among others.  Draft EIS at S-3.  The project will therefore result in construction along the rail line in both counties, and 16 daily round-trip train runs once the railway is operational.  <u>Id.</u> at S-1 to S-2.

In addition to contesting AAF's projections of the economic benefits of the railway, the counties allege that construction and operation will result in significant harms to them and their residents.  They maintain that construction efforts will necessitate temporary road closures, create diesel exhaust, cause noise and vibration, and delay freight travel through the counties.  <u>Id.</u> at 3-44, 5-5, 5-14, 5-45, 7-5.  The rail line will include 32 at-grade crossings in Indian River County and 27 in Martin County at which trains will cross east-west streets.  Draft EIS at 4-15.  After construction, the counties contend that trains will cause major delays at these crossings and risk collision with cars.  Declaration of Joseph A. Baird, Indian River County Administrator ("Baird Decl.") ¶¶ 30–35; Declaration of Taryn Kryzda, Martin County Administrator ("Kryzda Decl.") ¶¶ 8–13.  The trains will also pass over drawbridges in both counties, which the counties say will significantly delay waterway traffic and increase pollution from idling boats.  Martin County Supp. Ex. 2, Declaration of Stephen M. Ryan Ex. C.  The counties further claim that running passenger trains beside freight train lines will increase the risk of freight accidents, including spills of hazardous materials.  Baird Decl. ¶ 42.

The counties also allege harms to historic and recreational sites.  Indian River County contends that three nature conservation areas abutting the FECR corridor and an excavation site containing artifacts from the Ice Age will be harmed by the vibration and pollution caused by the construction activity and passing trains.  Baird Decl. ¶ 45; Declaration of Randolph B. Old, Chairperson of the Old Vero Ice Age Sites Committee, Inc. ("Old Decl.") ¶¶ 11–12.  Indian River County asserts that the project will decrease tourism and property tax revenue.  Baird Decl. ¶¶ 55–57.  Martin County adds that numerous public parks and buildings adjacent to the FECR corridor will be adversely affected by construction and operation of the railway.  Kryzda Decl. ¶ 13.

The counties and related plaintiffs filed suit against DOT and two of its officials alleging that DOT's provisional authorization of PABs prior to the completion of the FRA's ongoing NEPA review violated NEPA as well as Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act, which set forth procedures for reviewing projects that use land that has been determined to be environmentally or historically significant.  The counties also contend that the All Aboard Florida project is not an eligible use for the bond proceeds under the section of SAFETEA-LU that authorizes the PAB tax exemption.  AAF has intervened as a defendant in both cases.  The counties have filed motions to preliminarily enjoin DOT's PAB allocation until a determination on the merits of their claims. Indian River County has also moved for a temporary restraining order and for summary judgment.  DOT and AAF have responded that the counties lack standing to bring suit and have not met the standard required to obtain a preliminary injunction.  Although the two cases have not been joined, the parties noticed them as related and the counties' preliminary injunction

motions have proceeded along parallel tracks.  The Court held a hearing on both counties'
motions on May 29, 2015.

## II.       Legal Standards

### A.       <u>Standing</u>

The federal courts are limited by Article III of the Constitution to resolving actual cases
and controversies.  U.S. Const. art III, § 2, cl. 1.  To ensure that this limitation is upheld, and to
prevent courts from issuing advisory opinions, Article III standing is an absolute requirement of
any suit.  <u>E.g.</u>, <u>Raytheon Co. v. Ashborn Agencies, Ltd.</u>, 372 F.3d 451, 453 (D.C. Cir. 2004)
(citing <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 96–102 (1998)).  The plaintiff bears
the burden to establish standing as the party invoking federal jurisdiction.  <u>Lujan v. Defenders of</u>
<u>Wildlife</u>, 504 U.S. 555, 561 (1992).  The plaintiff's burden "varies with the procedural context of
the case."  <u>Sierra Club v. EPA</u>, 292 F.3d 895, 898 (D.C. Cir. 2002).  At the pleading stage,
"'general factual allegations of injury resulting from the defendant's conduct'" are sufficient,
whereas on summary judgment the plaintiff must set forth specific facts by affidavit or other
evidence.  <u>Id.</u> (quoting <u>Defenders of Wildlife</u>, 504 U.S. at 561).

### B.       <u>Preliminary Injunction</u>

A preliminary injunction is "an extraordinary remedy never awarded as of right."  <u>Winter</u>
<u>v. NRDC</u>, 555 U.S. 7, 24 (2008).  The party seeking a preliminary injunction must show: "(1) a
substantial likelihood of success on the merits[;] (2) that it would suffer irreparable injury if the
injunction were not granted[;] (3) that an injunction would not substantially injure other
interested parties[;] and (4) that the public interest would be furthered by the injunction."
<u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (citing
<u>Mova Pharm. Corp. v. Shalala</u>, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).  The District of Columbia

Circuit applies a "sliding-scale" approach to the preliminary injunction factors, meaning that "a strong showing on one factor could make up for a weaker showing on another." E.g., Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011).  But regardless of the plaintiff's showing on the other three factors, the lack of an irreparable injury is an absolute bar to obtaining a preliminary injunction.  Comm. of 100 on Fed. City v. Foxx, No. 1:14-CV-01903, 2015 WL 1567902, at *6 (D.D.C. Apr. 7, 2015) (citing Winter, 555 U.S. at 23–24).

## III.       Analysis

The Court cannot address the merits of the counties' request for a preliminary injunction unless they have standing to bring their claims.  To establish standing, a plaintiff must demonstrate (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent;" (2) which is fairly traceable to the defendant's conduct; and (3) is likely to be redressed by a favorable judgment.  Defenders of Wildlife, 504 U.S. at 560–61.  When the plaintiff's alleged injury "'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" then the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."  Id. at 562 (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)).  "The facts alleged must show that the [defendant's] action is at least a substantial factor motivating the third parties' actions[.]"  Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663, 669 (D.C. Cir. 1987).  "The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true."  Fla. Audubon Soc. v. Bensten, 94 F.3d 658, 670 (D.C. Cir. 1996).

The counties contend that they may demonstrate standing under a more relaxed standard because they have alleged a procedural injury, *i.e.*, DOT's authorization of the PAB tax exemption prior to the completion of NEPA review.  A plaintiff claiming a procedural defect in government action need not demonstrate that correcting the procedural defect will alter the government's ultimate decision.  Mass. v. EPA, 549 U.S. 497, 517–18 (2007); Defenders of Wildlife, 504 U.S. at 572 n.7.  But the standing inquiry here concerns whether a third party, AAF, will change its behavior if DOT is made to reverse course.  Thus, there is no relaxed standard for establishing a causal link between DOT's PAB authorization and the counties' alleged injuries.  See Fla. Audubon Soc., 94 F.3d at 664 ("the Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest").  The counties also must establish that reversing the PAB allocation will redress the injuries allegedly caused by AAF's construction under "the normal standard for redressability."  St. John's United Church of Christ v. Fed. Aviation Admin., 520 F.3d 460, 463 (D.C. Cir. 2008).

The Counties assert two general theories of injury: that construction and operation of the project will harm them and their citizens, and that the PAB authorization will impair FRA's ability to neutrally review the environmental effects of the project.  The Court will address these proffered bases for standing in turn.

## 1.  Harms from Construction and Operation of the Project

The counties allege that construction and operation of the railway will cause, among other harms: noise and vibration; damage to historic sites; backups on roads along the route's at-grade and waterway crossings; diminished property values; and an increased risk of train

accidents.  At least some of these allegations are sufficient to establish that construction and

operation of the railway will cause a judicially-cognizable injury.  But the counties must also

establish that any injuries caused by the railway expansion are fairly traceable to, and will be

redressed by enjoining, DOT's authorization of tax-exempt status for the PABs.  To establish

traceability, the counties must show a "'substantial probability' that [DOT's] action 'created a

demonstrable risk or caused a demonstrable increase in an existing risk, of injury.'"  Nat'l Parks

Conservation Ass'n v. Manson, 414 F.3d 1, 6 (D.C. Cir. 2005) (quoting Fla. Audubon Soc., 94

F.3d at 669).  To demonstrate redressability, the counties must show that enjoining the bonds

would "significant[ly] increase . . . the likelihood that [they] would obtain relief that directly

redresses the injury suffered."  Utah v. Evans, 536 U.S. 452, 464 (2002).  The issues before the

Court are thus whether the challenged government action—here, the PAB authorization—was a

substantial factor in causing the counties' alleged injuries, and whether enjoining that action is

substantially likely to redress those injuries by causing AAF to abandon the project.  The

answers to these questions turn on the effect of the PABs and the impact of a potential revocation

of their tax-exempt status on Phase II's prospects.  Essentially, DOT's PAB authorization

relieves bond purchasers from paying tax on the interest they receive on the bonds, allowing

AAF to offer the bonds at a lower interest rate compared to other private bonds that would offer

a higher, but taxable, return.  Expert Report of David F. Marcus, In Re All Aboard Florida

Litigation ("Marcus Report") ¶ 8 (May 11, 2015).  If the PAB authorization is revoked, AAF

would be forced to offer a higher interest rate to bond purchasers to make up the difference.  So

while the traceability and redressability standards are analytically distinct, in this case they

essentially merge because the crucial consideration in both inquiries is the same: the extent to

which DOT's PAB authorization influences AAF's decision to proceed with the project.

Accordingly, the Court need only analyze the issue in terms of redressability and will not engage in a separate traceability inquiry.

The counties attempt to meet their burden of establishing redressability by pointing to prior statements by AAF stressing the importance of the PABs to the completion of the project. AAF indicated to DOT in its PAB application letter, for example, that the bonds were "the linchpin for completing our project" and "a crucial factor in ensuring our project is financed and completed." PAB Request at 1. And in its March 2013 RRIF loan application AAF claimed that "due to the Project's status as a new development and the required construction period and operational ramp-up, traditional debt financing in the capital markets is not feasible." Pl. Ex. 43 (AAF Application to FRA) at 31.

AAF counters these pronouncements with a declaration from its President, Michael Reininger, who also signed the documents cited by the counties. Reininger flatly states that enjoining the PAB authorization "would not imperil the project" because "AAF would proceed with conventional financing, such as taxable bonds." Reininger Decl. ¶¶ 58, 60. According to Reininger, "AAF is committed to the Project and believes it will able to obtain alternative financing, if need be." Id. ¶ 61. AAF asserts that the Reininger declaration establishes that the counties' alleged injuries would not be redressed by the requested injunction.

The counties attack the Reininger declaration as conclusory and insufficient to establish that AAF will proceed with the project without the PABs insofar as it merely states Mr. Reininger's belief that the project would go forward and fails to specify how AAF would secure alternative financing. Yet the declaration reflects more than Mr. Reininger's naked belief that AAF will complete the project with or without the PABs. It expresses, through the company's president, AAF's present corporate commitment to completing the project. The declaration is

thus entitled to weight. AAF's stated intentions are bolstered by its demonstrated commitment to the project through its substantial prior investments, which include expenditures and commitments of nearly a billion dollars on development, construction, and land acquisition. AAF also anticipates spending another $400 million on further development and construction under the present financing structure. AAF's commitment to the project is further demonstrated by its having obtained $405 million in private debt financing, which is currently held in escrow, so that it can begin timely construction of Phase II regardless of whether it has obtained PAB financing or a RRIF loan. Reininger Decl. ¶ 45. This type of demonstrated commitment to a construction project is an important factor in assessing whether an injunction against government action would affect the project owner's continuation of the project. See Sierra Club v. Dep't of Energy, 825 F. Supp. 2d 142, 151 (D.D.C. 2011) (finding that enjoining a government loan guarantee would be unlikely to stop completion of a power plant that was already substantially underway); Appalachian Voices v. Bodman, 587 F. Supp. 2d 79, 83, 89 (D.D.C. 2008) (relying on the fact that a company "was preparing to build the plant even before it was awarded [a] tax credit" to find that enjoining the tax credit would not redress alleged injuries caused by the plant).

AAF's prior statements regarding the importance of the PABs do not undermine its current commitment to the project. While the company likely regrets having described the bonds as the "linchpin" of the project in its PAB authorization request letter, the Court does not interpret AAF to have meant, as the counties suggest, that the PABs were a necessary pre-condition to completing the railway. A fairer interpretation of the letter—which, after all, was intended to persuade DOT to authorize the tax-exemption—is that the PABs were important to the project because, as the letter continued, they would allow AAF to finance the project "in the

most expedient manner possible and with the highest degree of execution certainty." PAB

Request at 1. In this respect, this case is very similar to <u>Appalachian Voices</u>, where Judge

Urbina credited the project proponent's declaration that it would complete the coal project at

issue despite its prior statement that the contested government tax credit was "very important" to

the project. 587 F. Supp. 2d at 88–89. Based on that declaration, the court found that the

plaintiffs had failed to demonstrate that an injunction would redress their injuries and therefore

denied standing. <u>Id.</u>

AAF's intention to complete the project does not fully resolve the redressability question,

however. Commitment notwithstanding, completion of the project would still require access to

alternative financing in the absence of tax-exempt PABs. In his declaration, Reininger indicates

that he "believes" alternative financing, "such as taxable bonds," would be available if necessary.

Reininger Decl. ¶ 61. AAF's access to deep funding sources, through its parent corporation and

otherwise, lends support to that belief. And neither county has demonstrated that AAF would

not be able to secure *some* other form of financing through the capital markets. As a result, it is

not AAF's burden, as the counties suggest, to have already arranged for alternative financing or

to explain in detail how it would go about doing so.

That still does not end the inquiry. AAF's ability to tap other sources of financing does

not mean it would choose to do so if the incremental cost of that financing would imperil the

financial viability of its investment. Speaking to that point, AAF has submitted an expert report

indicating that replacing the PABs with taxable debt would increase AAF's interest costs by

$420 to $630 million over the first ten years of the project, depending on the assumed interest

rate. Marcus Report ¶¶ 10–11. At present value, those extra interest payments would result in a

roughly 9.5 to 13.5 percent increase in the overall cost of the project. According to AAF's

financial projections, the project's cash flow over the same period would be more than sufficient, by upwards of $290 million, to cover that additional debt service. <u>See</u> Reininger Decl. Ex. F at 27, Projected Cash Flows for the Project. AAF thus argues that even with the higher interest costs, the project would be financially viable from its perspective.

Indian River County offers its own expert who takes issue with AAF's calculation of the increased interest costs. Indian River's expert does not suggest that taxable debt would be unavailable at any price; his principal objection, rather, is that AAF's expert calculated the increased costs only over the first 10 years of the bonds' lives, as opposed to the entire 30-year amortization period. Declaration of Gaurav Jetley ¶ 7.[1] If the interest rate differential over the entire 30-year period is considered, according to Indian River's expert, the present value of the interest payments increases considerably. <u>Id.</u>[2]

Neither side offers definitive support for its proposed calculation horizon and, without a more detailed record, the Court is not in a position to determine which approach is more appropriate. Even assuming that AAF would have to pay additional interest beyond the first ten years of the project, AAF's financial projections still anticipate that the project would become and remain cash positive after the first few years. Reininger Decl. Ex. F at 27. Accordingly, the

---

[1] Indian River's expert also contends that AAF's expert's assumed interest rates are speculative and appear too low given the rate AAF offered on the $405 million in high-yield debt it currently holds in escrow. <u>Id.</u> ¶¶ 8–10. As discussed during the May 29, 2015 hearing and in the papers, however, AAF's past debt offering was for short-term, immediately-callable bonds that were to be used as a stopgap in case of a delay in funding the project. Reininger Decl. ¶ 64. The two forms of debt are thus not readily comparable.

[2] Martin County, by contrast, provides an expert report representing that the project will not generate sufficient revenue to operate for an extended period regardless of whether AAF obtains PAB tax exemptions. John N. Friedman, An Economic Analysis of All Aboard Florida at 9–11 (Feb. 2015). But assuming this to be true, the tax exemption would neither cause nor prevent the project's failure, adding little to the analysis of redressability.

counties have not met their burden to rebut AAF's declaration that it would continue to pursue

the project notwithstanding the increased cost of alternative financing.  This conclusion is

supported by other cases in this circuit in which the absence of similar government financial

assistance was held not to affect a third-party's ability to complete a challenged construction

project.  See St. Johns, 520 F.3d at 462 (finding lack of standing to challenge government

funding that amounted to two percent of project costs); Sierra Club, 825 F. Supp. 2d at 146, 150

(same where funding equated to fifteen percent of project costs); Appalachian Voices, 587 F.

Supp. 2d at 88 (same for seven percent funding of project).[3]

At the end of the day, one cannot but conclude that the additional interest costs that

would result from the absence of tax-exempt PABs would cause AAF, as a reasonable investor,

to think twice about proceeding with the project.  In the Court's view, however, the counties

have not demonstrated, as they must, that these costs would *significantly* increase the likelihood

that AAF would abandon the project after years of planning and over a billion dollars in

investment.  Given AAF's stated commitment to moving forward with or without the PABs; the

substantial investments that AAF has already made in the project and its access to further

funding sources; and the counties' failure clearly to demonstrate that having to pay taxable

interest would prevent AAF from financing construction of the remainder of the railway, the

Court concludes that enjoining the issuance of the PABs would not redress the counties' alleged

---

[3]  AAF's statement in its March 2013 RRIF application that traditional debt financing is "not feasible" likewise fails to demonstrate that it could not obtain debt from the public market without the PAB authorization.  AAF did not request PAB authorization until August 2014— after the RRIF application and the successful start of construction of Phase I.  Reininger Decl. ¶ 46.  Because the PABs will be sold on the open market, the company's representation in 2013 that it could not market bonds to the public to finance the project is contradicted, at least in part, by AAF's pursuit of the PABs themselves in 2014.  The only difference to investors if the Court grants an injunction is that they would be offered a higher, but taxable, interest rate on the bonds.

environment injuries.  The Court thus finds that the Plaintiffs lack standing to challenge the PAB authorization based on alleged harms arising from the construction and operation of the project.

2.   <u>Procedural Harms</u>

In addition to the injuries arising from the construction and operation of Phase II, the counties contend that they will be injured by the effect of DOT's PAB authorization on FRA's ongoing environmental review.  They first contend that the PAB authorization has committed the government to the project and thereby predetermined the eventual result of the EIS and ROD.  A plaintiff cannot maintain standing, however, based purely on a procedural violation, such as the government's failure to follow NEPA requirements.  <u>E.g.</u>, <u>United Transp. Union v. ICC</u>, 891 F.2d 908, 918 (D.C. Cir. 1989) ("before we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing.  Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements."); <u>California Forestry Ass'n v. Thomas</u>, 936 F. Supp. 13, 17 n.8 (D.D.C. 1996) ("Plaintiffs' procedural injury, standing alone, does not satisfy the injury-in-fact requirement." (citing <u>Fla. Audubon Soc.</u>, 94 F.3d at 664–65)). Moreover, the counties cannot object to the final EIS and ROD in this action before either is even completed.  If, after the final EIS and ROD are issued, they believe the EIS was unlawfully predetermined as a result of the PAB authorization, they can attempt to challenge the environmental review on that basis.

The counties alternatively claim that the weighing of alternatives in the EIS process "will be thrown out of kilter because the Project will be fully financed, giving it an overwhelming advantage over any other alternative."  Indian River County Mot. for Preliminary Injunction at 22.  In considering alternatives, agencies have broad discretion to define the objectives of the

19

project and compare the merits of the selected alternatives in achieving those objectives.  See

Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 73 (D.C. Cir. 2011) ("If the

agency's objectives are reasonable, we will uphold the agency's selection of alternatives that are

reasonable in light of those objectives."); see also 40 C.F.R. § 1502.14 (requiring agencies to

consider alternatives, but listing no specific criteria by which they must do so).  Here, nothing in

the record indicates that the financing structure of Phase II will determine which alternative is

selected.  Indeed, the primary screening criterion set forth in the draft EIS is whether the

alternative would provide reliable intercity passenger rail transportation while remaining a

private, cost-effective enterprise.  Draft EIS at 3-2.  In assessing the routing alternatives against

that standard, FRA examined whether the land at issue could be obtained by purchase; whether

the proposal was logistically efficient; whether the alternative relied upon existing or entirely

new rail infrastructure; and whether the alternative would create a unique danger to the

environment.  Id. at 3-4–3-6, 3-11, 3-16 to 3-18.  The draft analysis nowhere refers to the

financing of the alternatives beyond cursory references to the RRIF program.  And this is as one

might expect, as the overarching purpose of an EIS is to ensure that agencies assess significant

environmental consequences stemming from their actions and make the relevant information

available to affected constituencies.  See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768

(2004) (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  It is

not to evaluate alternative project financing options.

　　　For these reasons, the counties' concerns about the impact of PAB authorization on

FRA's environmental review do not, standing alone, establish a redressable injury that can form

the basis of a federal lawsuit.  The Court therefore concludes that the counties lack standing.

**IV.       Conclusion**

For the foregoing reasons, the Court will deny the Indian River County plaintiffs' Motion

for Summary Judgment, a Temporary Restraining Order, and/or a Preliminary Injunction and the

Martin County plaintiffs' Motion for Preliminary Injunction.  An Order accompanies this

Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   June 10, 2015