**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INDIAN RIVER COUNTY, et al.,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00460 (CRC) |
| **PETER M. ROGOFF, et al.,** | |
| Defendants. | |
| **MARTIN COUNTY, FLORIDA, et al.,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00632 (CRC) |
| **DEPARTMENT OF TRANSPORTATION, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Fourteen months ago, the Court denied preliminary-injunction motions filed by two Florida counties, Indian River and Martin, which sought to invalidate the U.S. Department of Transportation's ("DOT's") authorization of $1.75 billion in tax-free bonds to be issued to finance a private passenger-rail project known as All Aboard Florida. The Court found that the counties had not met their burden of demonstrating standing because they had failed to show that enjoining DOT's authorization would significantly increase the likelihood of halting construction on Phase II of the project, the portion that runs through their borders. In other words, Plaintiffs did not demonstrate that an injunction would redress their claimed injury. The Court then granted the counties' request to conduct jurisdictional discovery against the project's owner and operator, AAF Holdings, LLC ("AAF"), a second-level subsidiary of the private-equity and

asset-management firm Fortress Investments Group.  This discovery was designed to provide Plaintiffs an opportunity to uncover evidence to support their assertion that, without the ability to issue $1.75 billion in tax-free private activity bonds ("PABs"), AAF would be significantly less likely to proceed with the project.

After the close of jurisdictional discovery, DOT (the named defendant in these cases) and AAF (which intervened as a defendant) both moved to dismiss, again arguing that Plaintiffs lack standing because AAF will complete the project with or without PABs.  A lengthy hearing followed comprehensive briefing by both counties, DOT, and AAF.  Having reviewed Plaintiffs' several-thousand-page evidentiary submission, including an expert declaration, as well as declarations from AAF officers, the Court concludes that the counties have now met their burden of demonstrating standing.  The call is a close one, to be sure.  But based on the present record, the Court finds that invalidating DOT's decision to authorize $1.75 billion in PABs would significantly increase the likelihood that AAF would not complete Phase II of the project.  The Court will therefore deny Defendants' motions to dismiss on that ground.

On the merits, both counties allege violations of the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Department of Transportation Act ("DTA"), and Martin County additionally alleges a violation of Section 142 of the Internal Revenue Code, as amended by the Safe Accountable Flexible Efficient Transportation Equity Act ("SAFETEA").  Because Plaintiffs have alleged facts showing that the AAF project qualifies as major federal action, the Court will deny Defendants' motions to dismiss Plaintiffs' NEPA, NHPA, and DTA claims.  But because Martin County's asserted interests do not arguably fall within the zone of interests to be protected or regulated by Section 142 of the Internal Revenue Code, the Court will grant Defendants' motions to dismiss with respect to that claim.

# I.      Background

The history of the All Aboard Florida project and this litigation are discussed at length in the Court's prior opinion on the counties' preliminary injunction motion.  See Indian River Cnty. v. Rogoff, 110 F. Supp. 3d 59, 63–66 (D.D.C. 2015).  What follows is a brief overview of the most relevant facts that bear on Defendants' present motions to dismiss.

AAF, whose parent company is owned by investment funds managed by the Fortress Investments Group, aims to renew passenger service along the existing corridor of the Florida East Coast Railway ("FECR") by constructing and operating an express railway between Orlando and Miami.  Although the project will be privately owned and operated, AAF has sought public assistance to finance its construction.  Among other sources of financing, AAF requested that DOT exempt from federal taxes, subject to certain conditions, $1.75 billion in private activity bonds to be issued by a Florida development agency.  AAF would be solely responsible for marketing and repaying the bonds.  Indian River and Martin Counties, which are located on the Atlantic coast of Florida, south of Orlando and north of Palm Beach, contend that construction and operation of the railway will cause a variety of environmental harms to them and their residents.[1]

The project is divided into two phases.  In Phase I, AAF intends to provide rail service linking West Palm Beach, Fort Lauderdale, and Miami.  Phase I has received private funding and is in development; in fact, it is nearly complete.  AAF and the Federal Railroad Administration

---

[1]  As the Court previously described, see Indian River County, 110 F. Supp. 3d at 68, Plaintiffs allege that construction and operation of the railway will cause, among other harms, noise and vibration; damage to historic sites; backups on roads along the route's at-grade and waterway crossings; diminished property values; and an increased risk of train accidents.  The Court reaffirms its earlier holding that at least some of Plaintiffs' allegations are sufficient to establish that construction and operation of the railway will cause them to suffer a judicially cognizable injury.

("FRA"), an agency of the Department of Transportation, studied the environmental effects of Phase I and issued a Finding of No Significant Impact.  In Phase II of the project, AAF seeks to expand the line north from West Palm Beach to Cocoa and then inland to Orlando.

The project requires a significant capital expenditure.  AAF currently estimates the cost of both phases at over $2.9 billion, excluding $600 million worth of land and easements that it has already acquired.  Thus far, AAF and its parent company, Florida East Coast Industries ("FECI"), have spent over $612 million on development and construction and expect to commit to spending an additional $200 million.  See AAF's Mot. Dismiss IRC 6.

To fund Phase II of the project, AAF applied for a $1.6 billion loan through the Railroad Rehabilitation and Improvement Financing program ("RRIF").  RRIF is both a loan and loan-guarantee program administered by the FRA for the development and improvement of railroad tracks, equipment, and facilities.  See 49 C.F.R. § 260.5.  RRIF loans are subject to NEPA review of the proposed project's environmental effects.  See id. § 260.35.  FRA has been acting as the lead agency in preparing an Environmental Impact Statement ("EIS") and Record of Decision to determine the environmental effects of Phase II prior to making a final determination as to AAF's loan application.  FRA, in cooperation with the U.S. Army Corps of Engineers, U.S. Coast Guard, and Federal Aviation Administration, issued a draft EIS in September 2014 and a final EIS ("FEIS") in August 2015.  The FEIS analyzed a wide range of potential environmental and other consequences of the project and "identifie[d] and evaluate[d] measures that would avoid, minimize, or mitigate impacts that would result from the Project."  FEIS 7-1.  FRA has not issued a Record of Decision, nor has it made a determination as to AAF's loan application under the RRIF program.

While the RRIF application process was ongoing, AAF requested that DOT exempt from federal taxes $1.75 billion in PABs to finance the remainder of the project. Reininger Decl. Ex. F, Letter from Michael Reininger to Paul Baumer, Office of Infrastructure Finance and Innovation, DOT (Aug. 15, 2014) ("PAB Request"). PABs are bonds issued by state or local government agencies to finance projects of public utility. Under Section 11143 of Title XI of the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA"), Pub L. 109-59 (2005), DOT may designate up to $15 billion in PABs as tax-exempt in order to encourage private development of certain types of transportation projects by giving project owners access to lower-interest debt than might otherwise be available. Reininger Decl. Ex. G. The PABs at issue here would be issued by the Florida Development Finance Corporation ("FDFC"), a Florida development agency, and then sold to investors by AAF, which would be solely responsible for the repayment obligation. Reininger Decl. ¶ 46.

AAF's application letter to DOT described the PAB financing as "the linchpin for completing our project" and "a crucial factor in ensuring our project is financed and completed." PAB Request 1. The letter explained that AAF would use the bond proceeds "across the length of [the] passenger rail system, including the Miami-to-West Palm Beach segment." Id. The letter concluded, "[W]e are fully committed to deploying the time, energy and resources necessary to complete this project. . . . The private activity bonds . . . will enable us to bring a safe, efficient, cost-effective and environmentally friendly transportation alternative to South and Central Florida." Id. at 2.

DOT provisionally authorized the requested $1.75 billion PAB allocation in December 2014. Reininger Decl. Ex. H, Letter from Peter M. Rogoff, Under Secretary of Transportation, to Michael Reininger (Dec. 22, 2014). The authorization came with several conditions,

including that (1) DOT's authorization would automatically expire if the bonds were not issued by July 1, 2016; (2) "regardless of whether [AAF] pursues the RRIF [loan] application, . . . [it must] facilitate FRA's completion of the environmental review process;" (3) AAF cannot "use the bond proceeds until 45 days following the issuance of the Final [EIS;]" and (4) AAF must "complete and implement the measures specifically set forth in the EIS . . . to avoid, minimize, or mitigate any adverse effects of the Project on the environment." Id.  Having received two extensions, AAF now has until January 1, 2017 to issue the bonds.  DOT did not conduct a separate environmental review of the project, apart from FRA's ongoing review in connection with the RRIF loan application, before issuing the provisional authorization.

The counties and related plaintiffs filed suit against DOT and two of its officials alleging that DOT's provisional authorization of PABs prior to the completion of the FRA's ongoing NEPA review violated NEPA as well as Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act, which set forth procedures for reviewing projects that use land that has been determined to be environmentally or historically significant.  Martin County also contends that the All Aboard Florida project is not an eligible use for the bond proceeds under the section of the Internal Revenue Code that authorizes the PAB allocation.  AAF has intervened as a defendant in both cases.

Although the two cases have not been joined, the parties noticed them as related and the counties' preliminary-injunction motions proceeded along parallel tracks.  After the Court denied Plaintiffs' preliminary-injunction motions in May 2015, it allowed them to conduct jurisdictional discovery to determine the likelihood that AAF would abandon Phase II of the project absent PAB financing.  See Minute Order, July 7, 2016.  Following the close of jurisdictional discovery, Defendants moved to dismiss the cases under Federal Rule of Civil Procedure 12(b)(1) on the

ground that Plaintiffs lack standing, and under Rule 12(b)(6) on the ground that they have failed to state any viable claim.

## II.        Legal Standards

In response to a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  In order for the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must have standing to sue.  Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) ("The defect of standing is a defect in subject matter jurisdiction.").  A court may examine materials outside the pleadings as it deems appropriate in order to resolve the question of its jurisdiction.  See Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), aff'd, 2001 WL 135857 (D.C. Cir. Jan. 18, 2001) (citing Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Although well-pleaded factual allegations must be accepted as true, legal assertions devoid of factual support are not entitled to this assumption.  See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## III.       Analysis

### A.        Standing

The Court is powerless to address the sufficiency of the allegations in the counties' complaints unless they have standing to bring their claims.  To establish standing, a plaintiff must demonstrate (1) an "injury in fact" that is "concrete and particularized" and "actual or

imminent," and that is also (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judgment. Defenders of Wildlife, 504 U.S. at 560–61. When the plaintiff's alleged injury "'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" then the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Id. at 562 (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)). "The facts . . . must show that the [defendant's] action is at least a substantial factor motivating the third parties' actions[.]" Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663, 669 (D.C. Cir. 1987). "The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." Fla. Audubon Soc. v. Bensten, 94 F.3d 658, 670 (D.C. Cir. 1996).

Here, the counties' burden is to show that invalidating the PAB authorization would significantly increase the likelihood that AAF would abandon Phase II of the project. See Utah v. Evans, 536 U.S. 452, 464 (2002) (holding that a favorable decision must "significant[ly] increase . . . the likelihood that [Plaintiffs] would obtain relief that directly redresses the injury suffered"). They have met their burden here with their second bite at the apple.

As DOT correctly observes, see DOT's Mot. Dismiss IRC 18, the Court essentially made three findings in its opinion denying Plaintiffs' preliminary-injunction motions that led it to conclude that Plaintiffs had failed to demonstrate their standing to sue: *first*, that AAF had credibly committed to proceeding with the project even without PAB financing; *second*, that Plaintiffs had not shown that AAF would be unable to obtain alternative financing in the event its PAB authorization fell through; and *third*, that Plaintiffs had not shown that relying on

8

alternative financing would imperil the financial viability of the project.  See Indian River Cnty.,
110 F. Supp. 3d at 69–70.  The present record—compiled following jurisdictional discovery and
viewed in light of developments since the Court's prior ruling—calls each of those findings into
doubt.  While it is certainly plausible that AAF would proceed to complete Phase II in the
absence of PABs, Plaintiffs have demonstrated a substantial likelihood that AAF could not or
would not do so if PAB financing were unavailable.

### 1.   AAF's Commitment to the Project

AAF continues to insist that it "intends to complete the Project, with or without tax-
exempt private activity bond financing."  First Decl. P. Michael Reininger ¶ 59.  The company
acknowledges that "enjoining the allocation of federal tax-exempt status would certainly disrupt
the current financing plan, make the project more expensive to complete, and may delay its
progress."  Id. ¶ 58.  Yet a ruling in Plaintiffs' favor "would not imperil the Project," id., the
company's president explains, because "AAF would proceed with conventional financing, such
as taxable bonds, which will necessarily require a higher interest rate and therefore cost far
more."  Id. ¶ 60; see also id. ¶ 61 ("Th[e] increased cost would obviously be significant to AAF,
but would not prevent it from moving forward with the Project.  AAF is committed to the Project
and believes it will be able to obtain alternative funding, if need be.").

AAF undoubtedly desires to complete the entire project, if it can.  But information
adduced by Plaintiffs' through jurisdictional discovery raises legitimate questions about its
commitment to doing so without PABs.  First of all, PAB-based financing is not just the "current
financing plan" for the project—it appears to be the *only* financing plan.  ███████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ .

█████████████████████████████████.[2]  This strikes the Court as unusual given the uncertainty surrounding the PAB issue, particularly for a company that has expressed its concern with "keep[ing] the Project on schedule and avoid[ing] delay losses."  Id. ¶ 60.  ████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████—casts some doubt as to whether AAF is truly serious about moving forward with Phase II of the project regardless of the outcome of this lawsuit.  It also indicates that AAF may have simply assumed that alternative financing would be available ████████████████████████████████.  Although the declarations of AAF's president are certainly entitled to weight, the company's ██████████ █████████████ undercuts AAF's professed commitment to proceed and its statement that it "has been exploring other sources of financing."  It also makes more likely that AAF was not exaggerating in its application letter to DOT when it described the PAB financing as "the *linchpin* for completing our project" and "a *crucial* factor in ensuring our project is financed and completed."  PAB Request 1 (emphases added).[3]

Furthermore, based on Plaintiffs' representation of the discovery they received, ████████ ████████████████████████████████████████████████ ████████████████████████████████.[4] ██████████████████████████



---

[2] The Court has redacted certain sealed material from the publically-filed version of this opinion that references AAF's confidential business information.

[3] Based on the information it had at the time of the hearing on Plaintiffs' preliminary-injunction motions, the Court explained that "[a] fairer interpretation of the letter—which, after all, was intended to persuade DOT to authorize the tax-exemption—is that the PABs were important to the project," but not necessary for it to be completed.  Indian River Cnty., 110 F. Supp. 3d at 70.

[4] ████████████████████████████████████████████████

███████████████████████████.  Not only does this fact call into question the plausibility of AAF's assertion that it could substitute PAB financing (in part) with private equity, but it also raises another question:  How can AAF be so sure that equity investors are waiting in the wings

████████████████████████████████████████████████████████████████

████████████████████████████████?

To be sure, AAF has put its money where its mouth is.  Yet its financial commitment to the project thus far is heavily weighted toward Phase I.  As to Phase II, AAF has spent approximately $182 million, including nearly $57 million to acquire land and easements, an $8 million contribution to the Orlando Intermodal Transportation Center, and $2.3 million to relocate utilities.  It has also pledged $10 million of its assets as collateral for a $10 million irrevocable letter of credit to secure 3.5 years of lease payments at the Orlando station.  See Third Reininger Decl. ¶ 7.  That spending, according to Plaintiffs' financial expert, adds up to about 13% of the total estimated capital cost of the Phase II portion of the project.  See Decl. William H. Purcell ¶ 113.  That compares to $430 million AAF has already spent on Phase I, for an overall investment of $612 million (in addition to $600 million worth of land and easements that have been committed to the overall project).  See Third Reininger Decl. ¶ 7.

The difference in spending on the two phases is mainly due to the fact that construction is nearly complete on Phase I:  New stations are actively being built in Miami, Fort Lauderdale, and West Palm Beach, and AAF is currently upgrading tracks, grade crossings, bridges, and fiber between Miami and West Palm Beach.  See id. ¶¶ 4–5.  There is no dispute that construction of

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████.

Phase I is well beyond the point of no return. See Hr'g Tr. 94:20-21. Construction has not yet

begun on Phase II, however, where "preparations . . . are now nearly complete" (or were at the

time AAF filed its motion to dismiss). See id. ¶ 3; see also id. ¶ 5 ("The designs for the West

Palm Beach to Cocoa Beach line segment are expected to be completed [in February], and the

designs for the Cocoa Beach to Orlando line segment are expected to be completed shortly

thereafter.").

    A demonstrated financial commitment to a construction project is certainly important in

assessing whether an injunction against government action would affect the project owner's

continuation of the project. See Sierra Club v. Dep't of Energy, 825 F. Supp. 2d 142, 151

(D.D.C. 2011) (finding that enjoining a government loan guarantee would be unlikely to stop

completion of a power plant that was already substantially underway). But in this context it is

important to recognize the difference between AAF's demonstrated financial commitment to,

and the actual progress it has made toward completing, the first and second phases of the project.

AAF views "[t]he connection of Orlando to West Palm Beach, Fort Lauderdale and Miami [as]

important to the [overall] project," and—given the economies of scale—the Court credits AAF's

representation "that the volume of passenger use on the longest haul, Miami to Orlando, will

allow the Project to be far more profitable than it would be were it limited to Miami, Fort

Lauderdale, and West Palm Beach"—that is, Phase I. Second Reininger Decl. ¶ 4. Still, in its

FEIS connected to the RRIF loan, FRA concluded that "Phase I has independent utility (that is, it

could be advanced and serve a transportation need even if Phase II were not constructed)." FEIS

S-1. Those assertions are not mutually exclusive by any means. The point is simply that Phase I

can (and will, for a time) operate independently of Phase II, and AAF could theoretically cut its

losses by scrapping Phase II without abandoning the entire project. And it is the construction of

Phase II, specifically, that Plaintiffs claim will harm them.[5]   The Court consequently places somewhat more weight on its evaluation on AAF's limited commitment to Phase II than on its substantial commitment to Phase I, although AAF's investment in Phase I certainly bears on its intent to complete the entire project.

It is also noteworthy that jurisdictional discovery has cleared up a misunderstanding in the Court's prior opinion in this matter.  The Court supported its finding that AAF had demonstrated a commitment to completing Phase II of the project, in part, by noting that AAF had "obtained $405 million in private debt financing" in the form of Payment-in-Kind ("PIK") Toggle Notes, "currently held in escrow, so that it can begin timely construction of Phase II regardless of whether it has obtained PAB financing or a RRIF loan."  Indian River Cnty., 110 F. Supp. at 59.  Plaintiffs have now demonstrated, however, that the PIK notes are not a financing mechanism for Phase II of the project; ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████. This fact is still relevant, of course, because completing Phase I increases the probability that AAF will ultimately complete Phase II.  But, contrary to the Court's earlier understanding, it does not show that AAF had already arranged financing for a significant portion of Phase II's costs.

The Court does not doubt that AAF officers honestly wish to proceed with the entire project and view Phase II as critical to the project's success.  They have clearly made a substantial investment in the overall project, including in Phase II.  In the Court's view, however,

---

[5]  AAF thus oversimplifies the issue a bit when it speaks of "the likelihood that [it] would elect not to proceed with the *Project*," AAF Mot. Dismiss IRC 18 (emphasis added), rather than with Phase II in particular.

AAF's commitment to the project—and to Phase II in particular—appears less credible and less

firm than when the Court decided Plaintiffs' preliminary-injunction motion fourteen months ago.

2.   <u>Availability of Alternative Financing</u>

AAF insists that it has several alternative sources of financing available to it in the

event PAB financing falls through:  (1) a RRIF loan; (2) additional equity contributions from its

parent and/or other affiliated entities; (3) a sale of equity interests to third parties; and/or (4)

other conventional financing, including private debt facilities, private loan financing, and taxable

bonds.  AAF Mot. Dismiss IRC 20.  Again, these options may in fact be viable, and if they are,

AAF has a plausible path to completing Phase II in the absence of PABs.  The current record,

however, casts doubt on whether AAF could tap into these other sources of funding if it wanted

to.  And, of course, regardless of AAF's intent and its commitment to the project, it simply

cannot proceed if other financing options are unavailable.

The potential $1.6 billion RRIF loan would seem a close substitute for the $1.75 billion

PAB financing.  If AAF could easily obtain this loan, it is difficult to see how losing access to

PABs would stymie the completion of Phase II.  Yet at the hearing on Defendants' motions to

dismiss, DOT appeared to throw cold water on that possibility.  The Department represented that

"the company is not pursuing the loan application at this time."  Hr'g Tr. 8:2-3.  AAF has not

withdrawn the application, "but at this point DOT has no plans to issue a record of decision or

make a final decision on that loan application."  <u>Id.</u> at 10:5-7.  Furthermore, DOT described the

potential RRIF loan as merely "a hypothetical" at this juncture.  <u>Id.</u> at 10:3.  DOT did represent

that "the funding is out there right now if the company wanted to pursue it"—meaning that such

a loan is still conceivable—but AAF has "indicated at this time they do not want to pursue it."

<u>Id.</u> at 10:18-21.  It is thus unclear at this point whether AAF's loan application would be granted,

14

especially given the necessary involvement of other actors (including the Office of Management and Budget) and unknown factors, such as the current interest rate that FRA would propose to charge.  At a minimum, there is little evidence in the record suggesting that the loan application would be granted, and the Court has little basis to find that it is a readily available alternative to PAB financing.

FECI (AAF's parent company) or Fortress (whose investment funds own FECI) would seem to have the most control over self-financing Phase II in the form of additional equity contributions.  But as Plaintiffs' expert notes, Fortress's market capitalization has shrunk by nearly half since the Court ruled on Plaintiffs' preliminary-injunction motions.  See Purcell Decl. ¶ 72.  And FECI has significant debt obligations coming due in the next three to four years.[6]  In any event, neither entity has represented to this Court that it stands ready to inject the balance of necessary funding if PAB financing is unavailable.  Nor, for that matter, has either FECI or Fortress given a firm indication of how much of the balance it would be willing to contribute.  It is thus unclear what kind of equity contribution these entities could or would make given their financial situation, although Fortress is adamant (if quite unspecific) about its continued commitment to the project.  See generally Decl. of Kenneth J. Nicholson; First. Suppl. Decl. of Kenneth J. Nicholson.

At the same time, it would be odd to say that either equity sales to third parties or conventional financing would be completely unavailable to AAF.  Surely there is some interest rate at which investors would loan money to finance the project and a price at which they would purchase an equity stake in it.  But would those financing mechanisms be viable, given the

---

[6]  As Plaintiffs' expert explains, "FECI has $1.1 billion of debt coming due in 2019 and 2020 that will have to be paid in full or refinanced, as well as the $250 million of E-5 financing that becomes due and payable as of August 2020."  Purcell Decl. ¶ 111.

interest rate or projected rate of return that investors would demand?  The Court takes up this question in the following section.

### 3.   Alternative Financing's Impact on the Project's Financial Viability

As the Court has explained, "AAF's ability to tap other sources of financing does not mean it would choose to do so if the incremental cost of that financing would imperil the financial viability of its investment."  Indian River Cnty., 110 F. Supp. at 70.  In other words, if alternative financing would render the project unprofitable or less profitable than other potential investments, AAF—as a rational economic actor with fiduciary obligations to its investors— would be unlikely to turn to that financing to complete the project.  On this issue, the Court finds persuasive several observations in the expert declaration of William Purcell, submitted by Plaintiffs.[7]

As an initial matter, on the possibility of taxable bonds, the parties agree on one key point:  "If AAF were unable to consummate a PAB transaction and . . . proceed[ed] with conventional taxable financing instead, the interest rate would be approximately 1.5 times higher" than the interest rate associated with the PABs.  First. Suppl. Decl. Kenneth J. Nicholson ¶ 9.  In addition, counsel for AAF conceded at oral argument that "if corporate debt were available only in the 12 to 12.5 percent [range], then it would be a non-starter," at least in the

---

[7] AAF offers a fair critique of Purcell's opinion that the AAF financial projections provided to the Court in May 2015 did not reflect the economics of the project as they exist today or existed at that time.  The Court is not considering Purcell's declaration on that particular issue, however, so the back-and-forth between the parties on this front is largely beside the point.  The Court will nonetheless grant Plaintiffs' joint motion for leave to file a sur-reply to allow them to counter the argument in AAF's reply that Purcell is not a credible expert and that his declaration is factually inaccurate.  While the Court does find Purcell to be a credible expert based on his experience in and specialized knowledge of the field of capital markets, the Court's analysis is primarily based on certain undisputed facts contained in his declaration rather than a particular reliance on Purcell's opinions.

amount of $1.7 billion.  See Hr'g Tr. 108:5-10.  Given the interest rate spread between PABs and taxable bonds, a PAB interest rate of 8% or higher would likely make conventional debt financing infeasible for purposes of funding a substantial portion of the Phase II project costs.

Purcell asserts that an interest rate of 8.5% would be needed to sell $1.75 billion of PABs and that an interest rate of 12.75% would be needed to sell the same amount of taxable bonds. See Purcell Decl. ¶ 36.  To understand the origin of this figure, it is necessary to understand the history of AAF's past attempts to sell its PABs.[8]  AAF first attempted to sell the bonds in August 2015, when it released a Preliminary Limited Offering Memorandum ("PLOM") on the PABs indicating an interest rate of 6% for a single tranche of up to $1.75 billion.  See Reininger Sealed Dep. 145:6-10.  AAF found that it could not sell all its PABs at that rate on the terms it wanted. In its first supplement to the PLOM, in September 2015, AAF structured the offering so as to increase the projected interest rate to 7.5% and to issue the bonds in two tranches, one for $1.35 billion and the other for $400 million.  Again, there was insufficient interest from investors for AAF to close on the sales on AAF's terms.  See Hr'g Tr. 96:19-25.  AAF followed up with a second supplement in October and a third supplement in November, keeping the projected interest rate at 7.5% but adding additional terms that were arguably more favorable to investors. Id. at 97:5-25; 98:1.  Each time it was either unable to conclude a deal or chose not to do so, depending on whose framing of the issue one prefers.  Either way, the fact remains that the AAF project repeatedly did not generate sufficient interest to result in a sale of all bonds at the 7.5% rate.  See MC's Opp'n Defs.' Mots. Dismiss 5.  As a result, even aside from Purcell's best guess, it strikes the Court as reasonable that a full sale of the PABs would require an interest rate of at

---

[8] Although some of this history is recounted in excerpts from Mr. Reininger's deposition that has been given under seal, the Court has left this discussion unredacted because the issue was discussed at the June 30th public hearing and appears to be a matter of public record.

least 8% in the present market, which would bump the interest rate for taxable bonds into the range that AAF acknowledged is unacceptable.

AAF still makes an important point:  This discussion presupposes that AAF needs to consummate a full $1.75 billion bond offering in order to proceed with the project.  That assumption is unreasonable.  The more likely scenario is that if AAF could not sell all its bonds at its preferred rate, it would still sell some at a more-favorable rate and attempt to finance the rest of the project through other means.[9]  Even if issuing $1.75 billion in taxable bonds would increase AAF's interest costs by $744 million, as Purcell opines, that is not necessarily the correct figure to use if AAF would not actually issue all $1.75 billion in taxable bonds.

At the same time, the interest rate demanded as part of a significant sale of taxable bonds relates to the more fundamental issue: whether, generally speaking, AAF can obtain financing (other than PABs) on favorable enough terms to allow it to proceed with Phase II.  If investors are seeking an unrealistically high interest rate on taxable bonds, it follows that they would also demand an inflated projected rate of return on any equity investment.  That is, if the taxable-bond market looks bleak for AAF, so too would the equity market.  AAF offers no reason to believe otherwise, other than simply asserting that financing the project from a combination of sources would provide sufficient capital for the project to move forward.  Furthermore, Plaintiffs stressed at oral argument—and Defendants did not dispute—the general rule that equity investors demand a higher projected rate of return on their investment than do purchasers of corporate debt, given the greater risks involved.  Purcell estimates that equity investors in the AAF project "would most likely demand potential returns of at last 20% per annum," Purcell Decl. 108, a figure that

---

[9]  Although AAF was initially required to sell all at once any PABs it planned to issue, see Hr'g Tr. 80:2-6, DOT has more recently allowed AAF to issue its PABs in multiple tranches, see id. at 83:9-14.

is likely unacceptable to AAF.  Given the probable interest rate associated with conventional, taxable debt financing, that figure is likely not far off.  AAF has certainly not offered the Court a more credible one.

Also probative is that in 2014, AAF issued and sold $405 million in five-year taxable PIK Toggle Notes bearing an interest rate of *12%*.  While Purcell explains that those notes represent the reality of taxable-bond financing for the project, AAF counters that when those notes were issued, "the Project was in its infancy and had a substantially different risk profile than it does today."  See AAF Reply IRC 7.  Naturally, AAF cites the progress that has been made on the construction of Phase I and the rolling stock agreement now in place, along with its planning for Phase II.  It ignores, however, that—at least when these motions were briefed—the PIK notes were trading at a discount in the market, yielding above *18%* as of February 2016.  See Purcell Decl. ¶ 50.  Whether this is due specifically to investor skepticism about the economics of the project, as Purcell supposes, id. ¶ 50, or generally to investor skepticism over the entire high-yield corporate-bond market, as AAF contends, see AAF Reply IRC 8, the upshot is pretty much the same.  Whether because of concerns over the particular project or because of general market conditions, the implication is that the AAF project is seen in the bond market as a riskier proposition today than it was in 2014.  That fact steers the Court toward the interest rates and projected rates of return that Plaintiffs contend will be necessary to obtain conventional financing and away from those suggested by AAF.

The bottom line, in this case at least, is that will does not necessarily make way:  AAF may well have the desire and intent—and ultimately the means—to complete Phase II of the project, even in the absence of PABs.  It is plausible that AAF could cobble together an assortment of viable financing from a variety of sources, allowing it to proceed despite

substantially reducing the project's profitability.  The Court does not necessarily share Plaintiffs' view that such an undertaking would be practically impossible.  But Plaintiffs' burden is not to demonstrate with certainty that invalidating the PAB authorization would grind the project to a halt.  They must show, rather, that denying AAF access to PABs would significantly increase the likelihood that AAF would not proceed with Phase II of the project.  Plaintiffs have met their burden, because they have sufficiently called into question AAF's commitment to completing the project absent PABs and shown the difficulty AAF would face in obtaining any other form of financing.  The Court thus finds that removing PABs from the equation would significantly increase the likelihood that AAF would be unable or unwilling to proceed with Phase II, thereby averting Plaintiffs' claimed injury.  This showing of redressability satisfies Plaintiffs' obligation to demonstrate standing to proceed with this action.[10]  The Court therefore moves to the merits of Plaintiffs' claims.

### B.  Federal Nature of the Project

Plaintiffs' primary claim on the merits is that DOT approved the PAB allocation without undertaking environmental review under the National Environmental Policy Act, which is required for any "major Federal action[] significantly affecting the quality of the human environment."  See 42 U.S.C. § 4332(c); Compl. ¶¶ 126–40.  Defendants do not dispute that no environmental review took place before DOT authorized the PABs, but respond that no NEPA review was required because the project is not major federal action.  Plaintiffs also claim that

---

[10]  The Court has already found that construction and operation of Phase II would cause Plaintiffs to suffer a cognizable injury.  See Indian River Cnty., 110 F. Supp. at 68.  It has also explained that, "while the [causation] and redressability standards are analytically distinct, in this case they essentially merge because the crucial consideration in both inquiries is the same: the extent to which DOT's PAB authorization influences AAF's decision to proceed with the project. Accordingly, the Court need only analyze the issue in terms of redressability and will not engage in a separate traceability inquiry."  Indian River Cnty., 110 F. Supp. at 69.

DOT violated the National Historic Preservation Act by failing to "take into account" the

project's potential effects on historic properties, 54 U.S.C. § 306108, and that DOT violated

Section 4(f) of the Department of Transportation Act by failing to determine that "there is no

prudent and feasible alternative to using" land it has determined to be environmentally or

historically significant and to ensure that the project "includes all possible planning to minimize

harm" to that land, 49 U.S.C. § 303(c)(1)-(2).  Defendants contend that these claims "fail as a

matter of law, for much the same reasons" as Plaintiffs' NEPA claim, observing that "[l]ike

NEPA and the NHPA, . . . Section 4(f) is triggered only when a program or project is subject to

federal control or approval."  AAF's Mot. Dismiss IRC 30.  The D.C. Circuit has also explained

that "[s]imilar federal involvement is required under [S]ection 4(f) of DOTA . . . and under the

NHPA" as is required to determine "what constitutes a 'major federal action' under NEPA."

Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 197 n.7 (D.C. Cir. 2003).  The Court

will therefore proceed to analyze, for purposes of all three claims, the federal nature of the

project in relation to the requirements for what qualifies as major federal action under NEPA.

Taking Plaintiffs' well-pleaded factual allegations as true, the Court finds that the project does

constitute major federal action under those facts.  It will therefore deny Defendants' motions to

dismiss with respect to those claims.[11]

 A useful starting place, all parties agree, is the Council on Environmental Quality

regulation that defines "major Federal action" as an "action[] with effects that may be major and

---

[11] Although some courts treat the existence of major federal action as an issue of subject-matter jurisdiction, see Sancho v. U.S. Dep't of Energy, 578 F. Supp. 2d 1258, 1268 (D. Haw. 2008), aff'd, 392 Fed. App'x 610 (9th Cir. 2010), this Circuit appears to treat it as a merits issue, see, e.g., Macht v. Skinner, 916 F.2d 13 (D.C. Cir. 1990.  Furthermore, all parties in this case discuss the major-federal-action requirement in the context of their motions on Rule 12(b)(6) grounds. The Court thus accepts Plaintiffs' well-pleaded factual allegations as true for purposes of deciding the issue.

which [is] potentially subject to Federal control and responsibility." 40 C.F.R. 1508.18; see also

Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 54 (D.D.C. 2003) ("In determining what

constitutes a 'major Federal action,' the court may first look to the regulations implementing

NEPA."). That regulation further defines an "action" to include a "project[] [or] program[]

entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies."

Thus, a partly federally financed or assisted project with major effects would qualify as major

federal action, provided that it was potentially subject to federal control and responsibility.

Although there is no litmus test for whether something qualifies as major federal action,

courts have tended to "consider the following factors: (1) whether the project is federal or non-

federal; (2) whether the project receives significant federal funding; and (3) when the project is

undertaken by a non-federal actor, whether the federal agency must undertake 'affirmative

conduct' before the non-federal actor may act." Mineral Policy Ctr., 292 F. Supp. 2d at 54–55.

It is widely recognized that, in certain situations, "'major Federal action' can exist when the

primary actors are not federal agencies." Save Barton Creek Ass'n v. Fed. Highway Admin.,

950 F.2d 1129, 1134 (5th Cir. 1992). Unfortunately for reviewing courts, "[t]here are no clear

standards for defining the point at which federal participation transforms a [private] project into a

major federal action. . . . The matter is simply one of degree." Ka Makani 'O Kohala Ohana Inc.

v. Water Supply, 295 F.3d 955, 960 (9th Cir. 2002) (quoting Almond Hill Sch. v. United States

Dep't of Agric., 768 F.2d 1030, 1039 (9th Cir. 1985)) (internal quotation marks omitted)).

Defendants suggest—and the Court accepts—that a project qualifies as major federal

action if it may have effects that are major (a point not in dispute here), and "if it cannot begin or

continue without prior approval by a federal agency and the agency possesses authority to

exercise discretion over the outcome." See Sugarloaf Citizens Ass'n v. FERC, 959 F.2d 508,

512 (4th Cir. 1992) (internal quotation marks and citation omitted).  Defendants also suggest that if a federal agency "possess[es] actual power to control [a] non-federal activity" that may have major effects—and that is funded, financed, or assisted in a significant and tangible way by the federal government—then it qualifies as major federal action.  Id. at 512; see also Hr'g Tr. 6:24-25 (arguing that the precise test is unimportant because "DOT exercises neither control nor has it provided significant federal funding for the project.").  Plaintiffs basically agree.  See id. at 27:15-16 (counsel for Indian River County conceding "that frankly[,] the plaintiffs need to establish control *and* financial assistance." (emphasis added)).

Fundamentally, invoking "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause"—that is, the agency's action.  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 767 (2004).  In other words, an agency cannot be responsible for an environmental effect "when the agency has no authority to prevent the effect." Id.  It must be able to exercise some discretion with regard to its action so as be able to prevent (or mitigate) any environmental effects.  See id. at 770.  This idea conforms with the view that "the touchstone of 'major Federal action' [is] a federal agency's authority to influence nonfederal activity."  Save Barton Creek Ass'n, 950 F.2d at 1135.

Defendants are correct that DOT's PAB authorization is not a "legal precondition," NAACP v. Med. Ctr., Inc., 584 F.2d 619, 632 (3d Cir. 1978), for AAF to proceed with the project.[12]  Plaintiffs have not alleged otherwise.  That theory, then, may not serve as a basis for

---

[12]  Although DOT's PAB authorization is not a legal precondition for the project to proceed, the RRIF-FEIS states that "[a]pprovals by several federal agencies, including the FRA, U.S. Army Corps of Engineers (USACE), U.S. Coast Guard (USCG), Federal Aviation Administration (FAA), Federal Highway Administration (FHWA), U.S. Fish and Wildlife Service (USFWS), and the National Marine Fisheries Service (NMFS) are necessary to implement the Project." FEIS S-4.

finding that the AAF project is major federal action. The Court will therefore proceed to "examine two factors: (1) the amount and nature of Federal Defendants' funding [or financial assistance], and (2) the extent of Federal Defendant[s'] involvement and control." Sancho v. U.S. Dep't of Energy, 578 F. Supp. 2d 1258, 1266 (D. Haw. 2008), aff'd, 392 Fed. App'x 610 (9th Cir. 2010) (citing Rattlesnake Coal. v. EPA, 509 F.3d 1095, 1101 (9th Cir. 2007)).

## 1. Amount and Nature of Federal Financial Assistance

Addressing the amount and nature of federal financial assistance provided to the AAF project, Defendants contend first that a tax-exempt-bond allocation necessarily falls outside the ambit of major federal action because the federal government does not provide direct funding for the project. They further argue that whatever financial assistance the federal government is providing is not significant enough to essentially federalize the project. Plaintiffs respond that there is no conceptual reason why a PAB allocation should be analyzed differently than a grant or loan and that the allocation itself provides substantial federal financial assistance for the project.

The Court finds itself in somewhat uncharted waters. No court has yet addressed the precise issue here: whether the conferral of a tax benefit connected to and directed toward a particular project, if substantial enough, can fit under the major-federal-activity framework. Setting aside for a moment the degree of federal control over the project, it is difficult to discern a principled reason for automatically exempting conferrals of project-specific tax benefits from the realm of major federal action. For one thing, the CEQ regulation speaks of "projects or programs entirely or partly financed, *assisted*, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18 (emphasis added). That regulation requires only federal assistance, not funding per se. Assistance is a broad term, to be sure, and the regulation provides

no guidance on what form that assistance must take.  Direct funding in the form of a grant obviously counts, but what else?  On this point, federal loans provide a useful comparison.

AAF has applied for an RRIF loan via the FRA in the amount of $1.6 billion.  This loan would enable AAF to finance approximately 45% of the project's estimated $3.5 billion cost.  In contrast to a grant or direct subsidy, however, the ultimate net impact on the federal treasury in this scenario could be nil or even positive.  See FEIS 1-10 ("RRIF funding is a loan, not a grant, so it must be repaid with interest, with the funding backed by collateral provided by AAF."); Hr'g Tr. 12:1-4 (agreeing that the federal government "could actually make money off" the RRIF loan).  The risk exists, of course, that the loan might not be paid back.  But the most likely outcome is that the loan would be repaid with interest; the federal treasury would experience no net outflow; and the government's share of the costs, in that sense, would be zero.  See 45 U.S.C. § 822  ("The Secretary [of Transportation] shall require interest to be paid on [an RRIF] loan made under this section at a rate not less than that necessary *to recover the cost* of making the loan." (emphasis added)).  Nonetheless, all parties agree that the decision to award an RRIF loan under this circumstance is the type of federal-agency action that is subject to NEPA.  FRA's own regulation interpreting its obligations under NEPA and under other federal statutes confirms as much.  See 49 C.F.R. § 260.35 (explaining that the award of an RRIF loan "is subject to a variety of environmental and historic preservation statutes and implementing regulations including the National Environmental Policy Act . . . , Section 4(f) of the Department of Transportation Act . . . , and the National Historic Preservation Act," and that "[a]ppropriate environmental/historic preservation documentation must be completed and approved by the [Federal Railroad] Administrator prior to a decision by the Administrator on the applicant's" RRIF loan application).

Compare the loan to the PAB allocation provided here. DOT has allocated $1.75 billion in PAB authority, which would enable AAF to finance about 50% of the overall project. Indian River plausibly alleges in its Complaint that the cost to taxpayers from this particular PAB allocation—from the tax revenue that the government has chosen to forgo by making interest on the bonds tax-free—will be between $37 million and $60 million *per year*. MC's Compl. ¶ 63.[13] Over a ten-year timeframe, which the parties used at oral argument, that amounts to a $370 million to $600 million cost to taxpayers. The amount of assistance as a share of the overall costs for the project under this scenario would be between 10% and 17%. Again, although the RRIF loan might not be paid back in full, the anticipated impact on the public fisc would be far greater from the PAB allocation than from an RRIF loan award. The difference with the loan is that the federal government incurs an immediate outlay but on net expects to end up ahead, whereas with the PAB allocation, the federal government chooses to forgo future inlays but ends up hundreds of millions of dollars behind.[14]

---

[13]   According to Plaintiffs, assuming an interest rate of 7.5% on *taxable* bonds, "AAF would pay $131 million in interest each year, on which bond holders would owe approximately $37 million in taxes (assuming an average tax rate of 28%). . . . If AAF were to pay a tax-exempt equivalent to the 12% coupon rate on its PABs, the tax-payer subsidy would rise to $60 million per year." MC's Compl. Ex. 8 (John N. Friedman, An Economic Analysis of All Aboard Florida (Feb. 2015)), at 12.

[14]   At least one court in this District has attached no weight to the outlay/inlay distinction. In Sierra Club v. U.S. Department of Agriculture, Judge Sullivan found that the Department of Agriculture had "effectively provided financing" to a company for a project (within the meaning of NEPA's major-federal-action requirement) by restructuring and essentially reducing that company's prior debt owed to the agency. 777 F. Supp. 2d 44, 62 (D.D.C. 2011). True, the agency itself had made actual loans in the past for the project, but the court also found the agency's decision to take in less money to be a form of federal financial assistance for the project.

All else equal, it would be somewhat odd to find major federal action stemming from the government's provision of a loan in support of a project—allowing a builder access to 45% of the capital it needs to complete the project, without ultimately costing the federal government anything—but to find no major federal action when the federal government has authorized tax-exempt bonds to be issued to support a particular project, allowing a builder access to half of the capital it needs to complete the project at a final cost of hundreds of millions of dollars to the federal treasury.  The main conceptual difference is that, in the loan scenario, the federal government writes a check directly to the builder, while in the PAB scenario, the government's financial support is indirect and longer-term—mediated through investors who buy the bonds. But it is unclear why a finding of major federal action should turn on the precise mechanism the federal government employs to assist the project.  Certainly nothing in the text of the statute compels that result.  Here, there is no dispute that the federal government has consciously chosen to forgo large amounts of tax revenue for the specific purpose of helping AAF complete its railway project, and Plaintiffs plausibly allege that this assistance is critical to the project.  In the Court's view, then, if the amount of federal assistance conferred by the RRIF loan can support a finding of major federal action, so too can the amount of federal assistance conferred by the PAB-allocation decision.

Regardless, Defendants argue, the financial assistance provided by PABs to the project is simply too minimal or marginal to convert the project into major federal action.  Setting aside that both the benefit to the AAF project and the cost to taxpayers are arguably greater in the PAB context than in the RRIF context, Defendants' argument is somewhat misguided.  The cases they cite primarily stand for the proposition that

> [w]here the federal "involvement" consists *only* of funding a construction project, the project does not rise to the level of "major federal action" unless the funds

represent a significant portion of the project cost. Consequently, even a project that receives as much as 18% of its funding from the federal government has been held not to be a "major federal action" where the funding agency "could not exercise discretion and control over the design, location or choice of alternatives for the nonfederally funded portions."

Touret v. NASA, 485 F. Supp. 2d 38, 43 (D.R.I. 2007) (emphasis added) (quoting Riverfront Garden Dist. Ass'n v. City of New Orleans, 2000 WL 35801851, *7 (E.D. La. Dec. 11, 2000)). The Court does not have before it any persuasive authority that financial assistance at the level provided by the PAB allocation, *when paired with federal-agency control*, cannot make up major federal action. It is important, then, for the Court also to analyze the degree to which the AAF project is "potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

## 2.   Extent of DOT's Involvement and Control

While "major federal action can exist when the primary actors are not federal agencies, . . . 'the distinguishing feature' of federal involvement is 'the ability to influence or control the outcome in material respects.'" Riverfront Garden Dist. Ass'n, 2000 WL 35801851, at *6 (quoting Barton Creek, 950 F.2d at 1134). "[T]he federal decisionmaker must have discretion to exercise" some control over a significant portion of the project "before the matter in issue will be a major federal action." Id. That is so because "[t]he EIS process is supposed to inform the decision-maker." Id. (quoting Barton Creek, 950 F.2d at 1134 (internal quotation marks omitted)). If the agency cannot materially influence the project or require a project's proponent to take environmental mitigation measures in response to an EIS, there is no point in forcing that agency to conduct an environmental review in the first place before the project occurs. Cf. Town of Barnstable v. FAA, 740 F.3d 681, 691 (D.C. Cir. 2014) ("NEPA's 'rule of reason' does not require [an agency] to prepare an EIS when it would serve no purpose." (internal citation and quotation marks omitted)).

Again, a comparison to the RRIF loan award—which no party disputes involves the requisite degree of federal control and implicates the major-federal-action requirement of NEPA—is instructive.  Both the potential and actual control that DOT (or its sub-agency, FRA) exercises with respect to the AAF project is substantially similar in the most crucial respects in the RRIF and PAB scenarios.  In the RRIF context, FRA has discretion to condition its loan award on the recipient's compliance with various conditions, including environmental mitigation measures.  So too in the PAB-allocation context.  Indeed, that is exactly what DOT did here. Plaintiffs allege, and Defendants do not dispute, that DOT—as a condition of the PAB allocation—required AAF to wait until the completion of the environmental-review process connected to the RRIF application and then to comply with any mitigation measures outlined in the FEIS, even if AAF chose not to proceed with the RRIF loan.  See Reininger Decl. Ex. H. The mitigation measures outlined by the RRIF-FEIS, with which AAF was required to comply as a condition of PAB financing, are extensive.  In the FEIS, "[m]itigation measures are proposed for traffic and at-grade crossings, noise and vibration, water, navigation, wetlands, biological resources and natural ecological systems, essential fish habitat (EFH), threatened and endangered species, and historic properties."  FEIS 7-1.  They involve, among other things, certain construction techniques AAF must employ and types of equipment to be used or not used.  FEIS tbl.7.2-1.[15]  A summary list of these mitigation measures is attached to this opinion as an appendix.

This is the kind of federal control over private projects contemplated by statutes like NEPA:  The federal government has conferred a significant financial benefit on (or incurred

---

[15]  The RRIF-FEIS also includes mitigation measures related to the NHPA and Section 4(f) of the DTA.

significant costs in direct support of) a project with potentially major environmental effects, and—as a condition of that assistance—the relevant agency is empowered, and has chosen, to require the builder to alter the project and its construction so as to satisfy the agency that negative environmental consequences are minimized to the extent practicable.  DOT in fact required these types of material changes to the AAF project in exchange for authorization to issue $1.75 billion in tax-exempt bonds.  It thus enjoys the requisite degree of control called for by NEPA and related statutes so as to implicate major federal action.

In light of the considerable benefit conferred on AAF by access to PAB financing, the major cost to the federal government of specifically supporting the project in this way, and DOT's ability to exercise control over the entire project's manner of construction, the Court finds that Plaintiffs have adequately alleged the existence of major federal action.  It will therefore deny Defendants' motions to dismiss as to Plaintiffs' NEPA, NHPA, and DOTA claims.

### C.   DOT's Statutory Authority to Authorize the PABs

Plaintiff Martin County also claims that DOT exceeded its authority under 26 U.S.C. § 142(m), a provision of the Internal Revenue Code that allows for PABs to be allocated for "qualified highway or surface freight transfer facilities."  Martin County contends that the AAF project does not meet the statutory definition of a "qualified highway" or a "surface freight transfer facilit[y]," and that any PAB allocation in support of the project is therefore unlawful. The Court does not reach that question, however, because it finds that Martin County's stake in the project does not arguably fall within the zone of interests protected or regulated by 26 U.S.C.

§ 142. It will therefore grant Defendants' motion to dismiss with respect to Martin County's claim.

When a plaintiff sues under the APA, it must satisfy "not only Article III's standing requirements, but an additional test:  The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199, 2210 (2012) (quoting Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)).  As here, when a "plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987).  While "[t]he test is not meant to be especially demanding," and "there need be no indication of congressional purpose to benefit the would-be plaintiff," the question of reviewability "turns on congressional intent" as to "whether a particular plaintiff should be heard to complain of a particular agency decision." Id. at 399–400.

In conducting the zone-of-interest test here, the relevant unit of analysis (i.e., the allegedly violated statute) is the section of the Internal Revenue Code that allows for tax-exempt bonds to be issued when their proceeds are used to fund certain types of projects, such as airports, docks and wharves, sewage facilities, and—as relevant here—qualified highways or surface freight-transfer facilities.  It is proper to consider this specific statutory section, rather than the Internal Revenue Code as a whole, because the "Code is an extraordinarily complex statute which does not have a single, unified purpose.  Rather, the Code is intended to accomplish a wide variety of economic and social goals and purposes." Tax Analysts &

Advocates v. Blumenthal, 566 F.2d 130, 141 (D.C. Cir. 1977).  It would be similarly inappropriate to assess Martin County's interests against the entire Safe, Accountable, Flexible, and Efficient Transportation Act ("SAFETEA")—an 836-page law that serves primarily to provide nearly $300 billion in surface-transportation funding.  Martin County argues that because SAFETEA amended 26 U.S.C. § 142 to add "qualified highway or surface freight transfer facilities" to a preexisting list of projects eligible for exempt facility bonds (i.e., PABs), the Court must look to all of the Act's multifarious purposes to conduct the zone-of-interests inquiry here.  But SAFETEA is a massive statute with many objectives, and there is no indication that Martin County's asserted interests have any connection to the particular amendments SAFETEA made to Section 142.  Moreover, those amendments are but a tiny component of the overall legislation.  Exalting *any* interest protected or regulated by SAFETEA in performing the zone-of-interests analysis in this case would wrongly lead the Court to reason "on the basis of intent inferred from statutory provisions which perhaps embody different goals and policies."  Tax Analysts, 566 F.2d at 141.

Martin County's interests in the project may well be connected to public safety, as well as to environmental protection and historic preservation.  But Congress enacted 26 U.S.C. § 142 in general, and Sections 142(a)(1) and 142(m) in particular, to create a tax benefit to support the development and construction of certain kinds of projects with significant public benefits and a demonstrated need for financial assistance.  That portion of the Internal Revenue Code has nothing to do with Martin County's asserted interests, nor does it protect (or regulate) those who would claim that public safety or other related interests would be impaired by a bond allocation to an ineligible project.  Martin County presents no real argument that its interests are more than marginally related those protected or regulated by *Section 142* itself; it places all its eggs in the

SAFETEA basket instead.[16]   As in <u>Tax Analysts</u>, the Court deems significant that Martin County "[does] not in [its] submissions . . . attempt to persuade the court that [its] asserted . . . interests fall within the zone of interests relevant to [the provision of the Internal Revenue Code allegedly violated].  Rather, [it relies] entirely on other provisions" of the statute that amended that piece of the Internal Revenue Code "to argue that the zone standard has been satisfied."  566 F.2d at 143.  In sum, the Court agrees with Defendants that Congress did not intend for plaintiffs asserting public-safety, environmental-protection, or historic-preservation interests to sue for a violation of 26 U.S.C. § 142.  Because Martin County is not arguably within the zone of interests protected or regulated by the statute they contend was violated, the Court will dismiss this claim.

## IV.        Conclusion

        For the foregoing reasons, the Court will grant Defendants' motions to dismiss as to the claimed violation of Section 142 of the Internal Revenue Code.  The Court will, however, deny

---

[16]  Martin County also advances the argument that it has "an interest that the limited pool of PABs be used solely on qualifying projects, not any type of project that DOT unlawfully shoehorns into the statutory definitions."  MC's Opp'n Defs.' Mots. Dismiss 34.  But a mere interest in proper application of the Constitution and laws is not constitutionally cognizable, <u>see</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 573–74 (1992), and "on any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests' for purposes of prudential standing," <u>Mountain States Legal Found. v. Glickman</u>, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

33

Defendants' motions as to the claimed NEPA, NHTA, and DTA violations.  An Order

accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   August 16, 2016

**APPENDIX**

# 7    Mitigation Measures and Project Commitments

## 7.1    Introduction

According to the Council on Environmental Quality (CEQ) *Regulations for Implementing the National Environmental Policy Act (NEPA)*, project proponents shall, to the fullest extent possible:

> "Use all practicable means consistent with the requirements of the Act and other essential considerations of nation policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions on the quality of the human environment." (40 CFR § 1500.2(f))

In accordance with the NEPA regulations, this chapter identifies and evaluates measures that would avoid, minimize, or mitigate impacts that would result from the Project. Measures to minimize impacts by limiting the degree or magnitude of impacts associated with the proposed All Aboard Florida (AAF) passenger rail service and its implementation are described. As documented in this chapter, effects to various environmental resources are unavoidable due to the proposed location of the new MCO Segment and East-West Corridor (E-W Corridor) connecting with the existing Florida East Coast Railway (FECR) (the North-South Corridor [N-S Corridor]); therefore, measures that minimize adverse effects have been identified. A detailed analysis of proposed compensatory mitigation measures is included for areas in which replacing lost resources is necessary.

This chapter provides a description of mitigation for short-term construction-period effects, permanent loss of protected resources, and long-term effects of Project operations, and responds to public comments on the Draft Environmental Impact Statement (DEIS) concerning mitigation of potential environmental impacts of the Project. This chapter also describes consultation with federal and state agencies pertaining to mitigation.  In addition, this chapter summarizes the mitigation commitments for Phase I, the West Palm Beach to Miami Corridor, as set out in the 2013 Finding of No Significant Impact (FONSI) (FRA 2013).

## 7.2    Project Commitments

This section describes the proposed Best Management Practices (BMPs) incorporated in the Project and mitigation measures for unavoidable impacts. Mitigation measures are proposed for traffic and at-grade crossings, noise and vibration, water, navigation, wetlands, biological resources and natural ecological systems, essential fish habitat (EFH), threatened and endangered species, and historic properties. For each resource, the analysis describes efforts to avoid consequences, minimize impacts, and provide compensatory mitigation. Table 7.2-1 provides a summary of construction-period BMPs and mitigation measures proposed for environmental resources that would be affected by the Project. These construction-period BMPs were also required by the FONSI for the WPB-M Corridor.

| Table 7.2-1 | Project BMPs and Mitigation Measures – Construction Period |
|---|---|
| **Environmental Resource** | **BMPs and Mitigation Measures** |
| Transportation | • Implement traffic management BMPs during construction activities |
| Air Quality | • Implement BMPs (such as soil watering to reduce fugitive dust emissions) to keep emissions to a minimum<br>• Keep construction equipment on site for duration of construction |
| Noise and Vibration | • Avoid nighttime construction in residential neighborhoods<br>• Locate stationary construction equipment as far as possible from noise sensitive sites<br>• Re-route construction-related truck traffic along roadways that will cause the least disturbance to residents<br>• Monitor and maintain equipment to meet noise limits<br>• Minimize the use of generators to power equipment<br>• Limit use of public address systems<br>• Limit or avoid certain noisy activities, such as aboveground jackhammering and impact pile driving, during nighttime hours<br>• Use augers (as opposed to pile drivers) where practicable<br>• Operate earthmoving equipment on the construction lot as far away from vibration-sensitive sites as practicable.<br>• Phase demolition, earthmoving, and ground-impacting operations so as not to occur in the same time period.<br>• Select low-impact demolition methods where possible.<br>• Avoid vibratory rollers and packers near sensitive areas. |
| Hazardous Materials and Solid Waste Disposal | • Use appropriate special waste handling techniques<br>• Implement dust control measures<br>• Use proper technique for management/disposal of contaminated soil/groundwater |
| Water | • Implement sediment control BMPs (turbidity curtains and silt fences) |
| Essential Fish Habitat | • Use silt fences and turbidity curtains<br>• Develop and implement an Erosion and Sedimentation Control Plan<br>• In-kind compensatory mitigation at a federally approved mitigation bank |
| Biological Resources and Natural Ecological Systems | • Revegetate cleared areas when required by standard BMPs and applicable laws.<br>• Reduce the potential for invasive species spread by using imported soil for fill material that has been certified free of invasive species seeds and rhizomes. |
| Threatened and Endangered Species and Other Protected Species | • Adhere to the Reasonable and Prudent Measures, Terms and Conditions, and Conservation Recommendations of the Biological Opinion issued by USFWS.<br>• Make siltation/turbidity barriers of material to not entrap/entangle species, and not impede species movement.<br>• Operate water vessels at no wake/idle speeds at all times and in water depths where the draft of the vessel provides less than a 4-foot clearance from the sediment. Vessels to follow routes of deep water.<br>• Instruct personnel in the potential presence of threatened and endangered species in the vicinity. Personnel to be advised of the civil and criminal penalties for harming species.<br>• Cease activities if a manatee comes within 50 feet of the construction area or barrier, including vessels being shutdown, until the animal has moved on its own volition beyond the 50-foot radius of the construction operation. |

**Table 7.2-1      Project BMPs and Mitigation Measures – Construction Period (Continued)**

| Environmental Resource | BMPs and Mitigation Measures |
|---|---|
| Threatened and Endangered Species and Other Protected Species (Continued) | • Post signs regarding species before and during in-water construction activities.<br>• Do not subject feeding sites to water management practices.<br>• Comply with the Bald Eagle Management Plan with respect to all construction activities.<br>• Obtain a Bald Eagle Disturbance Permit.<br>• Submit an eastern indigo snake monitoring report to the appropriate federal and local field offices.<br>• Conduct construction activities during daylight hours in areas that might be visible from any sea turtle nesting beaches.<br>• Complete construction from the water utilizing floating barges and turbidity barriers.<br>• Use bubble curtains during pile driving to reduce noise impacts to swimming sea turtles and smalltooth sawfish.<br>• Complete Florida Fish and Wildlife Conservation Commission-compliant gopher tortoise surveys by a qualified gopher tortoise agent prior to ground disturbing activities.<br>• Conduct pre-construction surveys for listed plant species in coordination with USFWS and relocate individuals if necessary.<br>• Implement eastern indigo snake protection measures<br>• Implement STANDARD MANATEE CONDITIONS FOR IN-WATER WORK – 2011<br>• Implement SEA TURTLE AND SMALLTOOTH SAWFISH CONSTRUCTION CONDITIONS March 2006 |
| Historic Properties | • Implement Archaeological Monitoring Plan for all project work in the area of six identified archaeological sites (Hobe Sound National Wildlife Refuge #3 Site (8MT1287); the Fort Capron Site (8SL41); Vero Man/Vero Locality Site (8IRI/8IR9); Fort Pierce (8SL31); Railroad (8IR846); and Avenue A-Downtown Fort Pierce (8SL1772) and in any other areas designated by SHPO<br>• Consult with SHPO for design for rehabilitation and construction of all bridges that are contr buting resources to the Florida East Coast Railroad Historic District to avoid adverse effect to the district<br>• Consult with SHPO in the design and construction of replacement and updated crossing gates at grade crossings within historic districts abutting the Florida East Coast Railroad Historic District or in proximity to historic properties<br>• Consult with SHPO to assess and avoid potential adverse effects of construction activities identified outside of the existing APE for direct effects on historic properties or archaeological sites listed or eligible for listing in the National Register of Historic Places<br>• Place communications towers in locations that have been determined to contain no above or below ground historic properties<br>• Implement alternative construction methods such as v bratory or sonic pile driving to reduce vibration impacts from pile driving at archaeological sites located within 135 feet of locations where pile driving occurs |
| Section 4(f) Parks and Recreation Properties | • AAF will develop a construction management plan to reduce and minimize the effects of grade crossing reconstruction in Jonathan Dickinson State Park on park uses. AAF, in association with FRA, will coordinate with the land management agency. |

Table 7.2-2 provides a summary of project-level mitigation measures proposed for unavoidable impacts as a result of the Project.

**Table 7.2-2     Project Mitigation Measures for Unavoidable Permanent Impacts**

| Environmental Resource | Mitigation Measure |
|---|---|
| Traffic and Grade Crossings | • Work with State and local traffic officials to adjust traffic signal timing as needed in Project Area<br>• Implement and fund initial grade crossing safety enhancements identified in the Diagnostic Team Report (see Section 5.4.4 2) |
| Noise and Vibration | • Install noise barriers along the E-W Corridor (see Section 7.2.4) where effective in reducing noise impacts near elevated structures (Narcoossee Road and I-95)<br>• Maintain train wheels and rails to minimize vibration<br>• Install pole-mounted horns at 117 grade crossings where severe noise impacts would occur in the absence of mitigation (Appendix 3.3.5-D) |
| Water | • Implement stormwater treatment BMPs (surface infiltration through swales, ditches, and over-land flow; installation of underground French drain systems; deep injection wells to drain water via gravity or pumping; and/or wet detention and retention ponds) |
| Navigation | • Manage train schedules to minimize bridge closures<br>• Provide marine industry with bridge closure schedules to facilitate planning by boaters<br>• Develop a set schedule for the down times of each bridge location. This schedule will include both freight and passenger rail service.<br>• Provide that schedule of bridge closures in an internet-accessible format to offer the public with access to that information, including the boating community and marinas. This will be posted on the AAF website and/or the US Coast Guard website.<br>• Implement a notification sign/signal at each bridge location with warning count downs to indicate the times at which the bridge will begin to close and open and how long before a train will arrive.<br>• Develop formal contact with first responders and emergency personnel.<br>• Develop coordination plans between AAF and local authorities during peak vessel travel times on holidays and major public events<br>• Install a bridge tender at the New River Bridge |
| Wetlands | • To compensate for impacts to waters of the United States (wetlands and surface waters) AAF proposes the purchase of in-kind mitigation bank credits from a federally approved mitigation bank whose service area covers the project.<br>• To compensate for impacts to wetlands under the jurisdiction of State of Florida AA proposes: |
| Biological Resources and Natural Ecological Systems | • Develop designs to provide wildlife passage under bridges and through culverts in critical areas (Econlockhatchee River and Little Creek).<br>• Install wildlife crossing within the Tosohatchee Wildlife Management Area |
| Threatened and Endangered Species and Other Protected Species | • Purchase two scrub-jay credits with a USFWS-approved scrub-jay mitigation bank in accordance with Florida Statute Title XXVIII, Chapter 373.4135, Mitigation banks and offsite regional mitigation |
| Essential Fish Habitat | • Obtain Section 404 permit and follow wetland mitigation conditions<br>• In-kind compensatory mitigation at a federally approved mitigation bank in accordance with Florida Statute Title XXVIII, Chapter 373.4135, Mitigation banks and offsite regional mitigation |
| Historic Properties | • Prepare HAER documentation for the Eau Gallie River Bridge and the St. Sebastian River Bridge<br>• Develop website focusing on and highlighting the contributions of Henry Morrison Flagler as well as the history of the Florida East Coast Railway and its passenger rail service along the corridor.<br>• Continue to consult with the SHPO regarding appropriate design elements for the replacement of NRHP eligible bridges and those bridges that are contributing elements to the FECR Historic District. |