# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INDIAN RIVER COUNTY, et al.,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00460 (CRC) |
| **PETER M. ROGOFF, et al.,** | |
| Defendants. | |

| | |
|---|---|
| **MARTIN COUNTY, FLORIDA, et al.,** | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-00632 (CRC) |
| **DEPARTMENT OF TRANSPORTATION, et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION

Two Florida counties have challenged a 2014 decision by the United States Department of Transportation ("DOT") to allocate up to $1.75 billion in non-taxable private activity bonds, or "PABs," to help finance a railroad project along the state's eastern coastline. DOT, the counties allege, failed to comply with the requirements of the National Environmental Policy Act ("NEPA") and other environmental statutes before allocating the PABs. After this Court held that the counties had standing and had stated claims under these statutes, the project's sponsor—AAF Holdings, Inc. ("AAF")—applied for a new allocation of PABs to finance a portion of the project that does not affect the counties, and requested that DOT withdraw the previously challenged allocation. DOT did so. Defendants now move to dismiss these cases as moot. For the reasons that follow, the Court will grant the motions.

## I. Background

The history of this railroad project and the litigation it sparked are discussed extensively in prior opinions by the Court. See Indian River Cty. v. Rogoff, 201 F. Supp. 3d 1, 4 (D.D.C. 2016) (granting in part and denying in part Defendants' initial motions to dismiss); Indian River Cty. v. Rogoff, 110 F. Supp. 3d 59, 63–66 (D.D.C. 2015) (denying the counties' motions for a preliminary injunction). What follows is a brief overview of the most relevant facts that bear on Defendants' present motions to dismiss.

AAF seeks to construct and operate an express railway between Miami and Orlando. The project is divided into two phases. In Phase I, which received private funding and is nearing completion, AAF intends to provide rail service between Miami and West Palm Beach. The Federal Railroad Administration ("FRA"), an arm of DOT, led a study of the potential environmental harms of Phase I, which resulted in a Finding of No Significant Impact. In Phase II, AAF aims to extend the rail line north from West Palm Beach to Cocoa, and then inland to Orlando. Phase II of the project runs through Indian River and Martin Counties, which are located along the east coast of Florida just north of Palm Beach County.

To fund Phase II, AAF applied for a $1.6 billion loan through the Railroad Rehabilitation and Improvement Financing program ("RRIF"). RRIF is administered by the FRA, and the loans it provides are expressly subject to NEPA requirements. See 49 C.F.R. § 260.5. Under NEPA, a federal agency is required to prepare an Environmental Impact Statement ("EIS") and a Record of Decision before taking "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). FRA issued a final EIS in August 2015 but has not issued a Record of Decision or a decision on AAF's loan application.

While its application for a RRIF loan was pending, AAF also requested that DOT exempt from federal taxes $1.75 billion in PABs to finance the remainder of the project, spread over both phases. PABs are bonds issued by state or local government agencies to finance projects of public utility. By statute, DOT may designate up to $15 billion in PABs as tax-exempt nationwide in order to encourage private development of transportation projects. See 42 U.S.C. § 142(m). DOT provisionally authorized the requested $1.75 billion PAB allocation in December 2014. Indian River Cty., 201 F. Supp. 3d at 6 (citing Reininger Decl. Ex. F, Letter from Peter M. Rogoff, Under Secretary of Transportation, to AAF President Michael Reininger).

Indian River County and Martin County filed separate suits against DOT, alleging it improperly authorized the PAB allocation prior to the completion of FRA's then-ongoing NEPA review for Phase II. See Amend. Compl., Indian River Cty. v. Rogoff, 15-cv-460 (D.D.C. May 4, 2015); Compl., Martin Cty. v. Dep't of Transp., 15-cv-632 (D.D.C. Apr. 27, 2015). The counties also allege that DOT violated Section 106 of the National Historic Preservation Act ("NHPA") and Section 4(f) of the Department of Transportation Act ("DOTA"), both of which set forth additional requirements for projects that are subject to federal control or approval. See Compl., Indian River Cty., 15-cv-460, ¶ 6. The counties seek declaratory relief finding the 2014 allocation to be unlawful, as well as injunctive relief vacating the 2014 allocation and blocking DOT from issuing any additional PABs to fund Phase II without first complying with the relevant environmental statutes. Id. at 44–45. While the cases have not been joined, the parties noticed them as related and they have proceeded on parallel tracks. AAF subsequently intervened as a defendant in both cases. The Court denied Plaintiffs' motions for a preliminary injunction in May 2015.

3

In August 2016, the Court denied Defendants' motions to dismiss Plaintiffs' NEPA, NHPA, and DOTA claims. In doing so, it held that DOT's PAB allocation for the AAF project qualified as major federal action, thus triggering the requirements of NEPA, NHPA, and DOTA. See Indian River Cty., 201 F. Supp. 3d at 20. Several months later, the counties moved for summary judgment. The Court stayed summary judgment briefing, however, after Defendants informed the Court that AAF had asked DOT to withdraw the 2014 PAB allocation and replace it with a new, smaller allocation that would only be used to fund Phase I. See DOT's Mem. Supp. Mot. to Dismiss ("DOT's MTD"). On November 22, 2016, DOT withdrew the 2014 allocation and granted AAF a new PAB allocation of $600 million. A week later, Defendants moved to dismiss, arguing that both cases are now moot.

## II.  Legal Standard

### A.  Motions to Dismiss under Rule 12(b)(1)

A party may move under Federal Rule of Civil Procedure 12(b)(1) to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Like a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." Jeong Seon Han v. Lynch, 2016 WL 7209628, *4 (D.D.C. Dec. 12, 2016) (internal quotation marks omitted). But because the Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," Grand Lodge of Fraternal Order of Policy v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001), the "[p]laintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion," Delta Air Lines, Inc. v. Export-Import Bank of United States, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (quoting 5A Charles A. Wright &

4

Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)). Moreover, "unlike with a motion to dismiss under Rule 12(b)(6), the Court 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" Delta Air Lines, 85 F. Supp. 3d at 259 (quoting Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253–1254 (D.C. Cir. 2005)).

B. Mootness

A motion to dismiss for mootness is properly brought under Rule 12(b)(1) because mootness itself deprives the court of jurisdiction. See DL v. District of Columbia, 187 F. Supp. 3d 1, 5 (D.D.C. 2016) (internal citations omitted). Federal courts lack jurisdiction to decide moot cases "because their constitutional authority extends only to actual cases or controversies." Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983)); see also Worth v. Jackson, 451 F.3d 854, 855 (D.C. Cir. 2006) ("Three inter-related judicial doctrines—standing, mootness, and ripeness—ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies'") (citing U.S. Const. art. III, § 2).

A case becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Larsen v. U.S. Navy, 525 F.3d 1, 3–4 (D.C. Cir. 2008) (quoting Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). A party may lack a legally cognizable interest in the outcome "when, among other things, the court can provide no effective remedy because a party has already obtained all the relief it has sought," Jewell, 733 F.3d at 1204 (internal quotation marks omitted), or "when intervening events make it impossible to grant the prevailing party effective relief." Lemon v. Green, 514 F.3d 1312, 1315 (D.C. Cir. 2008); see also Spencer v. Kenma, 523 U.S. 1, 18 (1998) (noting that a case is moot when "there

is nothing for [the court] to remedy, even if [it] were disposed to do so"); Columbian Rope Co. v. West, 142 F.3d 1313, 1316 (D.C. Cir. 1998) (holding that a case is moot "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more than-speculative chance of affecting them in the future") (internal quotation marks omitted).

A defendant cannot, however, "automatically moot a case simply by ending its unlawful conduct once sued." Already, LLC v. Nike, Inc., 133 S. Ct. 721, 727 (2013) (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). Otherwise, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves his unlawful ends." Id.; see also Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 683 (2016) (Alito, J., dissenting) ("Our 'voluntary cessation' cases . . . hold that, when a plaintiff seeks to enjoin a defendant's conduct, a defendant's 'voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'") (quoting Knox v. SEIU, 132 S. Ct. 2277, 2287 (2012)). Thus, under the voluntary cessation standard, the case is moot only if (1) "there is no reasonable expectation that the [alleged] violation will recur" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Larsen v. U.S. Navy, 525 F.3d 1, 4 (D.C. Cir. 2008) (citing Los Angeles Cty. v. Davis, 440 U.S. 625, 631 (1979)).

**III.  Discussion**

Courts must apply the voluntary cessation standard "where the 'intervening event arguably ending any live controversy between [the parties]' is the government's own decision to end the challenged conduct.'" Cierco v. Lew, 190 F. Supp. 3d 16, 23 (D.D.C. 2016) (quoting Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997)). Here,

Defendants contend that DOT's withdrawal of the 2014 PAB allocation has mooted these suits. The Court will thus consider each prong of the voluntary cessation standard.

A. No Reasonable Expectation of Recurrence

The counties argue that the allegedly wrongful behavior will recur because the withdrawal of the 2014 PAB allocation is nothing more than "a scheme to navigate around this Court's ruling [that Plaintiffs stated a claim under NEPA] by providing the same [$1.75 billion] financing allocation in a two-step process." Pls.' Mem. Opp'n Defs.' Mots. to Dismiss ("Pls.' Opp'n") 5. In Plaintiffs' view, "DOT approve[d] the [new] allocation of $600,000,000 . . . to finance Phase I . . . with the understanding that AAF would follow up with a second application for the $1,150,000,000 balance." Id. Plaintiffs cite to a September 30, 2016 letter from AAF to DOT discussing the PAB withdrawal request:

> Enclosed herewith is a new application which seeks the issuance of an allocation of up to $600 million in PABs authority for Phase I. This application is a substitute for, and will effectively supplant, the Application originally filed in August of 2014. Within the next several weeks, we will separately discuss a new request for an allocation of up to $1.15 billion in PABs authority for Phase II (West Palm Beach to Orlando).

Letter from AAF President Michael Reininger to DOT (ECF No. 97-1) 4.

To be sure, the above-quoted passage indicates that AAF may well apply for a new allocation of PABs to fund Phase II. But the task for the Court in considering the Defendants' motions is to determine the likely recurrence of the alleged *unlawful behavior* that prompted the lawsuit. That behavior is not AAF's decision to apply for PABs to fund Phase II. Rather, it is DOT's decision to grant any future application without complying with NEPA and the other relevant environmental statutes. And as explained in detail in the Court's opinion denying the Defendants' motions to dismiss, whether a particular PAB allocation constitutes "major Federal action" requiring compliance with NEPA depends on a host of factors relating to the amount and

nature of the federal assistance provided and the degree of control that federal agencies exercise over the project. See Indian River Cty., 201 F. Supp. 3d at 14–21 (D.D.C. 2016). Each case will be different. Accordingly, even if the counties are correct in assuming that DOT will issue a new PAB allocation for Phase II without conducting a NEPA review, such an allocation would not necessarily be unlawful. Its lawfulness would depend on how large the allocation was, what economic assumptions were applied to assess its impact, and what federal strings were attached.

Nor is it at all clear that DOT *would* authorize a new allocation for Phase II without complying with NEPA. Plaintiffs argue that, absent an injunction, DOT will continue its "longstanding practice and policy of ignoring the Environmental Laws in its administration of the PABs program," citing statements made by the government in its earlier pleadings in this litigation. See, e.g., Pls.' Opp'n 4 (citing DOT's Opp'n to Pls.' Mot. Preliminary Injunction 4 ("DOT has never treated its allocations as federal actions implicating NEPA, the NHPA, or [DOTA]."); DOT's Mem. Supp. Mot. to Dismiss 27 ("NEPA does *not* apply in the context of a PAB allocation.").[1] Yet these statements offer little support to Plaintiffs' position because most were made *prior to* this Court's ruling that they had stated a claim under the relevant statutes. See Indian River Cty., 201 F. Supp. 3d at 4.[2] The Government also appears to have walked back these positions. See DOT's Reply MTD 9 (noting that the Court's motion to dismiss ruling would affect any future decision to allocate PAB's for Phase II). For these reasons, the Court's

---

[1] These pleadings stem from the counties' motions for a preliminary injunction and Defendants' motions to dismiss for failure to state a claim. See Indian River Cty., 15-cv-460, ECF Nos. 15, 53.

[2] Admittedly, DOT stated in its Answer, which was filed after the Court's motion-to-dismiss ruling, that "Federal Defendants deny that NEPA, the NHPA, or [DOTA] imposed any requirements on DOT with respect to the PAB Allocation and deny any violation of the law." DOT's Answer ¶ 8. The Court construes this statement more as a reservation of legal rights than as an indication of DOT's future intent to disregard this Court's ruling.

earlier ruling casts considerable doubt on whether DOT would adhere to any previous suggestions that PAB allocations are categorically excluded from NEPA's coverage. And even if DOT were to do so, Plaintiffs could readily call it to the carpet by renewing their lawsuits in this Court.

The Court's conclusion that the challenged behavior is not reasonably likely to recur is only bolstered by the recent change in presidential administrations. The decision to allocate tax exemptions for $1.75 billion in PABs (a significant portion of the $15 billion in non-taxable PABs that DOT is permitted, by law, to authorize nationwide, see 42 U.S.C. § 142(m)) was made by the previous administration, as was the decision to issue a new allocation of $600 million in late 2016. These actions were consistent with the former administration's express support for federal subsidies for high-speed rail projects.[3] Any decision on a future application by AAF will be made by entirely different officials in the new administration. While the new administration has not publicly opined on the AAF project (as far as the Court is aware) its early actions with respect to publicly-funded rail transportation in general suggest that it might take a different track.[4] Thus, while AAF may well apply for another allocation of PABs to fund Phase II,

---

[3] See, e.g., Obama White House Archives, President Obama Delivers on American High-Speed Rail (Jan. 28, 2010), *available at* https://obamawhitehouse.archives.gov/blog/2010/01/28/president-obama-delivers-american-high-speed-rail (highlighting $8 billion in federal grants that "make rail a viable transportation alternative in many regions" and constitute "an absolute game-changer for American transportation"); Obama White House Archives, High-Speed Intercity Passenger Rail Program for Tampa-Orlando-Miami, *available at* https://obamawhitehouse.archives.gov/sites/default/ files/rail_florida.pdf (noting that "[g]rants from the [2009] American Recovery and Reinvestment Act (ARRA) will go toward the creation of a new high-speed rail corridor that connects Tampa Bay, Orlando, Miami and other communities in central and south Florida").

[4] See, e.g., White House Office of Management and Budget, America First: A Budget Blueprint to Make America Great Again 35–36 (2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/ budget/fy2018/2018_blueprint.pdf (noting that the new administration's budget reduces funding for DOT overall by 13 percent, "reduces Federal subsidies to Amtrak," "[l]imits funding for the Federal Transit Administration's Capital

predictions concerning the reception that such an application would receive at DOT would be speculative at best.

The Court finds, accordingly, that there is no reasonable expectation that the allegedly unlawful behavior in this case will recur.

B. Effects of Violation Eradicated by Intervening Events

The Court now turns to the second prong of the voluntary cessation analysis: whether "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Larsen, 525 F.3d at 4 (quoting Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). "The determination whether sufficient effects [of the alleged violation] remain . . . will turn on the availability of meaningful relief." Cierco, 190 F. Supp. 3d at 24 (alteration in original) (quoting 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Fed Prac. & Proc., § 3533.3.1, at 104–05 (3d ed. 2008)).

The Counties' suits challenge a particular agency action: DOT's 2014 decision to allocate $1.75 billion in tax-exempt PAB authority to AAF prior to the FRA's completion of its ongoing NEPA review of Phase II of the project. The relief they seek in turn focuses on invalidating the challenged allocation. See Amend. Compl. 44–45, Indian River Cty. v. Rogoff, 15-cv-460 (D.D.C. May 4, 2015) (seeking a declaration that DOT violated NEPA by approving AAF's PAB application and an injunction against the issuance of any PABs prior to completion of the required environmental reviews); Compl. 34, Martin Cty. v. Dep't of Transp., 15-cv-632 (D.D.C. Apr. 27. 2015) (same). But now that DOT has rescinded the allocation, ordering the requested relief would no longer be meaningful and, as a result, would amount to an

---

Investment Program," and notes that "[f]uture investments in new transit projects would be funded by the localities that use and benefit from these localized projects").

10

inappropriate advisory opinion. Judge Boasberg's ruling in West v. Horner—a challenge to the Federal Highway Administration's approval of a state-funded Interstate highway construction project in Virginia without full NEPA review—provides a useful analog. 810 F. Supp. 2d 228 (D.D.C. 2011). About a year after the plaintiff in that case filed suit, Virginia abandoned the challenged project and announced it was planning a new project that it insisted would comply with NEPA. Id. at 230–31. The court found that interim events had eliminated the effect of any NEPA violation because the "sole subject" of the Complaint had been abandoned, and that "any injunction or order declaring [the abandoned project] illegal would accomplishing nothing— amounting to exactly the type of advisory opinion that Article III prohibits." Id. at 234–35 (quoting Larsen, 525 F.3d at 1, 4). The same is true here.

The Counties seek to avoid a mootness determination by reiterating their characterization of the challenged conduct as "DOT's *policy* of violating the Environmental Laws in approving PABs for transportation policies," Pls.' Opp'n 17 (emphasis added), and arguing that DOT will be free to continue that purported policy absent the requested relief. But the Complaint, fairly read, does not challenge a general policy; it contests a specific PAB allocation. As explained above, whether any new PAB allocation might require compliance with NEPA would depend on an individualized assessment of the actual allocation. No overarching policy controls whether PAB allocations are subject to prior NEPA review. And, again, to the extent that positions taken in the government's briefs may have revealed a misunderstanding on the part of the DOT on this point, those litigating stances were taken prior the Court's motion-to-dismiss ruling. Because there is no longer any meaningful relief that the Court can provide Plaintiffs, the Court finds that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Larsen, 525 F.3d at 4.

## IV.  Conclusion

For the foregoing reasons, the Court finds that these suits are moot and will dismiss both actions.  A separate order accompanies this Memorandum Opinion.

_Christopher R. Cooper_

CHRISTOPHER R. COOPER
United States District Judge

Date:   May 10, 2017